**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

     Plaintiff,                              Case No.:      1:19-cv-01868-RJL

v.

OMAROSA MANIGAULT NEWMAN,        **MOTION TO DISMISS**
                                            **PLAINTIFF'S CORRECTED**
                                            **COMPLAINT**

     Defendant,

_____/

## MOTION TO DISMISS PLAINTIFF'S CORRECTED COMPLAINT FOR FAILURE TO STATE A CAUSE OF ACTION UPON WHICH RELIEF CAN BE GRANTED

Comes now the Defendant, Omarosa Manigault Newman, by and through her undersigned counsel pursuant to Fed. R. Civ. P. 12(b)(6) and files her Motion to Dismiss Plaintiff's Corrected Complaint for Failure to State a Cause of Action Upon Which Relief can be Granted, and in support alleges as follows.

### INTRODUCTION

The United States of America has sued Ms. Manigault Newman for allegedly violating the Ethics in Government Act by "knowingly and wilfully failing to file her termination financial disclosure report within the time required by the EIGA." [DE 2-1: P.2, ¶1].  The United States of America seeks a civil penalty "up to $50,000" for Ms. Manigault Newman's alleged violations. [DE 2-1:P. 6]

The facts alleged within Plaintiff's Corrected Complaint fail to establish that Ms. Manigault Newman knowingly and wilfully failed to file her financial report.  As discussed

herein, Plaintiff's Corrected Complaint fails to state a cause of action upon which relief can be granted and is due to be dismissed.  *See* Fed. R. Civ. Pr. 12(b)(6).

### FAILURE TO STATE A CAUSE OF ACTION UPON WHICH RELIEF CAN BE GRANTED

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]' 'that the pleader is entitled to relief.' " *Id.* at 679, 129 S.Ct. 1937, *quoting* Fed. R. Civ. P. 8(a)(2). A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," id. at 678, 129 S.Ct. 1937, quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955, and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *Id.*

### STATEMENT OF RELEVANT FACTS

1. Ms. Manigault Newman worked as the Director of Communications in the Office of Public Liaison in the White House from January 20, 2017 through January 20, 2018.

2. On December 13, 2017, while at work in the West Wing of the White House, Ms. Manigault Newman was escorted into the Situation Room to discuss human resource issues

related to her employment with the Trump Administration.[1] Former White House Chief of Staff, Gen. John Kelly, White House ethics attorney Stefan Passantino, Esq., White House ethics attorney Uttam Dhillon, Esq.,  Human Resource Manager Irene Porada and Ms. Manigault Newman were present.

3.   General John Kelly terminated Ms. Manigault Newman while in the Situation Room. During the termination, General Kelly threatened, **"I'd like to see this be a friendly departure…and you can go on without any type of difficulty in the future relative to your reputation."**  [*See* attached Exh. "A"[2]] Shortly thereafter, General Kelly exited the Situation Room.

4.   Following General Kelly's departure, a conversation regarding Ms. Manigault Newman's termination date was discussed between Mr. Passantino, Mr. Dhillon, and Ms. Manigault Newman.  During this conversation, Ms. Manigault Newman asked White House ethics counsel, Mr. Dhillon, "How do I make it to the one year mark? Which is 1/20…that's important to me…to make it to the one year mark."  *Id.*

5.   Mr. Dhillon responded to Ms. Manigault Newman's inquiry by stating, "**I will see if that possible** and then I'll bring Irene in to begin the paperwork process … So let's do this, **I'll ask about keeping you [until] the twentieth**." *Id.* Mr. Dhillon then left the Situation Room and Irene Porada entered.

6.     Approximately ten minutes later, Mr. Dhillon returned to the situation room and announced, "**Yes, to the twentieth of January**." *Id.* "**We're taking you until the twentieth now.**" *Id.*

---

[1]Historically, The Situation Room at the White House is utilized during times of American crisis.  For example, the Situation Room was utilized during operation Neptune Spear, a mission against Osama Bin Laden.
[2] Exhibit "A" is an electronically stored audio recording that will be forwarded to this court under separate cover pursuant to Local Rule 5.4(e).

