## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

      Plaintiff,                              Case No.: 1:19-cv-1868 (RJL)

v.

OMAROSA MANIGAULT NEWMAN,

      Defendant,

_____/

### DEFENDANT OMAROSA MANIGAULT NEWMAN'S
### RESPONSE TO PLAINTIFF'S MOTION TO COMPEL

      Comes now the Defendant, Omarosa Manigault Newman, by and through her undersigned counsel and files this her Response to Plaintiff's Motion to Compel, and in support alleges as follows.

### FACTUAL BACKGROUND

      On October 24, 2019, the Government served their First Request for Production upon Defendant Omarosa Manigault Newman.  As argued by the Government, these requests seek "documents and recordings relating to: (a) Defendants termination from her position in the Executive Branch; (b) Defendants financial disclosure report and her obligation to file it within 30 days of her termination; (c) Defendant's efforts to obtain materials she contends were necessary to complete the financial disclosure report; and (d) the contents of the boxes that Defendant belatedly claimed she needed to complete her financial disclosure report; as well as documents (e) that were referenced in Defendant's interrogatory responses." [DE 18].

      In response to these requested documents, Defendant Omarosa Manigault Newman objected on the grounds that producing the requested documents and communications would

subject her to further bad faith litigation brought by President Donald J. Trump and his campaign, Donald J. Trump for President, Inc.  The Government argues that these objections should be overruled because, "Defendant merely speculates that such "bad faith litigation" might be filed, and provides no support whatsoever for that unsubstantiated claim.  Still, Defendant here takes the position that Defendant she [sic]  not produce documents until the Court orders her to do so." [DE 18].

As discussed below, Defendant Omarosa Manigault Newman is not "merely speculating."  She has already been sued for disclosing the very evidence sought by the Government in this case.  Furthermore, the President has openly bragged about it on Twitter.

## ARBITRATION ACTION

President Donald J. Trump[1], through his Campaign, Donald J. Trump for President Inc., has filed an arbitration action against Mrs. Manigault Newman for allegedly disclosing "confidential information" in violation of a nondisclosure agreement.  The arbitration action alleges, in part:

> Ms. Manigault Newman also released a surreptitious **recording that purports to be a conversation between Ms. Manigault Newman and General John F. Kelly, the White House Chief of Staff, which Ms. Manigault-Newman alleges was recorded in the Situation Room of the White House**.  If accurate, this recording contains confidential information.

> Ms. Manigault Newman released an surreptitious **recording that purports to be a conversation between Ms. Manigault-Newman and Mr. Trump**.  If accurate, this recording contains confidential Information.

> Ms. Manigault Newman further materially breached the agreement by, among other things, making alleged unauthorized **recordings of people in the White**

---

[1]   Donald J. Trump (@realdonaldtrump), Twitter (August 31, 2019, 8:58 A.M.), https://twitter.com/realDonaldTrump/status/1167783720021123073 : (…Yes, I am currently suing various people for violating their nondisclosure agreements.  Disgusting and foul mouthed Omarosa is one.  I gave her every break, despite the fact that she was despised by everyone, and she went for some cheap money from a book. Numerous others also!)

**House**, including, without limitation, Mr. Trump and Mr. Kelly, and releasing those recordings to the press.

As a result of Ms. Manigault Newman's breaches of the Agreement, [Donald J. Trump for President, Inc.] has suffered millions of dollars in damages.

This arbitration action is currently being litigated with the American Arbitration Association and has not reached a resolution.  A copy of the Statement of Claim has been attached hereto as **Exhibit "A"**.  A copy of the nondisclosure agreement is attached hereto as **Exhibit "B"**.

## ARGUMENT

### 1. DEFENDANT WILL BE SUBJECTED TO FURTHER BAD FAITH LITIGATION BY DISCLOSING THE REQUESTED DOCUMENTS AND RECORDINGS

Within the subject Motion to Compel, the Government contradicts President Trump's personal lawyers by arguing that, "none of the requested documents, which relate exclusively to Defendant's former position as an employee of the Executive Branch, is "proprietary or confidential" to Mr. Trump, his business, or his family.  Lynch Decl. Ex. A at 1.  They do not relate to "the personal life, political affairs, and/or business affairs of Mr. Trump or of any Family Member."  Id.  They do not relate to "the assets, investments, revenue, expenses, taxes, financial statements, actual or prospective business ventures" or other interest of Mr. Trump, his businesses, or his family members." [DE 18 at 4].

Significantly, Ms. Manigault Newman agrees with the ultimate conclusion reached by the Government on this issue.  That does not eliminate the weaponization of lawsuits filed against her or the attorneys fees she has incurred to defend even the most frivolous of claims.  Ms. Manigault Newman believes that she will ultimately be successful in defending the arbitration action filed against her by President Trump and his Campaign.  Nevertheless, Ms. Manigault Newman fears that by disclosing the requested communications and recordings, including

recordings of people in the White House, President Trump's personal lawyers will sue her for "millions of dollars in damages" (as they already have) and subject her to further prolonged litigation with the American Arbitration Association.  As discussed previously, this fear is not "speculative" as Ms. Manigault Newman has already been sued for disclosing the recordings of General John F. Kelly in the Situation Room and a recording of President Donald J. Trump.[2]

Defendant's objection to the Government's Request for Production applies to the categories of information sought in this action.

