IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

    Plaintiff,                                                         Case No.: 1:19-cv-1868 (RJL)

v.

OMAROSA MANIGAULT NEWMAN,

    Defendant,
_____/

## **DEFENDANT OMAROSA MANIGAULT NEWMAN'S RESPONSE TO PLAINTIFF'S RENEWED MOTION FOR PROTECTIVE ORDER**

Comes now the Defendant, Omarosa Manigault Newman, by and through her undersigned counsel and files her Response to Plaintiff's Renewed Motion for Protective Order, and in support alleges as follows.

### INTRODUCTION

The United States of America has sued Omarosa Manigault Newman for allegedly violating a provision of the Ethics in Government Act ("EIGA"), 5 U.S.C. app. 4 § 101 et seq. Specifically, the United States of America alleges that Ms. Manigault Newman "violated 5 U.S.C. app. 4 § 104, by *knowingly and willfully* failing to file her termination report within the time required by the EIGA." [ECF No. 2-1 at 6]. This lawsuit was filed on July 1, 2019.

On September 11, 2019, Ms. Manigault Newman moved to dismiss this lawsuit on the grounds that the United States of America has failed to adequately state a cause of action for which relief can be granted. [ECF No. 5]. Mrs. Manigault Newman's Motion to Dismiss was denied.

1

On October 28, 2019, parties to this litigation exchanged initial disclosures pursuant to Fed. R. Civ. P. 26(a).  In part, Ms. Manigault Newman listed fifteen (15) individuals who likely have discoverable information related to this case.  These individuals include, but are not limited to, Uttam Dhillon, Esq., (Former Deputy Counsel and Deputy Assistant to the President), John F. Kelly (Former White House Chief of Staff) and President Donald J. Trump.  In addition, Ms. Manigault Newman disclosed the "Executive Office of the President employee who allegedly referred this matter to the Department of Justice pursuant to 5 C.F.R. § 2634.701."[1]  Ms. Manigault Newman does not know the identity of the individual who referred this case to the Department of Justice for prosecution.

On November 13, 2019, the United States of America moved for a protective order regarding Ms. Manigault Newman's desire to depose former White House ethics counsel Uttam Dhillon, former White House Chief of Staff General John Kelly, and Donald J. Trump.  [ECF No. 17].  In addition, the United States of America summarily argues that Ms. Manigault Newman should be forbidden from deposing the White House employee who referred this matter to the Department of Justice for prosecution. [ECF No. 17 at 7-9].

Furthermore, within the United States of America's Motion for Protective Order, it is argued that "discovery regarding Defendant's actual termination date and the location of boxes of her personal effects left at the White House are neither relevant nor proportional to the needs of this case."  [ECF No. 17 at 12].

On June 17, 2020, the Goverement filed a Renewed Motion for Protective Order whereing they seek the same protections as previously requested.  [ECF No. 17].  As discussed

---

[1] 5 C.F.R. § 2634.701 (a) Referral of cases. The head of each agency, each Secretary concerned, or the Director of the Office of Government Ethics, as appropriate, must refer to the Attorney General the name of any individual when there is reasonable cause to believe that such individual has willfully failed to file a public report or information required on such report, or has willfully falsified any information (public or confidential) required to be reported under this part.

below, these arguments are without merit and Plaintiff's Renewed Motion for Protective Order should be denied.

### THE COMPLAINT

On July 1, 2019, the United States of America filed the operative Complaint.  Within said Complaint, the government presents numerous allegations which purportedly show that Ms. Manigault Newman violated the EIGA by knowingly and wilfully failing to file her termination financial disclosure report within the time prescribed under the EIGA.

The Complaint alleges that Ms. Manigault Newman knew of her obligation to file her termination financial disclosure report, in part, based upon a "post-government employment briefing" held "on or before December 19, 2017." [ECF No. 2-1 at 3].  The only "post-government employment briefing" held on or before December 19, 2017 was the meeting that took place in the Situation Room of the White House on December 13, 2017.  Former White House Chief of Staff, Gen. **John Kelly**, White House ethics attorney Stefan Passantino, Esq., White House ethics attorney **Uttam Dhillon, Esq.**,  Human Resource Manager Irene Porada and Ms. Manigault Newman were present for this meeting.