7.  Irene Porada then stated, "**O.K., so we'll take [her] through the twentieth**?"  To wit Mr. Dhillon responded, "**Yes, Ma'am.**" *Id.*

8.      The meeting in the Situation Room was the last time Ms. Manigault Newman has been on the White House grounds.  In addition, Ms. Manigault Newman has not communicated with General John Kelly since December 13, 2017.  The EIGA and/or the need to file a financial disclosure form was not discussed with Ms. Manigault Newman during this Situation Room meeting.

9. The following day, White House Press Secretary Sarah Huckabee Sanders released the following statement, "Omarosa Manigault Newman resigned yesterday to pursue other opportunities. **Her departure will not be effective until Jan. 20, 2018.** We wish her the best in future endeavors and are grateful for her service."

10.      Shortly thereafter an electronic financial disclosure form was sent to Ms. Manigault Newman.  The first page of the financial disclosure form listed her termination date as December 13, 2017.  Due to the electronic nature of the financial disclosure form, Ms. Manigault Newman was unable to correct the termination date, to January 20, 2018.  The inaccurate information contained on the first page of the electronic financial disclsoure form prohibited Ms. Manigault Newman from completing the form.[3]   Ms. Manigault Newman advised the White House ethics counsel of the termination date discrepency multiple times.

11.      The Plaintiff's Corrected Complaint alleges that "on or before December 19, 2017, Ms. Manigault Newman received a post-government employment briefing…" [DE 2-1: P. 3, ¶ 13].  The Complaint does not allege who attended this briefing, where this briefing occurred or even when this "briefing" occurred.  The only "briefing" Ms. Manigault Newman received

---

[3] 5 U.S.C. app. 4 §104(a)(2)(A)(i): "It shall be <u>unlawful for any person to knowingly and willfully falsify any information</u> that such person is required to report under Section 102. (*Emphasis added*)

regarding her termination was conducted in the Situation Room which occurred on December 13, 2017. The recording, attached hereto as exhibit "A", shows that the EIGA and Ms. Manigault Newman's need to file a financial disclosure report was <u>not</u> discussed within the situation room briefing. Other than the one meeting in the Situation Room, Ms. Manigault Newman has not received any other "briefing" regarding the EIGA or her need to file a financial disclosure report.

12. The Plaintiff's Corrected Complaint further alleges that emails were <u>sent</u> to Ms. Manigault Newman on December 29, 2017, January 3, 2018, January 12, 2018, January 19, 2018, February 6, 2018, "reminding her of her obligation to complete the financial termination report." [DE 2-1: P.4]. The Corrected Complaint does not allege that these emails were ever <u>received</u>. Despite receiving <u>no response, reply or acknowledgement of receipt</u> from Ms. Manigault Newman, all five (5) emails were sent to the same unmonitored email address. *Id.*

13. As further alleged in the Corrected Complaint, on March 26, 2018, Mr. Passantino emailed Ms. Manigault Newman, at an <u>updated</u> email address, regarding her termination financial disclosure report and "Shortly thereafter Ms. Manigault Newman called Stefan Passantino, Esq." [DE 201: P. 5, ¶22]

14. Conspicuously omitted from Plaintiff's Corrected Complaint was the substance of the telephone call between Ms. Manigault Newman and White House ethics attorney, Stefan Passantino, Esq. This telephone call was recorded and a copy of said recorded telephone call will be forwarded under separate cover as Exhibit "B"[4]. The following discussion took place during this telephone conference:

> **SP:** I don't know if you've been getting the emails that we have been sending about this terminating report, this financial disclosure form?

---

[4] Exhibit "B" is an electronically stored audio recording that will be forwarded to this Honorable Court pursuant to Local Rule 5.4(e).

**OMN:** Yeah, there's an error on the report about my termination day.  So, my last day is the 20th and it's indicated the 13th … you were in the [situation] room when we all agreed to the 20th, so once that's corrected, I can complete the report and everything will be done.  But, with that discrepancy, I don't feel comfortable completing that report.