### (a).  Documents and communications pertaining to Defendant's termination from her position in the White House.

Omarosa Manigault Newman was fired from her position with the Federal Government by General John F. Kelly.  Ms. Manigault Newman's firing occurred on December 13, 2017 within the Situation Room of the White House.  Clearly, this communication "pertains to Defendant's termination from her position in the White House." **Ms. Manigault Newman has provided this communication to the Government in this action.  Ms. Manigault Newman is currently being sued in the arbitration action for disclosing this communication.**

In addition, Ms. Manigault Newman has disclosed a communication between herself and President Donald J. Trump regarding her termination from the White House.  Again, this communication "pertains to Defendant's termination from her position in the White House." **Ms. Manigault Newman has provided this communication to the Government in this action.  Ms. Manigault Newman is currently being sued in the arbitration action for disclosing this communication.**

---

[2] This is not limited to Ms. Manigault Newman.  A former campaign staffer filed a lawsuit for sexual harassment and has been litigating, the very same overbroad nondisclosure agreement, in state and federal courts, as well as arbitration. *See* Denson v. Donald J. Trump for President, Inc., 180 A.D.3d 446, 451, 116 N.Y.S.3d 267 [1st Dept. 2020].

To the extent that Ms. Manigault Newman has any additional documents or communications responsive to Government's request, she naturally fears that she will be subjected to further ongoing litigation in the arbitration action if she discloses them here. Significantly, while Ms. Manigault Newman believes that she will ultimately be successful in the arbitration action filed against her, she nonetheless has experienced, first hand, that by disclosing additional documents requested in this action, she will be subjected to additional bad faith litigation by President Trump and his campaign.

**(b).  Documents and communications pertaining to Defendant's financial disclosure report and her obligation to file it within 30 days of her termination.**

The Complaint filed in this action alleges that Ms. Manigault Newman was informed of her obligation to file her financial disclosure report within 30 days because "on or about December 19, 2017, Ms. Manigault Newman received a post-government employment briefing in which she was advised of her obligation under the EIGA to file a termination financial disclosure report by January 18, 2018." [DE 2-1 at P.3].

The only "post-government employment briefing" that Ms. Manigault Newman received occurred on December 13, 2017 in the Situation Room with General John Kelly, Uttam Dhillon, Irene Paroda, and Stefan Passantino.  **The recording of this Situation Room meeting was previously disclosed to the Government and Ms. Manigault Newman is currently being sued for "millions of dollars" for disclosing it.**

In addition, Ms. Manigault Newman is currently being sued for "millions of dollars in damages" for "making alleged unauthorized recordings of people in the White House…and disclosing them..."  [Exhibit A].  By producing the documents and communications requested by

the Government in this action, including communications with other White House employees,

Ms. Manigault Newman will be subject to additional bad faith litigation in the arbitration action.

**(c). Documents and communications pertaining to Defendant's efforts to obtain materials she contends were necessary to complete the financial disclosure report.**

Ms. Manigault Newman has steadfastly attempted to recover her personal items that were

withheld from her by the White House after her employment ended.   As such, there are

numerous communications pertaining to her efforts to obtain the materials she contends were

necessary to complete the financial disclosure report.   These include communications with

members of the "Trump Family" as defined under the nondisclosure agreement.   For example,

Ms. Manigault Newman communicated with Ivanka Trump, a White House employee and

member of the "Trump Family" [3], about the return of her personal items within the boxes at the

White House.

The nondisclosure agreement that Ms. Manigault Newman is currently being sued under,

prohibits the disclosure of "confidential information" regarding any "Trump Family Member",

expressly including Ivanka Trump.   As such, Ms. Manigault Newman fears that by disclosing

these communications, including the communications with Ivanka Trump, that she will be

subjected to further litigation in the arbitration action.

In addition, Ms. Manigault Newman is currently being sued for "millions of dollars in

damages" for "making alleged unauthorized recordings of people in the White House…and

disclosing them..."  [Exhibit A].  By producing the documents and communications requested by

---

[3] See Exhibit B: ("Family Member" means any member of the Trump family, including, but not limited to, Mr. Trump's spouse, each of Mr. Trump's children and grandchildren and their respective spouses, including but not limited to Donald J. Trump Jr., Eric F. Trump and Ivanka M. Trump, Tiffany Trump, and Baron Trump, and their respective spouses, children and grandchildren, if any, and Mr. Trump's siblings and their respective spouses and children, if any.")

the Government in this action, including communications with other White House employees, Ms. Manigault Newman will be subject to additional bad faith litigation in the arbitration action.

Furthermore, Ms. Manigault Newman has communicated with various members of the Department of Justice regarding the return of her personal effects from the White House.  These include communications with Department of Justice attorney Ashley Cheung, Esq. and others. As argued by the Government, these documents and communications relate to "the sole disputed issue in the case." [DE 18 at 5].  Nevertheless, the Government has moved for a protective order seeking to prohibit Ms. Manigault Newman's discovery from Department of Justice employees on these issues.  [DE 17].

### 4. The contents of the boxes that Defendant claimed she needed to complete her financial disclosure report

The boxes that were withheld from Ms. Manigault Newman by the White House following her employment, contained the information necessary to complete her Termination Financial Disclosure Report.  The contents of the boxes also included personal effects, letters, tax returns, bank statements, and other private and personal financial information.  To the extent that these requested documents do not require the disclosure of private financial information and are non-violative of the nondisclosure agreement, Defendant agrees to produce said documents.