During this "post-government employment briefing" General John Kelly terminated Ms. Manigault Newman while in the Situation Room.  During the termination, General Kelly threatened, **"I'd like to see this be a friendly departure…and you can go on without any type of difficulty in the future relative to your reputation."**  [ECF No. 7] Shortly thereafter, General Kelly exited the Situation Room.

Following General Kelly's departure, a conversation regarding Ms. Manigault Newman's termination date was discussed between Mr. Passantino, Mr. Dhillon, and Ms. Manigault Newman.  During this conversation, Ms. Manigault Newman asked White House ethics counsel,

Mr. Dhillon, "How do I make it to the one year mark? Which is 1/20…that's important to me…to make it to the one year mark." *Id.*

Mr. Dhillon responded to Ms. Manigault Newman's inquiry by stating, "**I will see if that possible** and then I'll bring Irene in to begin the paperwork process … So let's do this, **I'll ask about keeping you [until] the twentieth**." *Id.* Mr. Dhillon then left the Situation Room and Irene Porada entered.

Approximately ten minutes later, Mr. Dhillon returned to the situation room and announced, "**Yes, to the twentieth of January**." *Id.* "**We're taking you until the twentieth now.**" *Id.*

Irene Porada then stated, "**O.K., so we'll take [her] through the twentieth**?" To wit Mr. Dhillon responded, "**Yes, Ma'am**." *Id.*

The meeting in the Situation Room was the last time Ms. Manigault Newman has been on the White House grounds. In addition, Ms. Manigault Newman has not communicated with General John Kelly since December 13, 2017. **The EIGA and/or the need to file a financial disclosure form was <u>not</u> discussed with Ms. Manigault Newman during this Situation Room meeting.**

Shortly thereafter an electronic financial disclosure form was sent to Ms. Manigault Newman. The first page of the financial disclosure form listed her termination date as December 13, 2017. **Due to the electronic nature of the financial disclosure form, Ms. Manigault Newman was unable to correct the termination date, to January 20, 2018**. The inaccurate information contained on the first page of the electronic financial disclsoure form

4

**prohibited Ms. Manigault Newman from completing the form.[2]  Ms. Manigault Newman advised the White House ethics counsel of the termination date discrepency multiple times**.

The Government's Complaint further alleges that emails were <u>sent</u> to Ms. Manigault Newman on December 29, 2017, January 3, 2018, January 12, 2018, January 19, 2018, February 6, 2018, "reminding her of her obligation to complete the financial termination report." [ECF No. 2-1 at 4].  These emails were not attached to the Complaint.  In addition, the Complaint does not allege who sent these emails or if these emails were received.  However, the Complaint states that "an **ethics attorney** in the White House Counsel's Office sent Ms. Manigault Newman an email regarding her of her obligation to file her termination financial disclosure report." [ECF No. 2-1 at 4].

The Complaint goes on to state that "Pursuant to the regulations of the Executive Office of the Government Ethics, 5 C.F.R. § 2634.701, the Executive Office of the President referred this matter to the Department of Justice for commencement of an action authorized by 5 U.S.C. app. 4. 104(a), and the action was authorized on March 17, 2019." [ECF 2-1 at 5].  The Complaint did not disclose the identity of the referring employee or the grounds upon which the referral was based.