**SP:** OK, well so, I will get with the Chief…

**OMN:** I've never had a conversation with him about the, a change of a date or anything. So, I don't know where that would have happened.  But that's the hold up.  Without that change I can't complete [the financial disclosure form]… Let me be clear, as soon as that date is corrected then I can complete it.   Without that, I don't feel comfortable completing a report with the wrong date on it.

**SP:** OK.  And so, when I talk to the Chief and the Chief is like "No, we changed it from the 20th to the 13th, it is the 13th."  If I hear that, I guess I'll just tell you.

**OMN:** I don't think you'll hear that because you were in the room when the 20th was decided.  And two other attorneys were in the room when that date was decided.  I don't know where the discrepancy would have come from…

**SP:** Yeah.  Right.  No, no, no, no, no.  I hear you and I was there for the conversation of the 20th.  There would be only, if subsequently, subsequent to that conversation [the date] changed.  But again, that's not my issue, I'm not going to get in the middle of that…

**OMN:** I want to be crystal clear, that's the only hold up, is the discrepancy of the date. After that, I can complete everything.

**SP:** Okay.  And so, also…we've got some personal stuff of yours… Okay.  Well, I will, I will just let them know that.  I will find out what, as far as the Chief was concerned, what the final date was, and let you know…

**OMN:** So, are they holding up my items in exchange for that report? Is that what I'm hearing? Is that why my items…

**SP:** No, well.  No.  It's not as nefarious as that.  It's just process that we have to do… I mean, at the end of the day, I've got two boxes of personal stuff**.**  And, I've got your commission certificate.  And, I want to, I just want to get this all wrapped up, so we can just trade whatever you have.  Sounds like you don't have anything else.

**OMN:** I don't.

**SP:** Okay, yeah so, if we could just get this all done then we can figure out a time to get to you or somebody your stuff and your certificate.

**OMN:** Yeah, I would like to get my personal items back…

**SP:** Yeah, no, I've got 2 boxes of personal stuff and your certificate.  So, we're all aligned to try to get this done.  Let me find out about what is the story on the dates and like I said, I'm just going to convey what I hear...

**OMN:** So, as soon as that date is changed I can complete the report and everything can kind of go from there.

**SP:** Right.  And like I said, all I can promise is, I was there when we set the 20th.  The only thing I can't guarantee is that subsequent to that, when we were together in the Sit[uation] Room, is something changed.  But, I will report back whatever I hear.  So, we will go from there.  I'm going to type up an email right now, based on this conversation.

15.     Shortly following this telephone conference, Ms. Manigault Newman emailed Mr. Passantino requesting information on where to "file a formal complaint about the fees and discrepancy in the report…" Ms. Manigault Newman further asked Mr. Passantino whether to direct her inquiry to the Ethics Office or the Department of Justice.  A copy of said email is attached hereto as Exhibit "C".

16.     Stefan Passantino did not respond to Ms. Manigault Newman's email and he never "reported back" to Omarosa regarding the discrepency with the date on the financial disclosure form.  As of the time of this filing, the termination date discrepancy still has not been corrected on the electronic financial disclosure form.  The last correspondence between Ms. Manigault Newman and Mr. Passantino regarding the financial disclosure form and the termination date discrepancy was the telephone call of March 26, 2018.

17.     Thirteen (13) months later, Ms. Manigault Newman received an email from the Department of Justice dated April 23, 2019.

18. On May 6, 2019 Ms. Manigault Newman responded to the Department of Justice by emailing the following response:

Thank you for your letter about the referral from the executive office of President Donald Trump.  I was always eager to get this termination report completed within the 30 days after my January 20th, 2018 seperation from the administration.

However, as I had communicated with my ethics contact, Stefan Passantino, at the White House, **I am still lacking some key information to complete the report**. Specifically, in several calls and emails to Stefan, we discussed the need for the contents of seven boxes from my office that were seized by Uttam Dhillon, Irene H. Porada and Mr. Passantino, upon my departure. **Much of the information that I need to complete this termination report – financial records, travel documents, emails and other important correspondence related to my employment on the Trump campaign, transition, inauguration and my tenure in the White House – is contained in those boxes. These boxes are still in the possession of the White House. I am still hopeful that the White House will return my boxes and give me access to the data necessary to complete the report.** Please advise. [*See* attached Exhibit "D"]

19.     On May 9, 2019, Ashley Cheung, Esq., with the United States Department of Justice, emailed Ms. Manigault Newman and informed her that the DOJ would "look into the situation and get back with you." A copy of said email is attached hereto as Exhibit "E".