### II. TRIAL COURT HAS BROAD DISCRETION IN DISCOVERY MATTERS

It is well settled that Trial Courts have broad discretion in conducting discovery.  Here, the Government asks that the Trial Court exercise its discretion and compel Ms. Manigault Newman to produce various documents and communications.  As previously discussed, by disclosing the requested documents and communications, Ms. Manigault Newman fears additional litigation against her in the concurrent arbitration action.

In support of their motion to compel, the Government relies upon a single case that is neither binding nor persuasive.  The Government relies on *Bohannon v. Honda Motor Co*., 127 F.R.D. 536, 540 (D. Kan. 1989) for the proposition that the nondisclosure agreement should not prevent Ms. Manigault Newman from disclosing these documents, communications and recordings.  However, unlike the Plaintiff in *Bohannon*, **Ms. Manigault Newman is currently being sued for "millions of dollars" for disclosing the exact communications sought by the Government in this action and fears additional litigation arising from further disclosures.**

The Government argues that "[Ms. Manigault Newman's] bare invocation of her agreement with a third party accordingly cannot excuse her non-compliance with Plaintiff's discovery requests."  Again, Ms. Manigault Newman is not making a "bare invocation of her agreement with a third party."  Rather, she is expressly concerned that by disclosing the requested documents, she will subjected to further litigation in the arbitration action, which has already commenced and is currently being litigated.

To be clear, Ms. Manigault Newman does not believe that President Trump and his Campaign will ultimately be successful in the ongoing arbitration action.  However, whether or not Ms. Manigault Newman is ultimately successful in defending the arbitration action is immaterial to her objection.  The objection is based upon the additional litigation that will almost certainly arise by her disclosure of various communications with White House officials, including communications with some "Trump Family Members" in compliance with the Government's requests.  The Campaign recently added nearly four hundred additional counts to the arbitration action and is keeping tabs on everything she says and does.  We are at a complete loss.

<u>CONCLUSION</u>

The Government seeks to compel Mrs. Manigault Newman to produce "recordings and communications" which will almost certainly subject her to further litigation in the concurrently filed arbitration action.  For the reasons discussed herein, Mrs. Manigault Newman seeks an order denying the Government's Motion to Compel.  Mrs. Manigault Newman will be moving for a protective order on this matter pursuant to Fed R Civ P 26(c)(1).  Mrs. Manigault Newman's Motion for Protective Order will be submitted concurrently with this Response.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of Court using the CM/ECF which will furnish a copy to Christopher M. Lynch, Esq., Joseph H. Hunt, Esq., James J. Gilligan, Esq., Jacqueline Coleman Snead, Esq., United States Department of Justice Civil Division, Federal Programs Branch, 1100 L. Street, N.W., Washington, D.C. 20005, at Christopher.m.lynch@usdoj.gov ;  Jacqueline.Snead@usdoj.gov ;this **1st** day of July, 2020.

Respectfully submitted,

**Law Office of John M. Phillips, LLC**

/s/ John M. Phillips
**JOHN M. PHILLIPS, ESQUIRE**
DC Bar Number:  1632674
4230 Ortega Boulevard
Jacksonville, FL 32210
(904) 444-4444
(904) 508-0683 (facsimile)
Attorneys for Defendant
jphillips@floridajustice.com
michele@floridajustice.com
Kirby@floridajustice.com

**The Law Office of J. Wyndal Gordon, P.A.**

9

/s/ J. Wyndal Gordon, Esq.
**J. WYNDAL GORDON, ESQUIRE**
MD Bar Number: 23572
20 South Charles Street, Suite 400
Baltimore, MD  21201
(410)332-4121
(410)347-3144 facsimile
jwgaattys@aol.com
Attorneys for Defendant

CHARLES J. HARDER (NY Bar No. 5282371)
ANTHONY J. HARWOOD (NY Bar No. 2187821)
RYAN J. STONEROCK (CA Bar No. 247132)
HARDER LLP
260 Madison Avenue, Sixteenth Floor
New York, New York 10016
Telephone: (212) 799-1400
Facsimile:  (212) 937-3167
Email:      CHarder@HarderLLP.com
            AHarwood@HarderLLP.com
            RStonerock@HarderLLP.com

Attorneys for Claimant
DONALD J. TRUMP FOR PRESIDENT, INC.


AMERICAN ARBITRATION ASSOCIATION

NEW YORK, NEW YORK

| | |
|---|---|
| DONALD J. TRUMP FOR PRESIDENT, INC., a Virginia not-for-profit corporation,<br><br>    Claimant,<br><br>    v.<br><br>OMAROSA MANIGAULT-NEWMAN, an individual,<br><br>    Respondent. | Case No.<br><br>**STATEMENT OF CLAIM FOR BREACH OF WRITTEN CONTRACT** |

Claimant DONALD J. TRUMP FOR PRESIDENT, INC. hereby alleges as follows:

**THE PARTIES**

1.      Claimant Donald J. Trump for President, Inc. (the "Company") is a not-for-profit corporation organized and existing under the laws of the State of Virginia, with its principal place of business in New York, New York.

2.      Claimant is informed and believes, and based thereon alleges, that Respondent Omarosa Manigault-Newman ("Ms. Manigault-Newman") is an individual

1  residing and domiciled in Jacksonville, Florida.