## ARGUMENT

### <u>Omarosa Manigault Newman is entitled to depose those who possess knowledge regarding the facts and circumstances of this case</u>

The Government seeks a protective order regarding the depositions of <u>Former</u> White House Chief of Staff Gen. John Kelly, <u>Former</u> White House Ethics Counsel Uttam Dhillon, and Donald J. Trump.  In support of this argument, the Government argues that Ms. Manigault Newman should not be permitted to take these depositions because "exceptional circumstances

---

[2] 5 U.S.C. app. 4 §104(a)(2)(A)(i): "It shall be <u>unlawful for any person to knowingly and willfully falsify any information</u> that such person is required to report under Section 102. (*Emphasis added*)

must exist before the involuntary depositions of high agency officials are permitted." *See In re FDIC*, 58 F.3d 1055, 1060 (5th Cir. 1995).

### A. General John Kelly

As discussed previously, General John Kelly has direct knowledge regarding the "post-government employment briefing" relied upon by the Government within their Complaint. The importance of this meeting is central to the Government's claim in proving that Ms. Manigault Newman knowingly and wilfully failed to file her termination financial disclosure report. Significantly, the Complaint alleges that at this "post government employment briefing…[Ms. Manigault Newman] was advised of her obligation under the EIGA to file a termination financial disclosure report by January 18, 2018." [ECF No. 2-1 at 5].

Ms. Manigault Newman was <u>not</u> advised of her obligation under the EIGA to file a termination financial disclosure report at this "post-government employment briefing." As such, Ms. Manigault Newman seeks to depose the <u>Former</u> White House Chief of Staff as he has direct knowledge of the "post government employment briefing", a fact relied upon by the Government in the prosecution of this case.

In support of their Motion for Protective Order, the Government asserts that "High ranking government officials have greater duties and time constraints than other witnesses" and given the government policies and actions, their "time would be monopolized by preparing and testifying" if their testimony were not limited to extraordinary circumstances." [ECF 2-1 at 6]. Ms. Manigault Newman fails to see how this rationale would apply to taking the deposition of a <u>former</u> high ranking government official, such as General John Kelly. In fact, the cases relied upon by the Government do not concern <u>former</u> high ranking government officials, only current ones. Currently, Former White House Chief of Staff Gen. John F. Kelly is <u>not</u> employed by the

federal government in any capacity and works for a private for-profit company. As such, the Government has failed to establish the requisite good cause for the entry of a protective order in regards to Former White House Chief of Staff, Gen. John Kelly. Further, Ms. Manigault Newman was also a "high ranking government official." The President of the United States, another "high ranking government official", is taunting her about suing her. These are not wasteful depositions. They are necessary to establish legtimate legal defenses to this action brought against her by the United States government.

**B. Uttam Dhillon**

At the time of the "post government employment briefing" referrenced in the Government's Complaint, Uttam Dhillon was employed as Deputy Counsel and/or Deputy Assistant to the President. Mr. Dhillon was present during the post government employoment briefing. Also, Mr. Dhillon has direct knowledge of the discussions regarding Ms. Manigault Newman's termination date. Mr. Dhillon also has direct knowledge of informing Ms. Manigault Newman that her termination date was effective January 20, 2018. In addition, Mr. Dhillon has direct knowledge of communications between himself and former White House Chief of Staff General John Kelly as it relates to Ms. Manigault Newman. Furthermore, Ms. Dhillon has direct knowledge that the Ethics in Government Act and/or the need to file her financial termination report was <u>not</u> discussed during the "post government employment briefing" as alleged in the Complaint.

Since the date of the post-government employment briefing took place, Mr. Dhillon took a position as the Acting Director of the Drug Enforcement Agency. Of course, this matter is unrelated to the Drug Enforcement Agency in any way. As such, Ms. Manigault Newman is not seeking to depose Mr. Dhillon for information related to his position with the DEA. Rather, Ms.

Manigault Newman seeks to depose Mr. Dhillon because he has direct knowledge of facts and circumstances surrounding this litigation.