20.   The following day, Ms. Cheung informed Ms. Manigault Newman that "The White House Counsel's Office has located documents that it intends to return to you. **Please let us know whether you would like to pick up the documents in person or have them mailed to you**…" A copy of said email is attached hereto as Exhibit "F".

21.     On May 15, 2019, John Phillips, one of Ms. Manigault Newman's counsels, requested that Ms. Cheung, "Please provide some description of the quantity of materials and proximate availability."  Counsel also inquired why the Department of Justice and the White House Counsel's Office were jointly using the word "us" and who actually possessed the boxes at all material times.  A copy of said email is attached hereto as Exhibit "G".

22.     Rather than providing a substantive response to Mr. Phillips request, Ms. Cheung emailed Mr. Phillips the contact information for the White House.  By email, Ms. Cheung expressed that, "We regard the return of your client's personal effects as unrelated to our claim under the Ethics in Government Act." A copy of said email has been attached hereto as Exhibit

"H".  The Department of Justice has never claimed to have inspected the contents of the Ms. Manigault Newman's boxes.  Ms. Cheung's email contained no explanation as to why the DOJ summarily regards the contents of Ms. Manigault Newman's personal effects as unrelated to the EIGA claim.

23.     On July 12, 2019 Ms. Manigault Newman and her counsel, retrieved two boxes and one commission certificate which were brought to the exterior gate of the White House.  *See* attached Exhibit "I".  The boxes retrieved from the White House contained Ms. Manigault Newman's financial records, bank statements, travel documents, tax returns, W-2's, emails and other important data required to fill out the requisite financial disclosure form. *See* attached Exhibit "J".

24.     It is worth noting that the subject Corrected Complaint indicates, "the Executive Office of the President referred this matter to the Department of Justice." [DE 2-1, P. 5, ¶ 24].

25.     The President of the United States, the referring entity in this case, has called Ms. Manigault Newman "wacky" [*see* tweet from @realdonaldtrump, August 13, 2017], said she "had zero credibility with the media," [*see* tweet from @realdonaldtrump August 13, 2017], called her a "lowlife" [*see* tweet from @realdonaldtrump August 13, 2017], insinuated she was illegitimate [*see* tweet from @realdonaldtrump August 13, 2017], said "people in the White House hated her," [*see* tweet from @realdonaldtrump August 13, 2017], said she was "vicious, but not smart," [*see* tweet from @realdonaldtrump August 13, 2017], indicated he'd "rarely see her," [*see* tweet from @realdonaldtrump August 13, 2017], that she "begged me for a job, tears in her eyes," [*see* tweet from @realdonaldtrump August 13, 2017], called her "wacky and deranged," [*see* tweet from @realdonaldtrump August 13, 2017], called her a liar for saying there was a tape of him saying the "N-word," as he has never had that word in his vocabulary,"

[*see* tweet from @realdonaldtrump August 13, 2017], and made other false statements about Ms. Manigault Newman.

26.     On August 31, 2019, President Donald J. Trump admitted to using lawsuits against people for allegedly violating confidentiality agreements.  He said, "Yes, I am currently suing various people for violating their confidentiality agreements.  Disgusting and foul-mouthed Omarosa is one.  I gave her every break, despite the fact that she was despised by everyone, and she went for some cheap money from a book."  [*see* tweet from @realdonaldtrump, August 31, 2019].

27.     This is the only lawsuit which exists between Mr. Trump, his agents or the United States Government and Ms. Manigault Newman.

28.     Employer/employee revenge is not a proper use of taxpayer money or court resources.

29.     On July 25, 2019, the Department of Justice, upon referral from the Executive Office of the President, filed the instant lawsuit seeking $50,000.00 in damages against Ms. Manigault Newman for allegedly violating a provision within the Ethics in Government Act.