2  **RELEVANT FACTS**

3      3.      Ms. Manigault-Newman previously served as an outreach advisor for Donald

4  J. Trump for President, Inc. (the "Company").  In connection therewith, Ms. Manigault-

5  Newman entered into a written agreement with the Company (the "Agreement"), effective

6  on or about July 16, 2016.  A true and correct copy of the Agreement is attached hereto as

7  **Exhibit A**.

8      4.      The Agreement prohibits Ms. Manigault-Newman from disclosing

9  confidential information (as defined in the Agreement) or disparaging the Company and

10  numerous persons associated with the Company, including Donald J. Trump ("Mr.

11  Trump") and his family members.

12      5.      Paragraph 1 of the Agreement specifically restricts Ms. Manigault-

13  Newman's disclosure of Confidential Information by providing, in pertinent part:

14      1. <u>No Disclosure of Confidential Information</u>.   During the
        term of your service and at all times thereafter you hereby
15      promise and agree:

16          a. not to disclose, disseminate or publish, or cause to be
17      disclosed, disseminated or published, any Confidential
        Information;
18
19          b. not to assist others in obtaining, disclosing,
        disseminating, or publishing Confidential Information;
20
21          c. not to use any Confidential Information in any way
        detrimental to the Company, Mr. Trump, any family Member,
22      any Trump Company or any Family Member Company;

23          d. not to save, store or memorialize any Confidential
        Information (including, without limitation, incorporating it into
24      any storage device, server, Internet site or retrieval system,
        whether electronic, cloud based, mechanical or otherwise)…
25

26      6.      "Confidential Information" is defined in the Agreement, in part, as "all

27  information (whether or not embodied in any media) of a private, proprietary or

28  confidential nature or that Mr. Trump insists remain private or confidential, including, but

-2-
STATEMENT OF CLAIM

not limited to, any information with respect to the personal life, political affairs, and/or business affairs of Mr. Trump or of any Family Member, including but not limited to, … meetings, conversations, notes, and other communications of Mr. Trump, any Family Member, any Trump Company or any Family Member Company." (Ex. A, ¶ 6.a.)

7.     Paragraph 2 of the Agreement prohibits Ms. Manigault-Newman from disparaging the Company or any other Trump Person (as defined in the Agreement), as follows:

> 2.   <u>No Disparagement</u>.  During the term of your service and at all times thereafter you hereby promise and agree not to demean or disparage publicly the Company, Mr. Trump, any Trump Company, any Family Member, or any Family Member Company or any asset any of the foregoing own, or product or service any of the foregoing offer, in each case by or in any of the Restricted Means and Contexts and to prevent your employees from doing so.[1]

8.     On or about December 14, 2017, Ms. Manigault-Newman appeared on ABC's "Good Morning America."  During that appearance, Ms. Manigult-Newman stated that she planned to disclose Confidential Information, and to make disparaging statements, in violation of the Agreement:

> There were a lot of things that I observed during the last year that I was very unhappy with, that I was very uncomfortable with…
>
> I'm not going to expand on it because I still have to go back and work with these individuals, but when I have a chance to tell my story, Michael, quite a story to tell as the only African-

---

[1] "Restricted Means and Contexts" is defined in the Agreement as "(i) …any means of expression, including but not limited to verbal, written, or visual, (ii) whether or not preserved in any medium now known or hereafter discovered or invented, including but not limited to audio recording of any type, written text, drawing, photograph, film, video, or electronic device, (iii) in any manner or form, including but not limited to any book, article, memoir, diary, letter, essay, speech, interview, panel or roundtable discussion, image, drawing, cartoon, radio broadcast, television broadcast, video, movie, theatrical production, Internet website, e-mail, Twitter tweet, Facebook page, or otherwise, even if fictionalized, (iv) in any language, or (v) in any country or other jurisdiction." (Agreement, ¶ 1.)

American woman in this White House, as a senior staff and assistant to the President, I have seen things that made me uncomfortable, that have upset me, that have affected me deeply and emotionally, that has affected my community and my people. And when I can tell my story, it is a profound story that I know the world will want to hear…

9.     On or about January 19, 2018, various news outlets published reports speculating that Ms. Manigault-Newman had secretly recorded communications that potentially involved Confidential Information.

10.     On or about January 25, 2018, counsel for Claimant, Charles J. Harder, sent a letter reminding Ms. Manigault-Newman of her obligations under the Agreement and demanding confirmation that she, among other things:

    a.     Does not intend to disclose Confidential Information to any person;

    b.     Does not intend to make disparaging statements in violation of the Agreement;

    c.     Has not retained any Confidential Information, including any audio or video recordings; and

    d.     Does not intend to disclose any recordings of Confidential Information to any person.

11.     Mr. Harder's letter also demanded that Mr. Manigault-Newman deliver all Confidential Information, including any and all recordings, to Mr. Harder's office, and certify that she did not and will not retain any Confidential Information.  A true and correct copy of Mr. Harder's letter is attached hereto as **Exhibit B**.

12.     Despite Mr. Harder's demand that Ms. Manigault-Newman respond within forty-eight (48) hours of transmission, Ms. Manigault-Newman did not respond to this letter.

13.     Thereafter, Ms. Manigault-Newman materially breached the Agreement by, among other things, disclosing Confidential Information and making disparaging statements about Trump Persons, as set forth immediately below.