The Government argues that Ms. Manigault Newman should be prohibited from taking Ms. Dhillon's deposition because she has not established "extraordinary circumstances". However, the very cases cited by the Government state that high-ranking government officials are required to testify "where the official has first had knowledge relating to the claims being litigated." See *Bogan v. City of Boston*, 489 F.3d 417, 423-25 (1st Cir. 2007). [ECF No. 17 at 6-7]. Significantly, in May 2020, Mr. Dhillon resigned from his position as the Acting Administrator of the Drug Enforcement Agency and is thus no longer a "high ranking government official." It is believed that Mr. Dhillon is now employed by the Department of Justice.

Here, the issue being litigated is whether or not Ms. Manigault Newman knowingly and wilfully failed to file her termination financial disclosure report within the time perscribed under the EIGA. In support of their claim, the Government relies upon a "post government employment briefing" and multiple emails sent to Ms. Manigault Newman by "an ethics attorney in the White House Counsel's Office." As the former Deputy Counsel and Deputy Assistant to the President, Mr. Dhillon has first-hand knowledge of the "post-government employment brieifng" and the "numerous emails" relied upon by the Government in the prosecution of this case. As such, Ms. Manigault Newman, in an effort to defend herself in this litigation, seeks to depose Mr. Dhillon.

**President Donald J. Trump**

The operative Complaint indicates, "the Executive Office of the President referred this matter to the Department of Justice." [ECF 2-1, P. 5, ¶ 24]. <u>This referral for prosecution cannot</u>

<u>be based on retaliation</u>, but must be based on "reasonable cause" to believe that Ms. Manigault Newman has wilfully failed to file a public report." 5 C.F.R. § 2634.701.

The President of the United States, the referring entity in this case, has previously called Ms. Manigault Newman "wacky" [*see* tweet from @realdonaldtrump, August 13, 2017], said she "had zero credibility with the media," [*see* tweet from @realdonaldtrump August 13, 2017], called her a "lowlife" [*see* tweet from @realdonaldtrump August 13, 2017], insinuated she was illegitimate [*see* tweet from @realdonaldtrump August 13, 2017], said "people in the White House hated her," [*see* tweet from @realdonaldtrump August 13, 2017], said she was "vicious, but not smart," [*see* tweet from @realdonaldtrump August 13, 2017], indicated he'd "rarely see her," [*see* tweet from @realdonaldtrump August 13, 2017], that she "begged me for a job, tears in her eyes," [*see* tweet from @realdonaldtrump August 13, 2017], called her "wacky and deranged," [*see* tweet from @realdonaldtrump August 13, 2017], called her a liar for saying there was a tape of him saying the "N-word," as he has never had that word in his vocabulary," [*see* tweet from @realdonaldtrump August 13, 2017], and made other false statements about Ms. Manigault Newman.

On August 31, 2019, President Donald J. Trump admitted to using lawsuits against people for allegedly violating confidentiality agreements. He said, "Yes, I am currently suing various people for violating their confidentiality agreements. Disgusting and foul-mouthed Omarosa is one. I gave her every break, despite the fact that she was despised by everyone, and she went for some cheap money from a book." [*see* tweet from @realdonaldtrump, August 31, 2019].

This is the only lawsuit which exists between Mr. Trump, his agents or the United States Government and Ms. Manigault Newman. Employer/employee revenge is not a proper use of

taxpayer money or court resources. Based upon the above referenced public disclosures from President Donald J. Trump, Ms. Manigault Newman believes that this action is a form of retaliation against Ms. Manigault Newman for publishing a book that President Trump did not like. This unlawful form of retaliation is a defense to the present lawsuit and Ms. Manigault Newman seeks discovery to support this defense.

### Ms. Manigault Newman is entitled to discovery regarding the Executive Office of the President's decision to refer this action to the Department of Justice for prosecution

In addition to seeking an order prohibiting Ms. Manigault Newman from deposing witnesses with information directly relevant to this claim, the Government further seeks to hamstring Ms. Manigault Newman by prohibiting her from discovering information related to the Executive Branch's decision to refer this case to the Departmnet of Justice for prosecution. 5 C.F.R. § 2634.701 states in pertinent part:

> The head of each agency, each Secretary concerned, or the Director of the Office of Government Ethics, as appropriate, must refer to the Attorney General the name of any individual **when there is reasonable cause to believe that such individual has willfully failed to file a public report or information** required on such report, or has willfully falsified any information (public or confidential) required to be reported under this part. 5 C.F.R. § 2634.701  (emphasis added)

As a condition pecedent to bringing this EIGA action against Ms. Manigault Newman, the Attorney General must have first received a referral from the head of the Office of the President.