30.     Ms. Manigault Newman's termination report has since been filed.

## ETHICS IN GOVERNMENT ACT

The Ethics in Government Act (hereinafter "EIGA") establishes financial reporting requirements for key personnel in each of the three branches of the federal government. *United States v. Rose*, 28 F.3d 181, 183 (D.C.Cir.1994) (citing to the EIGA prior to its consolidation at 5 U.S.C. app. 4 § 101 et seq.).

Under section 101 of the EIGA, all executive-branch employees at pay grade GS 15 or above must file a highly detailed financial statement within 30 days of the termination of their

federal employment. 5 U.S.C. app. 4 § 101(e), (f); see also *Washington Post Co. v. Dep't of Health & Human Servs.*, 690 F.2d 252, 265 (D.C.Cir.1982).

Under the EIGA, if an employee fails to file their financial statement within thirty (30) days and if the head of the agency overseeing that employee has <u>reasonable cause</u> to believe that said employee has <u>willfully</u> failed to file a report, then the head of the agency overseeing the employee shall refer to the Attorney General the name of any individual.  [5 U.S.C. app. 4 § 104(b)].

Section 104(a) of the EIGA authorizes the Attorney General to bring a civil action in federal district court against any individual "who <u>knowingly and willfully</u> fails to file or report any information that such individual is required to report" under the EIGA. [5 U.S.C. app. 4 § 104(a)] An individual knowingly and willfully fails to comply with the EIGA's filing requirements when that individual "<u>intentionally disregards the statute or is indifferent to its requirements.</u>" *United States v. Tarver*, 642 F.Supp. 1109, 1111 (D.Wyo.1986); see also *United States v. Bank of New England, N.A.*, 821 F.2d 844, 856 (1st Cir.1987) (defining "willfulness" for purposes of federal regulatory statutes as a disregard for the governing statute and an indifference to its requirements).

## ARGUMENT

Under the EIGA, the United States of America must allege facts that establish Ms. Manigault Newman <u>knowingly and willfully</u> failed to file her financial disclosure form and was otherwise <u>indifferent to the EIGA's requirements</u>.  [5 U.S.C. app. 4 § 104(a)].  Plaintiff's Corrected Complaint fails to do so.  As discussed herein, Plaintiff's Corrected Complaint makes factual allegations, which "even accepted as true, fail to state a claim that is plausible on its face." *Ashcraft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.E.d.2d 868 (2009).

Plaintiff's Complaint alleges that "on or before December 19, 2017, Ms. Manigault Newman received a post-government employment briefing in which she was advised of her obligation under the EIGA to file a termination financial disclosure report by January 18, 2018." (CITE Paragraph 13). The unsubstantiated accusation is materially false. Plaintiff's Complaint fails to provide the date this alleged "post-government employee briefing" took place, fails to disclose who was present during this briefing, fails to disclose the location of this briefing and fails to disclose the substance of this briefing. Furthermore, the Plaintiff has failed to show how this "post-government employee briefing" establishes that Ms. Manigault Newman "knowingly and willfully" failed to file her financial disclosure form. Again, the last time Ms. Manigault Newman has been on the White House grounds was December 13, 2017, the same date as the meeting in the Situation Room. As shown on the recording, the EIGA and/or need to file a financial disclosure form was not discussed during the Situation Room meeting.

Assuming for the purposes of this argument that a "post-government employment briefing" did take place on or about December 19, 2017 (which it did not), this fact alone fails to establish that Ms. Manigault Newman "knowingly and willfully" failed to file her financial disclosure form pursuant to the EIGA.

Plaintiff's Complaint next cites to a series of emails that were sent to Ms. Manigault Newman's unmonitored email address on December 29, 2017, January 3, 2018, January 12, 2018, January 19, 2018 and February 6, 2018. [DE 2-1: P. 4] The Plaintiff alleges that these emails, sent to Ms. Manigault Newman, establishes that she "knowingly and willfully" failed to file her financial disclosure report as required by the EIGA. They simply do not.