/ / /

-4-
STATEMENT OF CLAIM

14.     In an episode of the television program *Celebrity Big Brother*, aired by CBS on February 8, 2018, Ms. Manigault-Newman stated:

 a. "I was haunted by tweets every single day, like what is he going to tweet next?"

 b. "I tried to be that person [to stop the tweets] and then all of the people around him [President Trump] attacked me.  It was like 'Keep her away' 'Don't give her access.' 'Don't let her talk to him.'"

 c. "It's not my circus.  Not my monkeys."

 d. "I'd like to say it's not my problem but I can't say that because, like, it's bad."

 e. [Question by Ross Mathews: "Should we be worried?"]  Ms. Manigault-Newman nods.

 f. [Question by Ross Mathews: "I need you to say 'No, it's going to be OK."]  Ms. Manigault-Newman responds:  "No, it's not going to be OK.  It's not.  It's so bad."

 g. [Question by Ross Mathews:  "Would you vote for him [Mr. Trump] again [for President?"]  Ms. Manigault-Newman responds:  "God no, never. In a million years, never."

 h. "It's just been so incredibly hard to shoulder what I shouldered because I was so loyal to a person and I didn't realize that by being loyal to him it was going to make me lose a hundred other friends."

 i. "When you're in the middle of the hurricane it's hard to see the destruction on the outer bands."

15.     On or about July 26, 2018, Simon & Schuster issued a press release stating that Gallery Books, a division of Simon & Schuster, planned to publish a book written by Ms. Manigault-Newman entitled, "UNHINGED: An Insider's Account of the Trump White House by Omarosa Manigault Newman" (the "Book"), on August 14, 2018.  The press release stated, in part:

Few have been a member of Donald Trump's inner orbit longer than Omarosa Manigault Newman. Their relationship has spanned fifteen years—through four television shows, a presidential campaign, and a year by his side in the most chaotic, outrageous White House in history. But that relationship has come to a decisive and definitive end, and Omarosa is finally ready to share her side of the story in this explosive, jaw-dropping account.

A stunning tell-all and takedown from a strong, intelligent woman who took every name and number, **UNHINGED is** a must-read for any concerned citizen.

**<u>UNHINGED will be published on August 14, 2018.</u>** Simon & Schuster Audio and Simon & Schuster UK will simultaneously publish.

16.    On or about July 27, 2018, Ms. Manigault-Newman announced the Book via Twitter by linking to the listing of the Book on Amazon.com. The listing states, in part:

**The former Assistant to the President and Director of Communications for the Office of Public Liaison in the Trump White House provides an eye-opening look into the corruption and controversy of the current administration.**

Few have been a member of Donald Trump's inner orbit longer than Omarosa Manigault Newman. Their relationship has spanned fifteen years—through four television shows, a presidential campaign, and a year by his side in the most chaotic, outrageous White House in history. But that relationship has come to a decisive and definitive end, and Omarosa is finally ready to share her side of the story in this explosive, jaw-dropping account.

A stunning tell-all and takedown from a strong, intelligent woman who took every name and number, *Unhinged* is a must-read for any concerned citizen.

17.    Excerpts from the Book containing Confidential Information and disparaging statements, in violation of the Agreement, have been published on the internet at numerous websites, including:

/ / /

a.   https://www.thedailybeast.com/omarosa-book-excerpt-trump-has-mental-decline-that-could-not-be-denied

b.   https://www.washingtonpost.com/politics/2018/08/13/why-omarosas-comments-about-trump-race-will-have-little-impact/?utm_term=.b87de7ab8aab

c.   https://www.theguardian.com/us-news/2018/aug/10/omarosa-trump-book-the-apprentice-memoir

d.   https://www.cnn.com/2018/08/11/politics/omarosa-tell-all-white-house/index.html

18.   On or about August 12, 2018, during an interview with NBC's *Meet the Press* to promote the Book, Ms. Manigault-Newman stated:

> Donald Trump is a con and has been masquerading as someone who is actually open to engaging with diverse communities. But…he is truly a racist.

19.   During her interview on *Meet the Press*, Ms. Manigault-Newman also stated:

> They continue to deceive this nation by how mentally declined [Mr. Trump] is, how difficult it is for him to process complex information, how he is not engaged in some of the most important decisions that impacts (sic) our country.

20.   During her interview on *Meet the Press*, Ms. Manigault-Newman also released an surreptitious recording that purports to be a conversation between Ms. Manigault-Newman and General John F. Kelly, the White House chief of staff, which Ms. Manigault-Newman alleges was recorded in the Situation Room of the White House.  If accurate, this recording contains Confidential Information.

21.   On August 13, 2018, during an interview with *The Today Show* to promote the Book, Ms. Manigault-Newman released an surreptitious recording that purports to be a conversation between Ms. Manigault-Newman and Mr. Trump.  If accurate, this recording contains Confidential Information.  During this interview, Ms. Manigault-Newman disclosed additional Confidential Information and made disparaging statements, in violation of the Agreement.

STATEMENT OF CLAIM

22.     Also on August 13, 2018, in a subsequent interview on MSNBC's "*Velshi & Ruhle*" to promote the Book, Ms. Manigault-Newman said she "absolutely" has more tapes in her possession, but has not yet decided whether she will release them publicly.  During this interview, Ms. Manigault-Newman disclosed additional Confidential Information and made disparaging statements, in violation of the Agreement.