The Complaint alleges that "pursuant to the regulations of the Executive Office of the Government Ethics, 5 C.F.R. § 2634.701, the Executive Office of the President referred this matter to the Department of Justice for commencement of an action authorized by 5 U.S.C. app. 4 § 104(a), and the action was authorized on March 17, 2019." [ECF No. 2-1, at 5]. This referral was not attached to the Complaint. The Complaint did not allege who referred this

matter to the Attorney General, nor did it state the facts upon which the "reasonable cause" determination was made. Defendant Manigault Newman is entitled to discovery on this issue.

In support of their motion, the Government argues that this information is irrelevant to this litigation. Defendant Manigault Newman fails to see how discovery related to the referral for prosecution is irrelevant to the underlying claim. Had the referral not have been made, there would be no litigation. In addition, the requirement of this referral is codified in 5 C.F.R. § 2634.701. Furthermore, the Government argues that Ms. Manigault Newman should be prohibited from discovery on this issue because it somehow infringes upon "prosecutorial discretion." [ECF No. 13 at 11].

In support of the "prosecutorial discretion" argument, the Government cites to *United States v. Armstrong*, 517 U.S. 456, 464 (1996) which states, "In the ordinary case, so long as the prosecutor has probable cause to believe that the accused committted an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." However, this is not an ordinary criminal case. Nor is this a case in which we are questioning the prosecutors decision to file suit.

Ms. Manigault Newman seeks information relating to the referral for prosecution, not the ultimate decision to prosecute. Unlike ordinary criminal cases, the EIGA has a codified pre-requisite that must be met prior to the bringing of this suit. This pre-requisite is a referral from the Head of the Office of the President "**when there is reasonable cause to believe that such individual has willfully failed to file a public report or information.**" 5 C.F.R. § 2634.701. Without such "referral", the Department of Justice does not have the "prosecutorial discretion" to bring such an action.

It is Ms. Manigault Newman's position that no such "reasonable cause" existed, as the Head of the Office of the President was aware of the incorrect termination date on her report and was aware that the White House was retaining boxes of financial information required to complete the termination financial disclosrue report.  As such, the head of the Office of the President lacked the requisite 'reasonable cause' to believe that Ms. Manigault Newman 'wilfully' failed to file a public report or information.  To defend herself in this matter, Ms. Manigault Newman is entitled to discovery regarding the Executive Branch's referral for prosecution.

### DEFENDANT CAN SATIFY THE REQUIREMENTS TO DEPOSE DEPARTMENT OF JUSTICE EMPLOYEE, ASHLEY CHEUNG, ESQ.

The Government next moves for a protective order regarding Ms. Manigault Newman's request to depose Department of Justice employee, Ashley Cheung, Esq.  Significantly, Ashley Cheung, Esq., was directly communicating to Ms. Manigault Newman regarding the termination financial disclosure report <u>prior to the filing of this lawsuit</u>.  In addition, Ms. Cheung is <u>not litigation counsel</u> on this case.

Prior to the filing of this instant lawsuit, Ashley Cheung, Esq., communicated multiple times to Ms. Manigault Newman and her counsel in regards to obtaining her boxes of financial information which were withheld from her by the White House since December 13, 2017.  Ms. Cheung has information directly related to Ms. Manigault Newman's wilful desire and need to obtain these boxes from the White House.  In addition, Ms. Cheung has direct knowledge of the process that Ms. Manigault Newman had to go through in order to retrieve her boxes of financial information so that she could complete the financial disclosure report.