As an initial matter, all of these emails were sent to the same unmonitored email address. As alleged in the Corrected Complaint, Ms. Manigault Newman did not respond, reply or

acknowledge receipt of any of the emails.  The Corrected Complaint does not allege that Ms. Manigault Newman ever <u>received</u> these emails.  Again, the EIGA requires proof that Ms. Manigault Newman "knowingly and willfully failed to file her financial disclosure report."  On its face, the EIGA requires a showing of <u>actual knowledge</u> on behalf of the Defendant.  These unanswered emails that were sent to an unmonitored email address fail to establish that Ms. Manigault Newman "knowingly and willfully" failed to file her financial disclosure report.

The next factual allegation relied upon by the Plaintiff is reference to a telephone conversation that occurred between Ms. Manigault Newman and Mr. Passantino on March 26, 2018. [DE 2-1: P. 5, ¶22].  Specifically, the Complaint alleges that "Ms. Newman responded by calling the ethics attorney to discuss the overdue termination financial disclosure report." *Id.* The Complaint specifically incorporates this telephone call by reference but fails to provide the substance of the telephone conversation.  The mere allegation that a telephone call occurred between Ms. Manigault Newman and Mr. Passantino is woefully insufficient to establish that Ms. Manigault Newman "knowingly and willfully" failed to file her financial termination report in violation of the Ethics in Government Act.

As shown on the recording of the actual phone call of March 26, 2018, Mr. Passantino acknowledged that "he wasn't sure" if Ms. Manigault Newman had received his emails about the financial disclosure report.  Ms. Manigault Newman responded by stating that "there was an error on the report about my termination day."  Ms. Manigault Newman reminded Mr. Passantino that her termination date was January 20, 2018, not December 13, 2017.  Mr. Passantino responded by acknowledging that "I was there for the conversation of the twentieth."

Ms. Manigault Newman further advised Mr. Passantino that "Without that change I can't complete [the financial disclosure form]…let me be clear, as soon as the date is corrected then I

can complete it.  Without that, I don't feel comfortable completing a report with the wrong date on it."

After acknowledging the discrepancy in the termination date, Mr. Passantino advised Ms. Manigault Newman that he would "get with the Chief"; "when I talk with the Chief", "I will find out what, as far as the Chief was concerned, what the final date was, and let you know…"; "let me find out about what is the story on the dates and like I said, I'm just going to convey what I hear."; the telephone call ended with the following promise from Ms. Passantino, "I was there when we set the 20th.  The only thing I can't guarantee is that subsequent to that, when we were together in the Sit[utation] Room, is something changed.  But, I will report back whatever I hear. So, we will go from there."  [*See* Exhibit "B"].  Mr. Passantino never reported back what he heard from the Chief.

If anything, the telephone call referenced in the Plaintiff's Corrected Complaint establishes that <u>Ms. Manigault Newman was willfully attempting to complete her financial disclosure</u>.  Again, during this telephone call, Ms. Manigault Newman stated that the entire hold up of completing the financial disclosure form stems from the discrepancy in the termination date on the financial disclosure form.   Mr. Passantino acknowledged this discrepancy and advised Ms. Manigault Newman that he would "get with the Chief" and "report back whatever he hears."  To date, Mr. Passantino has not reported back what he heard from the Chief and the termination date discrepancy remains.

Significantly, if Ms. Manigault Newman knowingly filed a financial disclosure report which contained inaccurate information, such as an incorrect termination date, then she would be subjected to both civil and criminal penalties under the EIGA. [5 U.S.C. app. 4 § 104(a)(2)(B)]. Ms. Manigault Newman expressly told Mr. Passantino that she did "not feel comfortable

completing a report with the wrong date on it." [See Exhibit "B"].  Again, Mr. Passantino never reported back from the Chief as promised and the termination date discrepancy was never remedied.

In addition, during this telephone conference, Mr. Passantino acknowledged that he was in receipt of numerous personal items belonging to Ms. Manigault Newman.  Specifically, Mr. Passantino stated, "I've got two boxes of personal stuff and I've got your commission certificate."  Mr. Passantino went on to say, "if we could just get this done then we can figure out a time to get to you or somebody your stuff and your certificate."  This telephone conversation occurred on March 26, 2018.  Ms. Manigault Newman was only permitted to pick up her boxes from the White House on July 12, 2019, sixteen (16) months later.