23.     Remedies for Ms. Manigault-Newman's breach of the Agreement include monetary damages, injunctive relief and all other remedies available at law and equity. With regard to injunctive relief, Paragraph 7 of the Agreement provides, in pertinent part:

> a.     <u>Consent to Injunction</u>.   A breach of any of your promises or agreements under this agreement will cause the Company, Mr. Trump and each other Trump Person irreparable harm.   Accordingly, to the extent permitted by law, and without waiving any other rights or remedies against you at law or in equity, you hereby consent to the entry of any order, without prior notice to you, temporarily or permanently enjoining you from violating any of the terms, covenants, agreements or provisions of this agreement on your part to be performed or observed. Such consent is intended to apply to an injunction of any breach or threatened breach.

24.     The Agreement provides that the prevailing party in any dispute arising out of the Agreement shall be entitled to "an award of reasonable legal fees and costs." (Ex. A, ¶ 8.c.)

25.     In addition, Paragraph 8.b of the Agreement provides for arbitration of this dispute, stating:

> <u>Arbitration</u>.   Without limiting the Company's or any other Trump Person's right to commence a lawsuit in a court of competent jurisdiction in the State of New York, **any dispute arising under or relating to this agreement** may, at the sole discretion of each Trump Person, be submitted to **binding arbitration in the State of New York pursuant to the rules for commercial arbitrations of the American Arbitration Association**, and you hereby agree to and will not contest such submissions.   Judgment upon the award rendered by an arbitrator may be entered in any court having jurisdiction.

(Emphasis added.)

-8-
STATEMENT OF CLAIM

**FIRST CAUSE OF ACTION**

**Breach of Written Agreement**

26.     Claimants incorporate each and every allegation in the preceding paragraphs as through set forth in full herein.

27.     The Company and Respondent entered into the Agreement, effective on or about July 16, 2016.

28.     The Company has performed all of the covenants and conditions of the Agreement to be performed on its part, if any, except to the extent that such performance has been hindered, prevented, excused or waived.

29.     Ms. Manigault-Newman materially breached the Agreement by, among other things, disclosing Confidential Information and making disparaging statements in an episode of the television program "Celebrity Big Brother."

30.     Ms. Manigault-Newman further materially breached the Agreement by, among other things, making alleged unauthorized recordings of people in the White House, including, without limitation, Mr. Trump and Mr. Kelly, and releasing those recordings to the press.

31.     The Company is informed and believes, and based thereon alleges, that Ms. Manigault Newman has further materially breached the Agreement by, among other things, disclosing Confidential Information and making disparaging statements in the Book.  The Company has not had an opportunity to review and analyze the Book, which is scheduled for release on the date of this filing.  On this basis, the Company reserves the right to supplement this Statement of Claim at the appropriate time to identify the Confidential Information disclosed in the Book, and disparaging statements made therein about the Company and Trump Persons, in violation of the Agreement.

32.     As a result of Ms. Manigault-Newman's breaches of the Agreement, the Company has suffered damages in the millions of dollars, the specific amount of which will be presented and proven at arbitration.

/ / /

33.     Unless Ms. Manigault-Newman is restrained from further breaches of the Agreement, the Company will suffer and continue to suffer irreparable harm.

WHEREFORE, the Company requests the following relief:

1.     For general, special, consequential and incidental damages according to proof at arbitration;

2.     For a preliminary and permanent injunction enjoining Ms. Manigault-Newman from: (a) further disclosure or publication of any Confidential Information; and (b) making further disparaging statements in violation of the Agreement.

3.     For a preliminary and permanent injunction requiring Ms. Manigault-Newman to: (a) identify and turn over all Confidential Information, including all audio and/or video recordings in her possession, custody or control of Trump Persons and/or of all persons she recorded in the White House; (b) confirm under penalty of perjury that she has complied with subsection (a); and (c) preserve and turn over all communications to any persons regarding Confidential Information or her disparagement statements in violation of the Agreement;

4.     For attorneys' fees;

5.     For costs of arbitration;

6.     For prejudgment and post judgment interest at the maximum legal rate; and

7.     For such other and further relief as the Arbitrator may deem just and proper.

DATED: August 14, 2018

_____
CHARLES J. HARDER
Counsel for Claimant

# Exhibit A

## AGREEMENT

You have requested that the entity signing below (the "**Company**") engage you (as an employee or an independent contractor, as applicable) to perform services, or an independent contractor that employs you has requested to be engaged by Company to perform services and you desire in your capacity as an employee of such independent contractor to perform all or a part of such services.  You have made the promises and agreements set forth below in order to induce the Company to accept your or your employer's, as applicable, offer of engagement and to permit you, in the applicable capacity, to perform all or a portion of the subject services.  Those promises and agreements are part of what the Company is receiving in exchange for agreeing to engage you or your employer, and to permit you to perform all or a portion of the subject services, and the Company is relying on your fulfillment of these promises and agreements.

Any initially capitalized terms that are not defined when used in this agreement are defined in paragraph 6 below.