Within their Motion, the Government argues that the *Shelton* test applies when seeking to depose litigation counsel.   The rationale of the *Shelton* test is that, "counsel should be free to

12

devote his or her time and efforts to preparing the client's case without fear of being interrogated by his or her opponent" because permitting such depositions "disrupts the adversarial system…" [ECF No. 17 at 9].  Significantly, <u>Ashley Cheung is not litigation counsel on this case</u>.  As such, the *Shelton* test does not apply.

Assuming arguendo, that the *Shelton* test did apply here, the Government's motion should still be denied.  Under the <u>*Shelton*</u> test, depositions of <u>opposing counsel</u> are permitted "where the party seeking to take the deposition has shown that (1) no other means exist to obtain the infromation than to depose opposing counsel; (2) the information sought is relevant and nonprivledged; and (3) the information sought is crucial to the preparation of the case.  *Shelton*, 805 F. 2d at 1327.  As discussed above, the *Shelton* test is inapplicable here because Ms. Manigault Newman is not seeking to depose opposing counsel, but rather Department of Justice employee Ashley Cheung, Esq.

Nevertheless, should the *Shelton* test apply, Ms. Manigault Newman should still be permitted to depose Ashley Cheung, Esq.  Ms. Cheung directly communicated to both Ms. Manigault Newman and her counsel in regards to retrieving the boxes of financial information.  Ms. Cheung was informed of Ms. Manigualt Newman's wilful desire to complete the financial termination report prior to the filing of this instant action.  Ms. Cheung has direct knowledge of the White House's refusal to return these boxes to Ms. Manigault Newman.  Ms. Cheung is the only individual at the Department of Justice who spoke with Ms. Manigault Newman prior to the filing of this action.  The information Ms. Cheung has is crucial to the defense of this case and is directly relevant to whether or not Ms. Manigault Newman "wilfully" failed to file her financial termination report.  Within the Government's Motion for Protective Order they even state that "documents and communications pertaining to…Defendant's efforts to obtain materials she

contends were necessary to complete the financial disclosure report…relate to…the sole disputed issue in the case." [ECF No. 18 at 4-5]. For the forgoing reasons, the Government's Motion for Protective order should be denied.

### Discovery regarding Defendant's Actual Termination Date and the Location of Boxes of her Personal Effects at the White House are relevant and proportional to this case

The United States of America has sought an order prohibiting Ms. Manigualt Newman from deposing individuals with information regarding her termination date and/or the decision to withhold multiple boxes of fianncial information from her. The Government argues that the date of her termination is irrelevant to this case. In conclusory fashion, the Government argues that "neither Defendant's termination date nor the location and chain of custody of her personal effects is relevant nor are depositions on these topics proportional, because Defendant remains liable even accepting her position on each issue…" [ECF No. 13 at 11].

### Termination Date information is directly relevant to this case

Defendant argues that "discovery regarding her termination date is irrelevant and not proportional to the needs of the case because Defendant is liable whether that date is December 19, 2017, or her preferred date, January 20, 2018." [ECF No. 17, at 11]. The Government seemingly fails to understand the significance of the termination date discrepancy as it relates to the termination financial disclosure report.

As stated in Defendant's Motion to Dismiss, "an electronic financial disclosure form was sent to Ms. Manigault Newman. The first page of the financial disclosure form listed her termination date as December 13, 2017. **Due to the electronic nature of the financial disclosure form, Ms. Manigault Newman was unable to correct the termination date, to January 20, 2018. The inaccurate information contained on the first page of the electronic**

**financial disclsoure form prohibited Ms. Manigault Newman from completing the form. Ms. Manigault Newman advised the White House ethics counsel of the termination date discrepency multiple times."** [ECF No. 5 at 10].