Significantly, the boxes that were under Mr. Passantino's control for sixteen months contained the requisite financial documents and information necessary to complete the financial disclosure reports.  As shown in the responsive email sent May 6, 2019, Ms. Manigault Newman informed the Department of Justice that "as I had communicated with my ethics contact, Stefan Passantino, at the White House, I am still lacking some key information to complete the report."  The email goes on to state that "Much of the information that I need to complete this termination report – financial records, travel documents, emails, and other important correspondence… - is contained in those boxes.  These boxes are still in the possession of the White House."

The Department of Justice confirmed that the White House was still in possession of the boxes and provided Ms. Manigault Newman with the contact information required to pick up her boxes.  The Department of Justice went on to say, without explanation, that "we regard the return of your client's personal effects as unrelated to our claim under the Ethics in Government Act."

To be clear, when filling out a termination financial disclosure report, the employee will need access to their financial information. As previously established, the boxes that were admittedly retained by Mr. Passantino at the White House for sixteen (16) months, contained financial records, bank statements, travel documents, tax returns, W-2, honoraria and other documents required to fill out the financial disclosure report. [*See* Exhibit "J"]. Simply put, without access to this financial information Ms. Manigault Newman was incapable of completing the required financial disclosure form. The Department of Justice was aware of this at the time they filed the lawsuit.

<u>C**ONCLUSION**</u>

In sum, the Plaintiff's Corrected Complaint is due to be dismissed because it fails to "state a claim to relief that is plausible on its face." *Ashcroft*. The facts alleged within the Corrected Complaint simply do not "allow the court to draw the reasonable inference that the Ms.Manigault Newman is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The facts of this case show that Ms. Manigault Newman has desired to complete this financial disclosure form from the beginning. As shown herein, the termination date discrepency on the financial disclosure form and lack of access to requisite financial data contained within the boxes kept at the White House is the reason Ms. Manigault Newman was incapable of filing her financial disclosure form. The Corrected Complaint fails to allege any facts which support the claim that Ms. Manigault Newman "knowingly and wilfully failed to file her financial disclosure report as required by the EIGA.

WHEREFORE, Defendant, Ms. Manigault Newman, respectfuly requests an order dismissing this lawsuit with prejudice.

<u>C</u>ERTIFICATE OF <u>S</u>ERVICE

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of Court using the CM/ECF which will furnish a copy to Ashley A. Cheung, Esq., Joseph H. Hunt, Esq., James J. Gilligan, Esq., Jacqueline Coleman Snead, Esq., United States Department of Justice Civil Division, Federal Programs Branch, 1100 L. Street, N.W., Washington, D.C.  20005, at Ashley.cheung@usdoj.gov ; this **11<u>th</u>** day of September, 2019.

Authored and prepared by

**Law Office of John M. Phillips, LLC**

<u>John M. Phillips</u>
**JOHN M. PHILLIPS, ESQUIRE**
DC Bar Number:  1632674
4230 Ortega Boulevard
Jacksonville, FL 32210
(904) 444-4444
(904) 508-0683 (facsimile)
Attorneys for Defendant
jphillips@floridajustice.com
michele@floridajustice.com
Kirby@floridajustice.com
(*Pro Hac Vice Application for Admission Pending*)

Respectfully submitted by,

**The Law Office of J. Wyndal Gordon, P.A.**

<u>/s/ J. Wyndal Gordon, Esq.</u>
**J. WYNDAL GORDON, ESQUIRE**
Fed Bar No.: MD23572
20 South Charles Street, Suite 400
Baltimore, MD  21201
(410)332-4121
(410)347-3144 facsimile
jwgaattys@aol.com
Attorneys for Defendant

Re: Termination Report
Past Due – Notice of Late
Filing Fee Owed

me  Mar 26, 2018
to Stefan ˅

Hi Stefan,

If I want to file a formal complaint
about the fees and discrepancy in the
report can you tell who I direct that
to?

Is it the Ethics office or Justice
department.