      1.    <u>No Disclosure of Confidential Information</u>.  During the term of your service and at all times thereafter you hereby promise and agree:

      a.  not to disclose, disseminate or publish, or cause to be disclosed, disseminated or published, any Confidential Information;

      b.  not to assist others in obtaining, disclosing, disseminating, or publishing Confidential Information;

      c.  not to use any Confidential Information in any way detrimental to the Company, Mr. Trump, any Family Member, any Trump Company or any Family Member Company;

      d.  not to save, store or memorialize any Confidential Information (including, without limitation, incorporating it into any storage device, server, Internet site or retrieval system, whether electronic, cloud based, mechanical or otherwise) except as may be expressly required in connection with the performance of services to the Company;

      e.  to (i) provide the Company with written notice of any legal obligation to disclose any Confidential Information as soon as you become aware of such obligation, (ii) not make any disclosure notwithstanding such obligation until the Company (or the appropriate Trump Person) has had a reasonable opportunity to seek an appropriate protective order or similar relief, (iii) fully cooperate and join with the Company (and the appropriate Trump Person) in any request for a protective order or similar relief, (iv) exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded such Confidential Information in the event no such protective order or similar relief is obtained, whether because it has been denied or because the Company (or the appropriate Trump Person) has elected not to seek it, and (iv) under all circumstances, not furnish any greater portion of the Confidential Information than you are advised by counsel is absolutely legally required to be disclosed by you or furnish any Confidential Information to any individual, company or governmental entity other than the one to whom or to which you are absolutely legally required to disclose it; and

     f.   promptly upon the request, whenever made, of the Company, (i) return to the Company all Confidential Information furnished to you, together with all copies, abstracts, notes, reports, or other materials furnished to, or otherwise obtained by, you or prepared by you or on your behalf, without retaining copies, extracts or other reproductions, whether physical, electronic, cloud based or otherwise, in whole or in part, (ii) destroy all documents, memoranda, notes or other writings prepared by you or anyone on your behalf that are based upon the Confidential Information, and (iii) acknowledge such destruction in writing to Company.

The foregoing provisions each apply to Confidential Information and disclosure, dissemination, publication, use and effort to help others obtain, saving, storing and memorializing of Confidential Information, as applicable, (i) by any means of expression, including but not limited to verbal, written, or visual, (ii) whether or not preserved in any medium now known or hereafter discovered or invented, including but not limited to audio recording of any type, written text, drawing, photograph, film, video, or electronic device, (iii) in any manner or form, including but not limited to any book, article, memoir, diary, letter, essay, speech, interview, panel or roundtable discussion, image, drawing, cartoon, radio broadcast, television broadcast, video, movie, theatrical production, Internet website, e-mail, Twitter tweet, Facebook page, or otherwise, even if fictionalized, (iv) in any language, or (v) in any country or other jurisdiction (collectively, the "**Restricted Means and Contexts**").

    2.    <u>No Disparagement</u>.  During the term of your service and at all times thereafter you hereby promise and agree not to demean or disparage publicly the Company, Mr. Trump, any Trump Company, any Family Member, or any Family Member Company or any asset any of the foregoing own, or product or service any of the foregoing offer, in each case by or in any of the Restricted Means and Contexts and to prevent your employees from doing so.

    3.    <u>No Competitive Services</u>.  Until the Non-Compete Cutoff Date you promise and agree not to assist or counsel, directly or indirectly, for compensation or as a volunteer, any person that is a candidate or exploring candidacy for President of the United States other than Mr. Trump and to prevent your employees from doing so.

    4.    <u>No Competitive Solicitation</u>.  Until the Non-Solicitation Cutoff Date you promise and agree not to hire or solicit for hiring, or assist any other person, entity or organization to hire or solicit for hiring, any person that is an independent contractor of, employee of an independent contractor of, or employee of Company or any other Trump Person and who at any time provides services for the project or objective for which you or your employer, as applicable, are being engaged.

    5.    <u>No Competitive Intellectual Property Claims</u>. During the term of your service and at all times thereafter you promise and agree never to assert any rights to any intellectual property that (a) includes the name "Trump," (b) is owned by or associated with the Company, Mr. Trump, any Trump Company, any Family Member or any Family Member Company, for example, without limitation, any name, likeness, voice, or image of Mr. Trump or any Family Member, or any logo, motto or phrase created, developed or commonly associated with any of them, or (c) is developed in connection with the project or objective for which your services are

being engaged (all of which will be deemed a "work made for hire" or will be assigned by you to us).

6.     <u>Definitions</u>.  As used in this agreement, the following definitions apply:

a.     **"Confidential Information"** means all information (whether or not embodied in any media) of a private, proprietary or confidential nature or that Mr. Trump insists remain private or confidential, including, but not limited to, any information with respect to the personal life, political affairs, and/or business affairs of Mr. Trump or of any Family Member, including but not limited to, the assets, investments, revenue, expenses, taxes, financial statements, actual or prospective business ventures, contracts, alliances, affiliations, relationships, affiliated entities, bids, letters of intent, term sheets, decisions, strategies, techniques, methods, projections, forecasts, customers, clients, contacts, customer lists, contact lists, schedules, appointments, meetings, conversations, notes, and other communications of Mr. Trump, any Family Member, any Trump Company or any Family Member Company.

b.     **"Family Member"** means any member of Mr. Trump's family, including, but not limited to, Mr. Trump's spouse, each of Mr. Trump's children and grandchildren and their respective spouses, including but not limited to Donald J. Trump Jr., Eric F. Trump and Ivanka M. Trump, Tiffany Trump, and Barron Trump, and their respective spouses, children and grandchildren, if any, and Mr. Trump's siblings and their respective spouses and children, if any.

c.     **"Family Member Company"** means any entity, partnership, trust or organization that, in whole or in part, was created by or for the benefit of any Family Member or is controlled or owned by any Family Member.

d.     **"Non-Compete Cut Off Date"** means the date the current U.S presidential election cycle is over or, if earlier, the date Mr. Trump announces that he will not run or will no longer run for the Presidency of the United States of America in the current U.S. presidential election cycle.

e.     **"Non-Solicitation Cutoff Date"** means the Non-Compete Cut Off Date.

f.     **"Trump Company"** means any entity, partnership, trust or organization that, in whole or in part, was created by or for the benefit of Mr. Trump or is controlled or owned by Mr. Trump.

g.     **"Trump Person"** means each of Mr. Trump, each Family Member, each Trump Company (including but not limited to the Company) and each Family Member Company.