The Government argues that Ms. Manigault Newman should be prohibited from seeking discovery of this issue because "The *fact* of the deadline – the only element of Plaintiff's claim to which the termination date is relevant – can be established through less burdensome means." [ECF No. 17 at 12]. The Government's conclusory assertion fails to account for the discrepency on the termination financial report provided to Ms. Manigault Newman. Defendant Manigault Newman is defending herself, in part, based upon the "incorrect termination date" on the form provided to her. The *fact* that the termination date was incorrect on the provided termination financial report is certainly relevant to this action. The *fact* that Ms. Manigault Newman repeatedly informed White House counsel about this termination date discrepancy is certainly relevant to this action. The *fact* that Ms. Manigault Newman would have violated the EIGA had she submitted the termination financial report with the incorrect termination date is relevant to this case. Ms. Manigault Newman wilfully attempted to complete the financial disclosure report but was unable to do so because of the inaccurate termination date listed on her provided report. As such, discovery regarding the termination date and the termination date on the provided financial disclosure report are directly relevant, necessary, and discoverable.

### The White House's repeated refusal to return Ms. Manigault Newman's boxes containing financial information is directly relevant to this case

The Government admits that the White House possessed Ms. Manigault Newman's boxes from December 13, 2017 through July 2019. These boxes contained financial documents and records. Without these boxes of financial information, Ms. Manigault Newman was unable to complete the subject termination financial disclosure report. Since leaving the White House on

December 13, 2017, Ms. Manigault Newman repeatedly sought to retrieve these boxes, but was advised that the White House would not return them.

In the present case, the Government must prove that Ms. Manigault Newman's failure to file her financial termination report was both "knowing and wilfull."  To defend herself against these allegations, Ms. Manigault Newman argues, in part, that she was wilfully attempting to complete the termination report but was unable to do so because the White House refused to return her boxes of financial information.

In support of her defense, Ms. Manigault Newman seeks to discover relevant facts regarding the White House's decision to withhold her boxes from her.  For example, Ms. Manigault Newman seeks discovery on prior communications between herself and White House employees regarding these boxes of financial information.  It should be noted that the same White House that unlawfully possessed Ms. Manigault Newman's boxes for nearly two years is the same entity that referred this case to the Department of Justice for prosecution.

In support of their argument, the Government asserts that "the issue of the boxes' location" is irrelevant and undisputed. [ECF 17, at 13].  Simply put, this argument is without merit.  Ms. Manigault Newman's repeated attempts to collect her boxes of financial information show a wilful desire to complete her termination financial report.  Furthermore, evidence of the White House's refusal to provided boxes of financial information to Ms. Manigault Newman is directly relevant as to whether or not the requisite "reasonable cause" existed prior to referring this case for prosecution.

## Conclusion

For the reasons set forth above, the Court should deny Plaintiff's motion.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of Court using the CM/ECF which will furnish a copy to Christopher M. Lynch, Esq., Joseph H. Hunt, Esq., James J. Gilligan, Esq., Jacqueline Coleman Snead, Esq., United States Department of Justice Civil Division, Federal Programs Branch, 1100 L. Street, N.W., Washington, D.C. 20005, at <u>Christopher.m.lynch@usdoj.gov</u> ; <u>Jacqueline.Snead@usdoj.gov</u> ;this **1st** day of July, 2020.

Respectfully submitted,

**Law Office of John M. Phillips, LLC**

<u>/s/ John M. Phillips</u>
**JOHN M. PHILLIPS, ESQUIRE**
DC Bar Number:  1632674
4230 Ortega Boulevard
Jacksonville, FL 32210
(904) 444-4444
(904) 508-0683 (facsimile)
Attorneys for Defendant
<u>jphillips@floridajustice.com</u>
michele@floridajustice.com
Kirby@floridajustice.com

**The Law Office of J. Wyndal Gordon, P.A.**


<u>/s/ J. Wyndal Gordon, Esq.</u>
**J. WYNDAL GORDON, ESQUIRE**
MD Bar Number: 23572
20 South Charles Street, Suite 400
Baltimore, MD  21201
(410)332-4121
(410)347-3144 facsimile
<u>jwgaattys@aol.com</u>
Attorneys for Defendant