Kindly,



EXHIBIT
"C"

**From:** OMAROSA MANIGAULT <<u>omarosa1600@icloud.com</u>>
**Sent:** Monday, May 06, 2019 4:15 PM
**To:** Cheung, Ashley (CIV) <<u>ascheung@CIV.USDOJ.GOV</u>>
**Cc:** Gilligan, Jim (CIV) <<u>JGilliga@CIV.USDOJ.GOV</u>>
**Subject:** ○☐ Re: Response

To: James Gilligan
Cc: Ashely Cheung

Thank you for your letter about the referral from the executive office of President Donald Trump.

I was always eager to get this termination report completed within the 30 days after my January 20th, 2018 separation from the administration.  However, as I had communicated with my ethics contact, Stefan Passantino, at the White House, I am still lacking some key information to complete the report.

Specifically, in several calls and emails to Stefan, we discussed the need for the contents of seven boxes from my office that were seized by Uttam Dhillon, Irene H. Porada and Mr. Passantino, upon my departure.

Much of the information that I need to complete this termination report — financial records, travel documents, emails and other important correspondence related to my employment on the Trump campaign, transition, inauguration and my tenure at the White House — is contained in those boxes.  These boxes are still in the possession of the White House.

I am still hopeful that the White House will  return my boxes and  give me access to the data necessary to complete the report.   Please advise.

Regards,
Omarosa Manigault Newman



**From:** Cheung, Ashley (CIV)
**Sent:** Thursday, May 09, 2019 12:18 PM
**To:** OMAROSA MANIGAULT <omarosa1600@icloud.com>
**Subject:** RE: ○☐ Re: Response

Ms. Manigault,

Thank you for confirming that you received our letter and for indicating that you would like to resolve this matter and complete your termination report.

We will look into the situation and get back to you.

1



**From:** "Cheung, Ashley (CIV)" <Ashley.Cheung@usdoj.gov>
**Date:** May 10, 2019 at 3:20:00 PM EDT
**To:** OMAROSA MANIGAULT <omarosa1600@icloud.com>
**Subject: RE: ☐ Re: Response**

Ms. Manigault,

The White House Counsel's Office has located documents that it intends to return to you.  Please let us know whether you would like to pick up the documents in person or have them mailed to you.  If you would like them mailed to you, please provide your mailing address.

Best,

**Ashley Cheung**
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(p) (202) 616-8267  |  (f) (202) 616-8470
ashley.cheung@usdoj.gov

**EXHIBIT**

"F"

Re:  Re: Response

JM  **John M. Phillips** <jmp@floridajustice.com>
OMAROSA MANIGAULT;  Cheung, Ashley (CIV)
Wednesday, May 15, 2019 at 12:16 PM
Show Details

Delete from server

A copy of this message is on the server.

Please provide some description of the quantity of materials and proximate availability.

Thank You,

John

**John M. Phillips, B.C.S.\*\***
The Law Office of John M. Phillips
Telephone: (904) 444-4444
Email: jmp@floridajustice.com
Website: www.FloridaJustice.com

\* Board Certified Specialist and Expert in Civil Trial Law
\* Licensed to practice in Florida, Georgia and Alabama

On May 15, 2019, at 11:51 AM, OMAROSA MANIGAULT                    wrote:

Hi Ashley,
I am copying my attorney John Phillips on this email. He will coordinate with you the return of my boxes and all else going forward.
Regards,
Omarosa


EXHIBIT
tabbies®
" G "

**From:** "Cheung, Ashley (CIV)" <Ashley.Cheung@usdoj.gov>
**Date:** Tuesday, May 28, 2019 at 10:44 AM
**To:** 'John Phillips' <jmp@floridajustice.com>
**Subject:** RE: ☐ Re: Response

Mr. Phillips,

I'm writing to follow up on the below message.  Can you please confirm that your client is interested in resolving this matter without litigation and let us know your availability for a call to discuss?

As previously indicated, we regard the return of your client's personal effects as unrelated to our claim under the Ethics in Government Act.

Best,

**Ashley Cheung**
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
(p) (202) 616-8267  |  (f) (202) 616-8470
ashley.cheung@usdoj.gov





**EXHIBIT**

tabbies®

"I"