7.     <u>Remedies for Breach of this Agreement</u>.

a.     <u>Consent to Injunction</u>.  A breach of any of your promises or agreements under this agreement will cause the Company, Mr. Trump and each other Trump Person irreparable harm. Accordingly, to the extent permitted by law, and without waiving any other rights or remedies against you at law or in equity, you hereby consent to the entry of any order, without prior notice

to you, temporarily or permanently enjoining you from violating any of the terms, covenants, agreements or provisions of this agreement on your part to be performed or observed. Such consent is intended to apply to an injunction of any breach or threatened breach.

b. <u>Agreement to Indemnify</u>. You hereby agree to indemnify, defend (with counsel acceptable to the Trump Person you are defending) and hold harmless each Trump Person from and against any claim, demand, suit, proceeding, damages, cost, loss or expense of any kind or nature, including but not limited to reasonable attorneys' fees and disbursements, incurred by any Trump Person as a consequence of your breach of any of your promises or agreements in this agreement.

c. <u>Damages and Other Remedies</u>. Notwithstanding anything to the contrary, each Trump Person will be entitled to all remedies available at law and equity, including but not limited to monetary damages, in the event of your breach of this agreement. Nothing contained in this agreement will constitute a waiver of any Trump Person's remedies at law or in equity, all of which are expressly reserved.

d. <u>Third Party Beneficiaries</u>. Mr. Trump and each Family Member, Trump Company and Family Member Company is an intended third party beneficiary of this agreement. Without limiting the preceding sentence, Mr. Trump, each Family Member, Trump Company and Family Member Company, in addition to the Company, will be entitled to the benefit of this agreement and to enforce this agreement.

8. <u>Resolution of Disputes</u>.

a. <u>Governing Law; Jurisdiction and Venue</u>. This Agreement is deemed to have been made in the State of New York, and any and all performance hereunder, breach hereof, or claims with respect to the enforceability of this agreement must be interpreted and construed pursuant to the laws of the State of New York without regard to conflict of laws or rules applied in the State of New York. You hereby consent to exclusive personal jurisdiction and venue in the State of New York with respect to any action or proceeding brought with respect to this agreement.

b. <u>Arbitration</u>. Without limiting the Company's or any other Trump Person's right to commence a lawsuit in a court of competent jurisdiction in the State of New York, any dispute arising under or relating to this agreement may, at the sole discretion of each Trump Person, be submitted to binding arbitration in the State of New York pursuant to the rules for commercial arbitrations of the American Arbitration Association, and you hereby agree to and will not contest such submissions. Judgment upon the award rendered by an arbitrator may be entered in any court having jurisdiction.

c. <u>Prevailing Party Fees</u>. Any court judgment or arbitration award shall include an award of reasonable legal fees and costs to the prevailing party.

d. <u>Interpretation and Representation by Counsel</u>. This agreement has been drafted on behalf of the undersigned only as a convenience and may not, by reason of such action, be construed against the undersigned. Each of the parties (i) has had the opportunity to be and/or

has elected not to be, represented by counsel, (ii) has reviewed each of the provisions in this agreement carefully and (iii) has negotiated or has had full opportunity to negotiate the terms of this agreement, specifically including, but not limited to Paragraph 7 hereof.  You waive any claims that may be available at law or in equity to the effect that you did not have the opportunity to so consult with counsel.

        e.  <u>No Waiver</u>.  Neither the failure or delay to exercise one or more rights under this agreement nor the partial exercise of any such right, will be deemed a renunciation or waiver of such rights or any part thereof or affect, in any way, this agreement or any part hereof or the right to exercise or further exercise any right under this agreement or at law or in equity.

        9.    <u>Miscellaneous</u>.  **Modifications**. No change or waiver of the terms, covenants and provisions of this agreement will be valid unless made in writing and signed by the undersigned. **Relationship**.  Nothing herein contained is intended to, nor shall it be construed as, reflecting any employer-employee or independent contractor relationship between you and the undersigned or any other individual or entity. **Counterparts**.  This agreement may be executed in any number of counterparts, all of which taken together will constitute one and same instrument.  Delivery of an executed signature page of this this agreement by facsimile transmission or .pdf, .jpeg, .TIFF, or other electronic format or electronic mail attachment will be effective as delivery of an original executed counterparty hereof.

        10.    <u>Survival</u>.  This agreement will survive the expiration, cancellation or termination of any employment or independent contractor relationship that you may have with the Company or with any individual, entity, partnership, trust or organization that the Company has engaged.

        Donald J. Trump for President

        Name: Lucia Castellano
        Title: HR Director

**OMAROSA MANIGAULT ACKNOWLEDGES THAT SHE HAS READ AND UNDERSTOOD THIS AGREEMENT, AND AGREES TO COMPLY WITH THE FOREGOING WHICH CREATES A VALID AND BINDING LEGAL OBLIGATION ON HER.**

Omarosa Manigault

Signature:
Name:_Omarosa Manigault
Address: