**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**OMAROSA MANIGAULT NEWMAN,**

**Defendant.**

Civil Action No. 1:19-cv-1868 (RJL)

---

## PLAINTIFF UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff hereby moves for summary judgment on the ground that there is no genuine issue of disputed material fact that Defendant Omarosa Manigault Newman is liable for knowingly and willfully failing to timely file her termination financial disclosure report required by the Ethics in Government Act, 5 U.S.C. app. 4 § 101 *et seq.*, and that Plaintiff is entitled to judgment and an award of the statutory maximum $61,585 in civil penalties as a matter of law.

In support of this motion, Plaintiff submits the accompanying memorandum; statement of undisputed material facts; Declaration of Stefan Passantino; Declaration of Scott de la Vega; Declaration of David Jones; Declaration of Diana Veilleux; Declaration of David C. Mills; Declaration of Christopher M. Lynch; and Plaintiff's proposed order.

Dated: December 7, 2020

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

JACQUELINE COLEMAN SNEAD
Assistant Branch Director

*/s/ Christopher M. Lynch*
Christopher M. Lynch
D.C. Bar # 1049152
Trial Attorney
United States Department of Justice
Civil Division,
Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 353-4537
Fax: (202) 616-8470
Email: christopher.m.lynch@usdoj.gov

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 2

I.    Statutory Background ................................................................................. 2

II.    Factual Background ................................................................................... 4

    A.    February-August 2017: White House Ethics Counsel Undertakes Efforts to Obtain Defendant's Compliance with the Requirement to File Her New Entrant Report .......................................................... 6

    B.    December 12-19, 2017: Defendant Leaves her Employment at the White House, Triggering Her Obligation to File a Termination Report ........................... 8

    C.    December-January 2017: White House Ethics Counsel Sets Up Defendant's Termination Report and Provides Her with Her Termination Packet ............................................................................ 9

    D.    The White House Ethics Office's Extensive Efforts to Remind Defendant of Her Obligations Under EIGA, Offer Assistance, and Obtain Compliance ....................................................................... 10

    E.    May 2019-Present: Plaintiff Initiates This Lawsuit and Defendant Advances a Series of *Post Hoc* Rationalizations for Her Failure to File Her Termination Report .......................................................... 16

STANDARD OF REVIEW ................................................................................... 19

ARGUMENT ........................................................................................................ 20

I.    Defendant Was Required by EIGA to File a Termination Report within 30 Days of Leaving the White House and Failed to Do So .......................................... 21

II.    Defendant's Failure to File a Termination Report Was Knowing and Willful ............... 22

    A.    Defendant Knew She Was Required to File a Termination Report ..................... 22

    B.    Defendant's Entire Course of Conduct Since Her Termination Demonstrates Her Intentional Disregard for EIGA and Indifference to Its Requirements ................................................................. 23

    C.    Defendant's Revisionist History Does Not Create a Material Dispute that Her Failure to File Was Willful .......................................................... 26

        1.    The Termination Date "Discrepancy" Is Irrelevant ................................. 27

2.      Defendant's Personal Effects That She Failed to Retrieve from the
        White House Until After this Action Was Filed Have No Bearing
        on Her Willfulness ................................................................................. 29

3.      The "Unmonitored Email Address" Was Not in Fact Unmonitored ........ 32

III.    The Court Should Award Plaintiff the Maximum Amount of Civil Penalties
        Permitted by Law ............................................................................................. 34

CONCLUSION ............................................................................................................. 36

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................ 19, 20

*Arabaitzis v. Unum Life Ins. Co. of Am.*,
   Civ. A. No. 16-1273 TNM/DAR, 2018 WL 4610893 (D.D.C. Sept. 11, 2018) ...................... 19

*Dawson v. Reukauf*,
   751 F. Supp. 2d 146 (D.D.C. 2010) ................................................................................. 20

*Fed. Election Comm'n v. Craig for U.S. Senate*,
   70 F. Supp. 3d 82 (D.D.C. 2014) ................................................................................... 34

*Nunnally v. District of Columbia*,
   243 F. Supp. 3d 55 (D.D.C. 2017) ................................................................................. 20

*Richardson v. Nat'l Rifle Ass'n*,
   871 F. Supp. 499 (D.D.C. 1994) ................................................................................... 20

*Trump v. Mazars USA, LLP*,
   940 F.3d 710 (D.C. Cir. 2019) ....................................................................................... 2

*United States v. Gant*,
   268 F. Supp. 2d 29 (D.D.C. 2003) .................................................................... *passim*

*United States v. Hunter*,
   No. 1:14-cv-442-JEB, slip. op. (D.D.C. Aug. 27, 2014) ............................................ 20, 23, 36

*United States v. Lairy*,
   1:19-cv-2488-RC (D.D.C. July 17, 2020) ...................................................................... 24, 36

*United States v. Rose*,
   28 F.3d 181 (D.C. Cir. 1994) .......................................................................................... 2

*United States v. Tarver*,
   642 F. Supp. 1109 (D. Wyo. 1986) ............................................................................... 3, 23

*Waggel v. George Washington Univ.*,
   No. CV 16-1412 (CKK), 2018 WL 5886653 (D.D.C. Nov. 9, 2018) ..................................... 19

*Wash. Post Co. v. Dep't of Health & Human Servs.*,
   690 F.2d 252 (D.C. Cir. 1982) ........................................................................................ 3

*Defs. of Wildlife v. U.S. Dep't of Interior*,
  314 F. Supp. 2d 1 (D.D.C. 2004) ............................................................ 2, 3

**Statutes**

2 U.S.C. § 434 ................................................................................................ 31

5 U.S.C. app. 4 § 101 ............................................................................... *passim*

5 U.S.C. app. 4 § 102 ................................................................................. 3, 21

5 U.S.C. app. 4 § 104(a) ........................................................................... *passim*

28 U.S.C. § 2461 .............................................................................................. 4

52 U.S.C. § 30109(a)(6)(B) ........................................................................... 34

Honest Leadership and Open Government Act of 2007,
  Pub. L. No. 110-81, 121 Stat 735 ................................................................ 3

**Rules**

Fed. R. Civ. P. 56(a) ..................................................................................... 19

**Regulations**

5 C.F.R. § 2634.201 ......................................................................................... 3

5 C.F.R. § 2634.202 ......................................................................................... 3

5 C.F.R. § 2634.701 ..................................................................................... 3, 4, 20, 34

**Other Authorities**

153 Cong. Rec. S324 (daily ed. Jan. 10, 2007) ......................................... 4, 35

153 Cong. Rec. S746 (daily ed. Jan. 18, 2007) .............................................. 4

153 Cong. Rec. S10687 (daily ed. Aug. 2, 2007) ........................................... 4

2017 Base GS Pay Scale,
  https://www.federalpay.org/resources/pdf/locality/gs-payscale-2017-base-table.pdf ............. 21

*Employment of Experts & Consultants*,
  U.S. DOE 321.1, Ch. III(2)(a)(2) (Nov. 6, 2006) ......................................... 3

2017 GS-15 Payscale,
  https://www.federalpay.org/gs/2017/GS-
  15#:~:text=GS%2D15%20pay%20is%20capped,is%20%2449.68%20per%20hour1 ............. 5

Ariana Tobin & Derek Kravitz, The White House Wouldn't Post Trump Staffers' Financial
   Disclosures. So We Did, ProPublica (Apr. 1, 2017),
   https://www.propublica.org/article/white-house-wouldnt-post-trump-staffers-financial-
   disclosures  .................................................................................................................... 11

Brian Stetler, Omarosa's Trump tell-all 'Unhinged' tops NYT best seller list, CNN
   Business (Aug. 23, 2018, 8:09 AM ET),
   https://money.cnn.com/2018/08/22/media/omarosa-unhinged-best-selling-book/index.html . 36

## INTRODUCTION

Pursuant to the Ethics in Government Act ("EIGA" or the "Act"), 5 U.S.C. app. 4 § 101 *et seq.*, Defendant Omarosa Manigault Newman was required to file a financial disclosure report ("Termination Report") within 30 days of her termination of employment with the White House in December 2017.  Defendant has known of this requirement since that time, but has yet to file a compliant Termination Report nearly three years after the report was due.  Her entire course of conduct over those three years evinces a flagrant disregard for the statute and indifference, if not contempt, for its requirements.  Defendant has received well over 100 emails and had multiple phone calls with the White House Counsel's Office advising her of her obligation to file the report and offering her assistance with doing so.  But rather than submitting the report as required, she offered a series of shifting, inaccurate, and contradictory excuses for failing to do so.  For example:

- Defendant initially claimed that the "only hold up" preventing her from completing her Termination Report was that the online report form created by the White House contained an "incorrect" termination date for her—even though (a) the report form contained an empty field for the termination date; (b) that field could be adjusted by the user; (c) government records indicate that Defendant had *not even logged in* to view the report form as of December 2019, and to date has not attempted to start the online report; and (d) Defendant could have submitted a hardcopy Termination Report in lieu of the online form created by the White House had there (contrary to reality) in fact been any information on the White House form that was incorrect.

- More than a year later (and notwithstanding her previous contention as to the "only hold up"), Defendant for the first time claimed that she was not able to complete her Termination Report because she needed materials that she had left in the White House.  But (a) she had never raised this issue before in numerous discussions with the White House about her Termination Report; (b) she failed to submit a compliant report even after she picked the materials up from the White House; and (c) none of the specific items she now claims is missing from these materials must be reported in the Termination Report.

- Finally, Defendant has contended that the White House sent the more than 100 emails regarding her Termination Report to an "unmonitored" email address, even though (a) Defendant herself confirmed that email address as an appropriate contact method following her termination; (b) the White House used multiple addresses to contact her about her Termination Report; and (c) both Defendant

and her husband replied to emails from White House personnel about her Termination Report, including from the putative "unmonitored" address.

Because of Defendant's protracted, willful refusal to file a compliant Termination Report in the face of dozens of reminders, entreaties, and offers to help from White House personnel, Defendant is liable for a civil penalty. The egregiousness of her conduct—particularly the many transparently pretextual excuses Defendant has offered over the course of the past three years, including numerous incorrect and contradictory factual representations to this Court—warrant the maximum penalty, both as punishment for Defendant's conduct and as a deterrent to any filers who might seek to ignore their ethical obligations in the future.

## BACKGROUND

### I.      Statutory Background

"Enacted in the wake of the Watergate scandal," EIGA "requires many aspiring and current government officials . . . to file financial disclosure reports[.]" *Trump v. Mazars USA, LLP*, 940 F.3d 710, 714-15 (D.C. Cir. 2019), *rev'd on other grounds* 140 S. Ct. 2019 (2020). The Act "foster[s] public confidence in the integrity of federal officials" and deters conflicts of interest because it "establishes a system of public financial disclosure" that safeguards against the "us[e of] a public office for personal gain" or against "substantial[] participati[on] in an official capacity through decision, approval, or otherwise, in matters in which they have a personal financial interest." *Defs. of Wildlife v. U.S. Dep't of Interior*, 314 F. Supp. 2d 1, 5 (D.D.C. 2004) (citations omitted).

EIGA's "financial reporting requirements [apply to] key personnel in each of the three branches of the federal government." *United States v. Gant*, 268 F. Supp. 2d 29, 33 (D.D.C. 2003) (citing *United States v. Rose*, 28 F.3d 181, 183 (D.C. Cir. 1994)). Within the Executive Branch, these "covered positions" include employees who hold a position compensated at a rate of basic

pay that is "equal to or greater than 120 percent of the minimum rate of basic pay payable for GS-15." 5 U.S.C. app. 4 § 101(e), (f)(3); *see* 5 C.F.R. § 2634.202(c); *Employment of Experts & Consultants*, U.S. DOE 321.1, Ch. III(2)(a)(2) (Nov. 6, 2006). The Act requires such employees to disclose detailed information about "the filer's property, debts, positions held with a business or organization, terms of any continued payments from a former employer, and the identity and source of compensation received." *Defs. of Wildlife*, 314 F. Supp. 2d at 5 (citing 5 U.S.C. app. 4 § 102). These disclosures must be filed via public financial disclosure reports at the start of employment ("New Entrant Report"), annually by May 15 of the reporting year, and on or before the thirtieth day after leaving the covered position ("Termination Report"). *See* 5 U.S.C. app. 4 § 101(a), (d), (e); 5 C.F.R. § 2634.201(a), (b), (e); *Gant*, 268 F. Supp. 2d at 33 (citing *Wash. Post Co. v. Dep't of Health & Human Servs.*, 690 F.2d 252, 265 (D.C. Cir. 1982)).

An individual who occupies a covered position and who "knowingly and willfully" fails to file a report required by EIGA is liable for both civil and criminal penalties. 5 U.S.C. app. 4 § 104(a); 5 C.F.R. § 2634.701(b). "An individual knowingly and willfully fails to comply with the [Act]'s filing requirements when that individual 'intentionally disregards the statute or is indifferent to its requirements.'" *Gant*, 268 F. Supp. 2d at 33 (citation omitted) (quoting *United States v. Tarver*, 642 F. Supp. 1109, 1111 (D. Wyo. 1986)).

In the past, the consequence for such failure had been limited to a maximum civil penalty of $10,000. In 2007, however, as part of the Honest Leadership and Open Government Act of 2007, Pub. L. No. 110-81, 121 Stat 735, Congress strengthened the penalties for EIGA disclosure violations by adding criminal penalties and increasing the maximum civil penalty from $10,000 to $50,000. *Id.* Title VII, § 702. As Senator Lieberman explained at the time, "[t]he penalty provisions for disclosure violations under [EIGA] ha[d] not been addressed in some time," and the amendment was needed to "increase the civil penalties that already exist under [EIGA] and []

create a new [criminal] penalty for knowing and willful falsification or failure to report." 153 Cong. Rec. S324 (daily ed. Jan. 10, 2007) (statement by Sen. Lieberman). Senator Vitter described the then-$10,000 maximum penalty as "unacceptable" because, "this can . . . be a slap on the wrist in certain situations" that could "literally encourage people to falsify documents or not report certain information completely or properly because . . . . [i]t may be worth paying that and trying to get away with it versus disclosing certain information." *Id.* (statement by Sen. Vitter). Ultimately, the legislation raising the maximum civil penalty for the EIGA violation at issue here to $50,000 enjoyed broad bipartisan support. *See* 153 Cong. Rec. S746 (daily ed. Jan. 18, 2007) (passed in the Senate 96-2); *see also* 153 Cong. Rec. H9210 (daily ed. July 31, 2007) (passed in the House with an amendment 411-8); 153 Cong. Rec. S10687 (daily ed. Aug. 2, 2007) (Senate concurrence in House amendment by unanimous consent decree).

Like the predecessor maximum penalty, the $50,000 maximum civil penalty is subject to adjustment for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990. 28 U.S.C. § 2461, statutory note; *see also, e.g., Gant*, 268 F. Supp. 2d at 33 n.3 (imposing an $11,000 penalty because the $10,000 maximum civil penalty was adjusted for inflation). As of the date of this motion, the inflation-adjusted maximum civil penalty under 5 C.F.R. § 2634.701(b) is $61,585.

## II.    Factual Background

Defendant occupied the position of Director of Communications for the Office of Public Liaison in the White House starting on January 20, 2017. Lynch Decl. Ex. A at 1. In this role as a commissioned officer whose annual salary was $179,700, Defendant was required by EIGA to file public financial disclosure reports. *See* 5 U.S.C. app. 4 § 101(f)(3) (requiring public financial disclosures of "each officer or employee in the executive branch, . . . in the case of positions not under the General Schedule, for which the rate of basic pay is equal to or greater than 120 percent

4

of the minimum rate of basic pay payable for GS-15 of the General Schedule"); Declaration of Stefan Passantino ("Passantino Decl.") Ex. H (Form SF-50 showing Defendant's Basic Pay of $179,700); 2017 GS-15 Payscale[1] (GS 15 step 1 basic pay was $103,672 in 2017).  Pursuant to this requirement, after the start of her employment, Defendant submitted a New Entrant Report on March 31, 2017.

Defendant was terminated from her position at the White House in mid-December 2017.[2] Motion to Dismiss Plaintiff's Corrected Complaint for Failure to State a Cause of Action upon Which Relief Can Be Granted ("Mot. to Dismiss") ¶¶ 5-6, ECF No. 5.  Pursuant to EIGA, Defendant was required to file a Termination Report within 30 days of the termination of her employment.  5 U.S.C. app. 4 § 101(e).  Defendant's termination was effective on December 19, 2017, and her Termination Report was due no later than January 18, 2018.  Passantino Decl. ¶ 9.  Although Defendant claims her termination was not effective until January 20, 2018, as of this filing she *still* has not submitted a compliant Termination Report.  *See* Mot. to Dismiss ¶¶ 1-9.

Defendant admits that she knew of the requirement to file a Termination Report by no later than January 24, 2018.  Lynch Decl. Ex. B at 4; *see also* Mot. to Dismiss ¶¶ 13-15.  Defendant spoke to at least two different White House officials about this obligation by phone before the end of March 2018. Lynch Decl. Ex. B at 4-5; Mot. to Dismiss ¶ 14 & Ex. B.  During one of those phone calls (a recording of which Defendant herself submitted in connection with her Motion to Dismiss) it was made "super clear" to Defendant that regardless of the effective date of her

---

[1] *Available at* https://www.federalpay.org/gs/2017/GS-15#:~:text=GS%2D15%20pay%20is%20capped,is%20%2449.68%20per%20hour1 (last visited Dec. 6, 2020).

[2] Defendant alleged in her unsuccessful motion to dismiss that the date of the meeting in which her employment was terminated was December 13, 2017. Mot. to Dismiss ¶ 2.  The date was in fact December 12, 2017.  *See* Passantino Decl. Ex. A.  This discrepancy is immaterial to the claim at issue in this litigation.

termination—the basis of her only stated excuse for failing to submit the report—the report must be filed "within 30 days of whatever that [termination] date was, *which we're past*."  Mot. to Dismiss Ex. B (emphasis added).

Despite the knowledge that she must file a Termination Report and despite the "super clear" admonition that her Termination Report was past due and must be filed notwithstanding the effective date of her termination, Defendant did not submit a Termination Report in the 18 months after that conversation.  Rather, on September 11, 2019, *the same date she filed her Motion to Dismiss in this action*, Defendant emailed the White House a form purporting to satisfy her obligations under the statute.  *See* Declaration of David Jones ("Jones Decl.") Ex. C.  This report was incomplete and failed to satisfy her reporting requirement.  Despite the repeated efforts of White House personnel to work with Defendant to address these deficiencies, to date she has failed to do so.

### A.     February-August 2017: White House Ethics Counsel Undertakes Efforts to Obtain Defendant's Compliance with the Requirement to File Her New Entrant Report

Defendant's Termination Report, at issue here, was not the first report she was required to file under EIGA.  Nor was it the first occasion in which she demonstrated her lack of respect for the statute's requirements.  Starting sometime around February 2017, shortly after Defendant began her employment at the White House, ethics officials expended substantial effort to inform Defendant of her obligation to file a New Entrant Report under EIGA, to offer assistance with completion of that report, and to obtain her compliance.  Declaration of Scott de la Vega ("de la Vega Decl.") ¶¶ 6-7.  This effort involved numerous calls with and face-to-face requests to both Defendant and her assistant.  *Id.* ¶¶ 6-8.  Scott de la Vega, the Ethics Counsel who spearheaded the effort, viewed Defendant's response to these efforts as "dismissive"; more than once, she informed him that she was "too busy" to deal with her required report.  *Id.* ¶ 8.

The White House had agreed to make all New Entrant Reports public on March 31, 2017. As that date approached, Defendant continued to rebuff White House ethics officials and had not otherwise begun work on her report. *See id.* ¶¶ 11-13.  Mr. de la Vega personally informed Defendant that there was a firm deadline to complete and submit her report, and offered to assist her up until March 31, when he would be preoccupied with finalizing all of the many reports of the other White House employees who also were required to submit their reports by that deadline. *Id.* ¶ 10.  Defendant did not accept these offers of assistance; nor did she begin work on her report before March 31, 2017.  Every other White House employee required to submit a New Entrant Report had submitted a draft report before that date.  *Id.* ¶ 11.

Notwithstanding Mr. de la Vega's admonition that he needed a draft report before that date, on March 31, 2017, Defendant's assistant requested that Mr. de la Vega assist Defendant with her New Entrant Report.  *Id.* ¶ 12.  After initially resisting because he was very busy finalizing the other reports also scheduled for publication that day, he was eventually persuaded to visit Defendant's office. *Id.* ¶¶ 12-13.  Defendant explained to Mr. de la Vega that she was very upset, because that morning she had been embarrassed at a staff meeting for being the only person who had not submitted her New Entrant Report.  *Id.* ¶ 13.  Indeed, Defendant had not yet started the report. *Id.* ¶ 14.

Defendant provided Mr. de la Vega a large envelope of bank statements and legal documents and asked him to fill out the report for her.  *Id.*  While he began to work on the report, he overheard a phone conversation Defendant was having in his presence about her wedding dress, which she stated was being given to her as a gift in connection with her appearance on the reality television program *Say Yes to the Dress*.  *Id.* ¶¶ 15-16.  Mr. de la Vega insisted that Defendant end the call and asked her about the wedding dress, explaining that this type of donation would have

7

to be reported on her New Entrant Report.  *Id.*  He noted that had he not overheard the call, Defendant would have failed to disclose the gift of her wedding dress.  *Id.* ¶ 16.

Although an initial draft of Defendant's New Entrant Report was completed on the deadline, the report—because of its last-minute preparation—required several months of additional work by Mr. de la Vega and the Office of Government Ethics (OGE) in order for OGE to finally certify the report.  *Id.* ¶ 17.  Defendant's New Entrant Report was finally certified by OGE months later, on August 4, 2017.  *Id.* ¶ 17 & Ex. A.

### B. December 12-19, 2017: Defendant Leaves her Employment at the White House, Triggering Her Obligation to File a Termination Report

Defendant was terminated from the White House at a meeting on December 12, 2017.  *See* Mot to Dismiss Ex. A; Passantino Decl. ¶ 4.  Defendant purportedly recorded the meeting on her cell phone.  *See* Mot to Dismiss Ex. A.  At the meeting, Defendant was advised that the White House would accept a voluntary resignation in lieu of termination.  *Id.*  Defendant also requested at the meeting that she be permitted to remain on the payroll until January 20, 2018, and was told that request would be granted.  Passantino Decl. ¶ 5.

During the meeting, Defendant was provided a separation form with the contact information that the White House had on record for her and a place to list the reason for her separation.  Passantino Decl. ¶ 6 & Ex. A.  Defendant updated her mailing address, crossing out the typed address that the White House had on file and handwriting in her correct address.  *Id.* Ex. A.  Defendant did not change the email address that the White House had on file for her, which was also pre-printed on the form.  *Id.*  Defendant signed and dated the form December 12, 2017. *Id.*

Defendant left the White House that evening and did not return to work at the White House. Based on events that followed the December 12, 2017 meeting, the decision was made to make the effective date of her termination December 19, 2017. *Id.* ¶ 7.

### C.   December-January 2017: White House Ethics Counsel Sets Up Defendant's Termination Report and Provides Her with Her Termination Packet

As part of her termination packet, White House Ethics Counsel prepared a termination memo reflecting the December 19, 2017 termination date advising Defendant of her post-employment obligations, including her obligation to file a Termination Report within 30 days. This memo was emailed to her on January 3, 2018.[3] *See* de la Vega Decl. Ex. B.  On December 29, 2017, White House Ethics Counsel set up in Integrity.gov the online form for Defendant to complete her Termination Report, and emailed her that day with instructions about how to complete the report.[4]  Passantino Decl. ¶¶ 10-11 & Ex. B at 3; *see* Jones Decl. Ex. B at 1.

With the exception of Defendant's name, the first page of her Termination Report in Integrity.gov is blank.  *See* Jones Decl. Ex. A.  This includes the "Date of Termination" field, which can be populated and edited by Defendant in Integrity.gov.  Jones Decl. ¶¶ 6-7.  Defendant neither started her Termination Report in Integrity.gov nor even logged into Integrity.gov *at all*

---

[3] The remainder of her termination packet was sent by certified mail to the address Defendant provided on her separation form at the December 12, 2017 meeting, but was returned as undeliverable.  *See* Passantino Decl. Ex. G.  The materials were subsequently emailed to Defendant in March 2018.  Passantino Decl. ¶ 22; *see id.* Ex. G & H.

[4] The financial disclosure reports required by EIGA have been traditionally submitted on an OGE Form 278e.  Although blank forms are available online, White House personnel are encouraged to use an online system known as "Integrity.gov" to submit their EIGA disclosure reports.  *See* Veilleux Decl. ¶¶ 3-4; Jones Decl. ¶ 4.  Filing a report through the Integrity.gov system has a distinctive advantage for the filer: She can "prepopulate" a new form with the information included on her prior form, so that subsequent reports can be easily prepared by editing only the information that has changed since the previous report.  *See, e.g.,* Passantino Decl. Ex. B at 3.  In Defendant's case, preparing her Termination Report in Integrity would have enabled her to prepopulate that report with information from her previously submitted New Entrant Report, which OGE certified on August 4, 2017.  *Id.*; *see* de la Vega Decl. Ex. A.

between December 1, 2017, and December 1, 2019.  *See* Declaration of Diana Veilleux ("Veilleux Decl.") ¶ 8.  As of the date of this filing, Defendant's report on that platform remains "Not Started," its status since it was set up in December 2017.  Jones Decl. ¶ 8.  Had Defendant reviewed her report to view the "Date of Termination" field or attempted to enter information in that field, the status of her report in Integrity.gov would have changed from "Not Started" to "Draft, Pre-Review."  *Id.* ¶ 9.

### D. The White House Ethics Office's Extensive Efforts to Remind Defendant of Her Obligations Under EIGA, Offer Assistance, and Obtain Compliance

Subsequent to Defendant's termination, the White House Ethics Office made numerous efforts to remind her of the requirement to file her Termination Report, to offer assistance, and to obtain her compliance.

On December 29, 2017, Alice Bartek-Santiago, an ethics attorney in the White House Counsel's Office, sent Defendant an email to ▮▮▮▮▮▮@gmail.com, the email address listed on Defendant's separation form that she executed on December 12, 2017.  Passantino Decl. Ex. B at 3; *see id.* Ex. A.  Ms. Bartek-Santiago advised Defendant that "[a]s part of your post-employment requirements, you must file a termination report upon leaving government service. . . . Please . . . submit your termination report by January 18, 2018."  *Id.* Ex. B.  Ms. Bartek-Santiago further explained that she was responsible for assisting Defendant with filing her Termination Report and had assigned the report to Defendant in Integrity.gov.  *Id.*  Ms. Bartek-Santiago also explained how Defendant could log in to complete her report in Integrity.gov and that Defendant could "pre-populate" her report with the information from her New Entrant report, which would facilitate Defendant's completion of her Termination Report; Defendant only had to edit those prior

disclosures that had changed in the 11 months since Defendant began working at the White House.[5]
*Id.*

Starting on December 29, 2017, when Ms. Bartek-Santiago set up the Defendant's Termination Report in Integrity.gov, and continuing to the present, Integrity.gov has issued weekly automatic notifications to Defendant's ▮▮▮▮ @gmail.com email address.  Jones Decl. ¶ 10 & Ex. B.  These notifications, over 100 of which have been sent to date, indicate the due date of the report, instructions for how to access the report and (in the email notifications subsequent to the due date) that the report was past due.  *See id.* (collection of emails to Defendant generated by Integrity.gov).

On January 3, 2018, Mr. de la Vega, who assisted Defendant with her New Entrant Report, emailed Defendant at the same email address, offering to assist her with her Termination Report and noting "it is due on **January 18, 2018**.  If you will require an extension, please request it in writing (email is fine) prior to January 18, 2018."  De la Vega Decl. ¶ 21 & Ex. B at 1 (emphasis in original).  Mr. de la Vega attached to his email the December 19, 2017, briefing memo prepared by the White House Counsel's Office outlining Defendant's post-employment obligations.  *Id.* The first paragraph of that briefing memo advised Defendant that "[a]s a commissioned officer, you are also required to file a termination financial disclosure report within 30 days of leaving Government service – **your report is due no later than <u>January 18, 2018</u>**."  *Id.*  ¶ 22 & Ex. B at

---

[5] Because her position required filing a public financial disclosure report, Defendant's prior financial disclosure report—the New Entrant Report—is not only available through Integrity's "pre-populate" feature, but is also publicly available online.  *See* Omarosa Manigault OGE 279e form,   https://drive.google.com/drive/folders/0BwDYM_Qm5fLWVXgzMVZMLVA0Ync   (last visited Dec. 6, 2020); *see generally* Ariana Tobin & Derek Kravitz, The White House Wouldn't Post Trump Staffers' Financial Disclosures. So We Did, ProPublica (Apr. 1, 2017), https://www.propublica.org/article/white-house-wouldnt-post-trump-staffers-financial-disclosures (last visited Dec. 6, 2020).  Her financial disclosure is also publicly available from the White House on request.  *See* https://www.whitehouse.gov/disclosures/ (last visited Dec. 6, 2020).

1 (emphasis in original).  The document further explained that Defendant "received instructions on how to file [her] report" "[b]y separate e-mail" and requested that she "please contact my office if you need any assistance."  *Id.*  Section IV of the report provided additional instructions about the Termination Report and noted that "[t]he address we have for you is: ██████ @gmail.com. Please inform us if there are any changes to your email address."  *Id.* ¶ 23 & Ex. B at 9.

On January 12, 2018, Ms. Bartek-Santiago sent Defendant a third email to the same email address, offering her assistance with completing her report.  Passantino Decl. Ex. B at 2 ("Let me know if you experience any problems or have questions regarding your termination report.  I'm here to help.").

Ms. Bartek-Santiago sent Defendant a fourth email to the same address on January 19, 2018.  *See id.*  She wrote, "[y]our termination report was due on January 18, 2018.  Unfortunately, that means your report is now overdue.  If your report becomes overdue by 30 days, you may be assessed a $200 filing fee.  According to the database, you have not yet logged in to complete your termination report."  *Id.*

On January 24, 2018, Deputy White House Counsel Stefan Passantino wrote to Defendant at two email addresses, ██████ @gmail.com (the email address listed on Defendant's signed separation form) and ██████ @icloud.com.  Passantino Decl. ¶ 14 & Ex. C.  Mr. Passantino reminded Defendant "that your termination report was due **January 18** and will become overdue [i.e. subject to the $200 fee] **February 19**."  *Id.* (emphasis in original).  Mr. Passantino's email included Ms. Bartek-Santiago's three prior emails to Defendant, noting "[a]ll relevant information [about the termination report] is set forth in the emails below."  *Id.*  Mr. Passantino also advised Defendant that he still had some of her personal effects and that White House records indicated

that Defendant had not returned certain White House property, and requested a time to meet to exchange the parties' respective property.[6]  *Id.*

Two days later, on January 26, 2018, Marcia Kelly, Director of White House Management and Administration, wrote to Defendant at ███████ @icloud.com, noting her understanding that Defendant had tried to reach out to her by email.  *See id.* ¶¶ 14-15 & Ex. D.  Ms. Kelly indicated that she had spoken to Mr. Passantino and that he had advised her that Defendant's "[t]ermination report was due January 18" and that Defendant risked incurring "a late fee."  *Id.* Ex. D.  In apparent response to Defendant's inquiry regarding her personal effects, Ms. Kelly noted that while there were "many pictures" among Defendant's personal effects, White House staff "did not locate wedding proofs."  *Id.*

On the morning of February 6, 2018, Ms. Kelly sent a follow-up email, this time adding the email address ███████ @gmail.com and addressing herself to Defendant's husband as well as Defendant, again reminding her about the items raised in Ms. Kelly's earlier email— including the Termination Report. *Id.* ¶ 16 & Ex. D.  Ms. Kelly advised Defendant and her husband to work with Mr. Passantino on the outstanding issues.  *Id.*   Shortly thereafter, Defendant's husband responded by email to Ms. Kelly, acknowledging his understanding that Mr. Passantino was the appropriate point of contact "for future followup."  *Id.* ¶ 17 & Ex. D.

That afternoon, Ms. Bartek-Santiago wrote to Defendant again, this time copying both the ███████ @gmail.com and ███████ @icloud.com addresses. *Id.* ¶ 18 & Ex. E.  She advised Defendant "I've noticed you have not yet logged into integrity.gov to complete your report.  I'm more than happy to chat over the phone if you need assistance filing your report."  Ms. Bartek-

---

[6] A few minutes after sending that email, Mr. Passantino sent Defendant a follow-up email to the same two addresses, correcting a typographical error in the original email.  *Id.*

Santiago provided her phone number and invited Defendant to "[f]eel free to call [her] anytime if [Defendant] h[ad] questions." *Id.* Ex. E.

Almost a month later, Defendant called Mr. Passantino.  He returned her call on March 5, 2018, which she apparently recorded.  *See* Passantino Decl. ¶ 20; Mot. to Dismiss Ex. B.  Mr. Passantino inquired whether Defendant had received the emails his office had sent about her overdue Termination Report, and Defendant indicated that she had.  Mot. to Dismiss ¶ 14 & Ex. B.  Defendant repeatedly indicated on the call that she was unwilling to complete the report based on her belief that her termination date was January 20, 2018.  *See id.*  ("I want to be *crystal clear, that's the only hold up* [in completing the Termination Report], is the discrepancy of the date. After that, I can complete everything.") (emphasis added); *id.* ("Let me be clear, as soon as that date is corrected then I can complete [the Termination Report]."); *id.* ("[A]s soon as that date is changed, I can complete the report and everything can kind of go from there.").  Mr. Passantino pointed out that the report was already past due regardless of her understanding of her termination date, but he agreed to confirm her termination date.  *Id.*; *see* Passantino Decl. ¶ 20.  Mr. Passantino also indicated his desire to return Defendant's personal effects that she had left at the White House, noting "we've got some personal stuff of yours" and want to "figure out a time to get to you or somebody your stuff."  Mot. to Dismiss ¶ 14 & Ex. B.  Defendant indicated that she would like to obtain those materials because she believed that they contained "a little thumb drive with all of my wedding photos on it, as I have told everyone . . . to anybody that will listen, that I need that thumb drive back with my pictures on it."  Mot. to Dismiss Ex. B.

On March 26, 2018, another White House ethics attorney, Deborah Raviv, emailed Defendant at both ███████@gmail.com and ███████@icloud.com, reminding Defendant again that her "termination report is past due."  Passantino Decl. ¶ 22 & Ex. B at 1.  Defendant called Ms. Raviv that morning.  *Id.* ¶ 23 & Ex. F.  As of that time, Defendant still "had not filed

(or started filling out)" her Termination Report. *Id.* Defendant stated she would not file the report until the Government "corrected" her termination date to January 20, 2018. *Id.* Ms. Raviv told Defendant that White House Human Resources had confirmed that Defendant's separation date was actually December 19, 2017. *Id.* Ms. Raviv agreed to raise the issue with Mr. Passantino, but "explained to Ms. Manigault that even using this later date, her report would still be late." *Id.*

Later that day, Mr. Passantino followed up with Defendant, once again writing to both ███████ @gmail.com  and  ███████ @icloud.com.  *Id.* ¶ 22 & Ex. G.  Mr. Passantino explained that his office reviewed the issue with White House Human Resources, who provided records that "were sent to you via certified mail in December" which "show[] your employment with the government officially ended effective December 19, 2017." *Id.* Mr. Passantino attached the records to the email and indicated that he "hope[d] these records clear up any confusion with respect to your separation date." *Id.* He also noted that "as we discussed . . . you were required to file a termination report within 30 days of leaving government service" or "on January 18, 2018. Your termination report is now past due" and "[b]ecause your termination report is more than 30 days overdue, we are required to assess a $200 late filing fee due at the time of filing." *Id.* He also advised her that the White House "may have to refer this matter" to DOJ if she failed to file her report. *Id.* Mr. Passantino then provided Defendant with instructions for filling out the report that Ms. Bartek-Santiago previously had sent Defendant and invited her to contact his office if she had any trouble accessing the report. *Id.*

Shortly after Mr. Passantino's March 26, 2018, email, Defendant replied to him from the email address ███████ @gmail.com, asking Mr. Passantino "If I want to file a formal complaint about the fees and discrepancy in the report can you tell who I direct that to? Is it the Ethics office or Justice [D]epartment[?]" *Id.* ¶ 25 & Ex. I.

On June 11, 2018, Mr. Passantino sent a letter to Defendant by certified mail to the address she provided the White House at the time of her separation.  The letter stated that

> As described in detail in my email of March 26, 2018, our office has notified you on several occasions that your termination report is past due.
>
> The Ethics in Government Act requires that you file a termination report within thirty (30) days of leaving government service. The attached records confirm that you separated from the government effective **December 19, 2017.** Therefore, your termination report was due on **January 18, 2018.** Your termination report is now past due, and we are required to assess a $200 late filing fee made out to the U.S. Treasury, which is due at the time you file your report.
>
> As we have previously advised, the Ethics in Government Act requires that we notify the Department of Justice if you fail to file your termination report. Under the statute, the Attorney General has authority to bring a civil action for knowing and willful failure to file a public disclosure report and to seek penalties not to exceed $50,000.00. We would prefer not to have this occur, and thus, we encourage you to file your report.

*Id.* ¶ 26 & Ex. J. (citation omitted).  The letter also provided instructions for completing the Termination Report and a further offer of assistance.  After numerous attempts to deliver the letter, it was returned as undeliverable.  *Id.* ¶ 26.

### E. May 2019-Present: Plaintiff Initiates This Lawsuit and Defendant Advances a Series of *Post Hoc* Rationalizations for Her Failure to File Her Termination Report

In May 2019, well over a year after the deadline for Defendant's Termination Report, Defendant was sent an inquiry about this matter from the Department of Justice.  *See* Mot. to Dismiss Ex. D.  In response, Defendant advanced a new rationale for her failure to file her Termination Report.  In direct contradiction to her representations to Mr. Passantino over a year earlier,[7] when she had last been in touch with the White House Ethics Office about her overdue

---

[7] *See* Mot. to Dismiss  ¶ 14 & Ex. B (Defendant's March 2018 explanation to Mr. Passantino that "I want to be *crystal clear, that's the only hold up* [in completing the Termination Report], is the discrepancy of the date.  After that, I can complete everything.") (emphasis added); *id.* Ex. B (expressing desire to retrieve her personal effects left at the White House only because Defendant believed they contained "a little thumb drive with all of my wedding photos on it").

Termination Report, Defendant now claimed that "[m]uch of the information that [she] need[ed] to complete [her] termination report . . . is contained in . . . boxes [that] are still in the possession of the White House." *Id.* In response, the Department of Justice provided Defendant with a contact at the White House to coordinate the return of her personal effects.

This action was filed on June 25, 2019. On July 12, 2019, after coordinating with the White House Ethics Office, Defendant's counsel retrieved the two boxes of her personal effects that she left at the White House in December 2017, as well as her commission certificate. Mot. to Dismiss ¶ 23. On September 11, 2019, over 60 days after retrieving her boxes of personal effects from the White House, on the same day she filed her motion to dismiss this action,[8] Defendant submitted a Termination Report by email to the White House. Jones Decl. ¶ 11 & Ex. C. White House Ethics Counsel identified numerous deficiencies in that submission. *Id.* After several attempts to reach Defendant's counsel by phone to discuss the deficiencies, White House ethics attorney David Jones emailed a list of the deficiencies to Defendant's counsel on November 18, 2019. *Id.* ¶¶ 12-13 & Ex. D. Neither Defendant nor her counsel addressed the deficiencies in response to that email. Instead, Defendant's counsel contended that it was the Government's responsibility to "chang[e]" the "date" "to reflect January 20, 2018." *Id.* ¶ 14 & Ex. E. In response, Mr. Jones explained that he could not help Defendant address the issue unless Defendant's counsel sent a screen shot of the field in question. Instead of providing the requested screen shot, Defendant's counsel simply repeated his unsubstantiated claim that it was his "understanding" that the report had an incorrect "severance date." *Id.* ¶ 16 & Ex E. Despite a further request for a screen shot, Defendant's counsel did not provide one. *Id.* ¶¶ 17-18 & Ex. E. On November 20, 2019, Mr. Jones responded that he would provide assistance if Defendant accessed the report on Integrity.gov

---

[8] The Court denied Defendant's Motion to Dismiss by minute order on May 21, 2020.

and determined at that time that she required assistance. *Id.* ¶ 19 & Ex. E.  Neither Defendant nor

her counsel responded to Mr. Jones's email for more than seven months, until May 2020. *Id.* ¶ 20.

After a meet and confer in June 2020, Defendant's counsel sent government counsel a letter

on June 10, 2020, claiming—notwithstanding his November 2019 correspondence with the White

House Ethics Office—that he had "never received any correspondence from the White House

ethics office, we have not received a list of any deficiencies with her submitted termination report"

and had "no record of ever being provided with the names or contact information of any current

White House ethics officials who can assist with any alleged deficiencies." Lynch Decl. Ex. C at

4.

When reminded of the November 18, 2019 email from the White House, Defendant's

counsel changed course, claiming that Defendant was "still waiting on White House Counsel to

address the incorrect date in the report," even though the online draft report did not and never had

any date entered.  Defendant's counsel also claimed that to complete the report he needed two

things.  First, he requested "any and all prior drafts and documents submitted by our client,"

notwithstanding that since December 2017 she had access to her New Entrant Report through

Integrity.gov.  Jones Decl. Ex. F. at 2.  Second, he requested "missing information," apparently

referring to the materials Defendant had left in her office at the White House, even though counsel

himself had retrieved those materials in July 2019. *Id.*

On June 18, 2020, Mr. Jones responded to defense counsel's letter, advising that "[w]e

have provided you all of Ms. Manigault Newman's personal effects that we are aware of her

leaving at the White House" and requesting that if Defendant "believes something in particular

was not returned to her, please let us know what the item is and where she last saw it so that we

can conduct a search for the item." Jones Decl. ¶ 23 & Ex. F at 1.  Mr. Jones also explained that

"[i]f Ms. Manigault Newman needs access to a prior report as you indicate, she has always had

access to her prior report by logging on to the *Integrity* system."  He went on to note that he had "asked [Defendant's counsel] repeatedly in . . . emails . . . [in November 2019] to identify the field you believe shows an incorrect date and to send a screen shot to help us identify the issue" but that Defendant's counsel had not done so.  White House ethics counsel also attached a pdf of Ms. Manigault Newman's pending Termination Report in Integrity.gov showing that "there are no prepopulated dates on her report at all."  *Id.*; Jones Decl. ¶ 23.  As of the filing of this motion, Defendant has neither corrected the deficiencies in her September 2019 Termination Report, nor responded to the White House's June 18, 2020 email.  *Id.* ¶ 24.

## STANDARD OF REVIEW

A motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  To defeat such a motion, the nonmoving party must do more than present a "mere . . . scintilla" of evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("[T]he mere existence of a scintilla of evidence in support of [the non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving] party.").  Rather, "'the adverse party must set forth specific facts showing that there is a genuine issue for trial.'"  *Arabaitzis v. Unum Life Ins. Co. of Am.,* Civ. A. No. 16-1273 TNM/DAR, 2018 WL 4610893, at *4 (D.D.C. Sept. 11, 2018) (quoting. *Liberty Lobby,* 477 U.S. at 250).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Liberty Lobby*, 477 U.S. at 247–48 (emphasis in original).  *See, e.g., Waggel v. George Washington Univ.*, No. CV 16-1412 (CKK), 2018 WL 5886653, at *11 (D.D.C. Nov. 9, 2018) (granting summary judgment to Defendant "based on Plaintiff's admissions of many of Defendant's material facts, and her non-genuine or immaterial disputes as to other such

facts"); *Richardson v. Nat'l Rifle Ass'n*, 871 F. Supp. 499, 503 (D.D.C. 1994) (granting summary judgment where court found "that the[ putative] disputes are not material even if plaintiff's version of each paragraph is accepted").

"Only disputes over facts that might affect the outcome of the suit under the governing law" are material. *Liberty Lobby*, 477 U.S. at 248.  A genuine issue is one where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.,* as opposed to evidence that "is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. Accordingly, "conclusory statements unsupported by any evidence in the record, aside from [a party's] own self-serving affidavits" and "mischaracteriz[ations of] evidence contained in the record" are likewise insufficient to preclude summary judgment. *Dawson v. Reukauf*, 751 F. Supp. 2d 146, 150–51 (D.D.C. 2010).  Likewise, "a [party's] mere speculations are insufficient to create a genuine issue of fact." *Nunnally v. District of Columbia*, 243 F. Supp. 3d 55, 68 (D.D.C. 2017).

## ARGUMENT

It is unlawful to "knowingly and willfully . . . fail to file or report any information that [a] person is required to report under" EIGA.  5 U.S.C. app. 4 § 104(a)(2)(A)(ii); *see id.* § 104(a)(1). "An individual knowingly and willfully fails to comply with the EIGA's filing requirements when that individual intentionally disregards the statute or is indifferent to its requirements." *United States v. Gant*, 268 F. Supp. 2d 29, 33 (D.D.C. 2003) (citations and internal quotation marks omitted); Mem. Op. & Order ("*Hunter* Op."), *United States v. Hunter*, 1:14-cv-442-JEB (D.D.C. Aug. 27, 2014), ECF No. 8 (finding willfulness where defendant ignored "repeated letters . . . to remind him of his obligations" under EIGA.  This Court has authority to assess a civil penalty of up to $61,585.  *See* 5 U.S.C. app. 4 § 104(a)(1); 5 C.F.R. § 2634.701(b).  Here, Defendant's failure to file a compliant Termination Report was unquestionably willful, and her "flagrant and ongoing" misconduct deserves the maximum penalty under the statute. *Gant*, 268 F. Supp. 2d at 34.

I.     **Defendant Was Required by EIGA to File a Termination Report within 30 Days of Leaving the White House and Failed to Do So**

EIGA requires each "civilian employee . . . employed in the Executive Office of the President . . . who holds a commission of appointment from the President" to "file a report containing" certain financial information "on or before the thirtieth day after termination of employment in such position."  5 U.S.C.  app. 4 § 101(e), (f)(8); *see also id.* § 101(f)(3) (requiring disclosure from "each officer or employee in the executive branch . . . who occupies a position . . . for which the rate of basic pay is equal to or greater than 120 percent of the minimum rate of basic pay payable for GS-15 of the General Schedule"); *id.* § 102 (setting forth information required to be disclosed).  As the Director of Communications for the Office of Public Liaison in the White House, Defendant was a commissioned officer in the Executive Office of the President subject to EIGA's financial disclosure requirements; at a salary of $179,700 per year, her rate of basic pay was equal to or greater than 120 percent of the $103,672 minimum rate of basic pay payable for a GS-15 employee in 2017.   *See* Passantino Decl. Ex. H; 2017 Base GS Pay Scale, https://www.federalpay.org/resources/pdf/locality/gs-payscale-2017-base-table.pdf  (last  visited Dec. 6, 2020).  Defendant was thus required to file a financial disclosure report on or before the thirtieth day after termination of her employment.

Defendant's termination from her position at the White House was effective December 19, 2017, making her Termination Report due no later than January 18, 2018.  Passantino Decl. Ex. H.  There is no dispute that Defendant did not file her Termination Report by January 18, 2018, by February 19, 2018, or indeed at any time before September 2019.  *See, e.g.* Lynch Decl. Ex. A at 2; Mot to Dismiss Ex. D.  Defendant never asked for an extension of her deadline to file.  *Cf.* Mot. to Dismiss Ex. C (requesting information on where to file a complaint about the late fee on March 26, 2018, after her Termination Report was undisputedly past due).  There is thus no dispute

that Defendant is subject to EIGA's requirements and failed to timely file her required Termination Report.

## II.        Defendant's Failure to File a Termination Report Was Knowing and Willful

A person who "knowingly and willfully" fails to file a required financial disclosure report is subject to a civil penalty.  5 U.S.C. app. 4 § 104(a)(1).  This standard is met when an individual subject to the statute "intentionally disregards [EIGA] or is indifferent to its requirements."  *Gant*, 268 F. Supp. 2d at 33 Defendant admits that she knew of her obligation to file her Termination Report no later than January 2018.  The evidence is also overwhelming that her failure to file was willful.

### A.        Defendant Knew She Was Required to File a Termination Report

There is no dispute that Defendant knew no later than January 2018 of her obligation to file her Termination Report within 30 days of the termination of her employment.  Indeed, she has admitted that "[o]n or about January 24, 201[8][9], I first became aware of the obligation" to file the report, Lynch Decl. Ex. B at 4, and repeatedly discussed that obligation with representatives of the White House Counsel's Office by email and over the phone between January and March 2018. *See* Background Pt. II.D, *supra*.

Moreover, Integrity.gov has generated email reminders on at least a weekly basis to Defendant about her obligation from December 29, 2017 to the present.  *See, e.g.,* Jones Decl. ¶ 10 & Ex. B; *id.* at 1 (12/29/17 notice); *id.* at 4 (1/2/18 reminder); *id.* at 9 (2/8/18 reminder); *id.* at

---

[9] The interrogatory responses list the date as "2019," but from the context of the response, it is clear that Defendant meant "2018."  Lynch Decl Ex. B at 4 ("On or about January 24, 2018, I spoke to Stefan Passatino [sic]."); *id.* at 5, 11-12; *see also* Lynch Decl Ex. D at 3 ("Defendant does not recall the specific date in which she was informed that she was required to file a [Termination] Report.  However, on or about March 26, 2018, Defendant Manigault Newman recalls discussing the [Termination] Report with Stefan Passantino.  During this telephone call, Mr. Passantino informed Ms. Manigault Newman of her obligation to file the termination report.").

15 (3/8/18 reminder); *id.* at 20 (4/12/18 reminder); *id.* at 26 (5/24/18 reminder); *id.* at 29 (6/14/18 reminder); *id.* at 32 (7/5/18 reminder); *id.* at 37 (8/19/17 reminder); *id.* at 41 (9/7/18 reminder); *id.* at 46 (10/12/18 reminder); *id.* at 50 (11/9/18 reminder); *id.* at 54 (12/7/18 reminder); *id.* at 59 (1/11/19 reminder); *id.* at 63 (2/8/19 reminder) ; *id.* at 68 (3/15/19 reminder); *id.* at 72 (4/12/19 reminder); *id.* at 76 (5/10/19 reminder); *id.* at 80 (6/7/19 reminder); *id.* at 85 (7/12/19 reminder); *id.* at 88 (8/2/19 reminder); *id.* at 93 (9/6/19 reminder); *id.* at 97 (10/4/19 reminder); *id.* at 101 (11/1/19 reminder); *id.* at 107 (12/13/19 reminder).   Defendant therefore was repeatedly and regularly informed both in writing and by phone, starting from no later than 10 days after her termination, of her obligation to submit a Termination Report.   Thus, the knowing element of her EIGA violation is established on this record.

### B.   Defendant's Entire Course of Conduct Since Her Termination Demonstrates Her Intentional Disregard for EIGA and Indifference to Its Requirements

Defendant's failure to file was willful.   By any measure, Defendant's conduct demonstrates that she "intentionally disregard[ed] [EIGA] or is indifferent to its requirements."   *Gant*, 268 F. Supp. 2d at 33 (internal quotation marks and citation omitted).   That requirement is met where a defendant "refused to comply, although he possessed full knowledge of the Act."   *United States v. Tarver*, 642 F. Supp. 1109, 1111-12 (D. Wyo. 1986).   A failure to file a required report after receiving only a few reminders of one's obligation to file is sufficient to establish that the failure was "knowing and willful."   *See, e.g., id.* at 1112 (finding a "clear violation" of EIGA where the defendant failed to file a required financial disclosure after he "was twice informed of the requirements of the Act and that those requirements applied to him"); *Hunter* Op. at 2 (failure to file a Termination Report was "knowing and willful" where defendant was sent four letters advising him of his obligation under EIGA to file a Termination Report); *Gant*, 268 F. Supp.2d at 31, 33 (failure to file was willful where defendant "received two departmental memoranda, three

certified letters from the Department, a summons and a copy of the plaintiff's complaint, two voice-mail messages, and a follow-up letter from the plaintiff's counsel"); Mem. Op. ("*Lairy* Op.") at 6, *United States v. Lairy*, 1:19-cv-2488-RC (D.D.C. July 17, 2020), ECF No. 16 (defendant "intentionally disregarded the statute by failing to file the required report for over six months, even after repeated attempts by [his agency] to provide clear instructions to help [him] file the report").

This record contains ample evidence of Defendant's willfulness. Since December 2017, Defendant had at least two phone calls with individuals in the White House Counsel's Office, exchanged more than 10 emails with individuals at the White House, and has received over 100 automated email reminders from Integrity.gov, about her need to file a Termination Report. She received personal emails addressing her obligation to file a Termination Report on December 29, 2017; January 3, 2018; January 12, 2018; January 19, 2018; January 24, 2018; January 26, 2018; and February 22, 2018, as well as three separate emails on February 6, 2018 and two separate emails on March 26, 2018. *See* Passantino Decl. Exs. B, C, D, E, & G. She had two separate calls with White House ethics officials in March 2018. *See id.* ¶¶ 20-21 & 23 & Ex. F; Mot. to Dismiss Ex. B. And she was sent weekly reminders automatically generated and sent by Integrity.gov in the 153 weeks since December 29, 2017. Jones Decl. ¶ 10 & Ex. B. Despite these numerous reminders, *she never even logged in* to Integrity.gov to attempt to start her report. *See* Veilleux Decl. ¶ 8. Indeed, the sheer number of communications between White House ethics officials and Defendant about her failure to file her Termination Report—both before and after the commencement of this litigation—is extraordinary.[10]

---

[10] The evidence makes clear that this refusal to file was specific to her intentional disregard for and/or indifference to EIGA's requirements, not because of some general inability or unwillingness to contact White House personnel after her employment ceased. In January 2018, Defendant filed a form with the White House electing to continue her health insurance coverage. She was thus perfectly capable of filing a form she was *not* required to file and that she *chose* to file for her *personal* benefit, despite her refusal to file her *required* report for the *public's* benefit.

In addition to the scores of emails that Defendant ignored, the period of time that has elapsed and Defendant's continued refusal to provide a compliant report constitute powerful evidence of her indifference, if not contempt, for EIGA's requirements.  When informed that this litigation was imminent, rather than file her long overdue Termination Report, Defendant claimed for the first time that she had not submitted her report because she needed the personal items that she had left at the White House. *See* Mot. to Dismiss Ex D.  Yet, three months after the complaint was filed in this case, and more than 60 days after receiving those items, Defendant emailed a woefully deficient financial disclosure form to the White House—conveniently on the same day that she moved to dismiss in this action; only four of the eight pertinent sections of the form even contained information.[11]  *See* Jones Decl. Ex. C.  Although subsequently and repeatedly advised of these deficiencies, Jones Decl. ¶¶ 11-23 & Exs. C-F, Defendant as of this filing still has not corrected them.  This course of conduct is susceptible to only one conclusion: Defendant's failure to file a compliant Termination Report is willful.

Finally, the evidence of Defendant's willful violation of EIGA's requirements after her termination is bolstered by her indifference to her obligation to timely file her New Entrant Report.  A mere nine months before Defendant's termination, she repeatedly rebuffed the efforts of White House ethics counsel to get her to timely complete and submit her New Entrant Report.  De la Vega Decl. ¶¶ 7-8.  Although every other White House staff member with the same reporting obligation had submitted their reports before the March 31, 2017 deadline, Defendant did not begin

---

*See* Mills Decl. Exs. A & B.  Similarly, Defendant and her husband both reached out to White House officials about whether her wedding pictures were still in her office, including in response to communications addressing her obligation to file her Termination Report. *See, e.g.*, Passantino Decl. Ex. D.

[11] Section 4 of the report is only to be completed by those filing New Entrant Reports, not Termination Reports.  *See* Jones Decl. Ex. C at 7.

filling out her report until that day.  *Id.* ¶¶ 11-17.  Defendant did so only after allegedly being embarrassed about her noncompliance at a staff meeting.  *Id.*  And Defendant ultimately completed her New Entrant Report only with the extensive hands-on assistance of White House Ethics Counsel (and that counsel's fortuitously overhearing that she received an expensive gift of a wedding dress).  *Id.*

### C.     Defendant's Revisionist History Does Not Create a Material Dispute that Her Failure to File Was Willful

Defendant has proffered three different arguments at various points in time, including after the filing of this action, for why her conduct was not willful.  Specifically, she has claimed (1) that the electronic report prepared by the White House contained an "incorrect" termination date; (2) that she needed certain personal effects that she left in the White House to complete her report; and (3) that the emails sent to her by the White House informing her of her obligation to file a termination report and offering assistance were sent to an "unmonitored" email address.  None creates a genuine issue of material fact as to whether her violation was willful.[12]

---

[12] Defendant has also repeatedly claimed that this lawsuit is a form of retaliation by the President. For the reasons demonstrated in Plaintiff's Renewed Motion for Protective Order, ECF No. 17, and Reply in support thereof, ECF No. 21, this argument is both incorrect and irrelevant: The White House was *required* by regulation to refer this case for prosecution, and the references to litigation between Defendant and the President in the tweets relied on by Defendant to support her retaliation theory plainly refer to the arbitration filed against Defendant by the President's campaign, not to this lawsuit.  ECF No. 17 at 8-9; ECF No. 21 at 3-5.  Although that arbitration has been pending throughout this lawsuit and Defendant has been represented by the same counsel in both the arbitration and this case, Defendant represented to the Court in three separate filings that the instant case "is the only lawsuit which exists between Mr. Trump, his agents or the United States Government and Ms. Manigault Newman."  *See* Mot. to Dismiss ¶ 27; Def.'s Response to Pl.'s Mot for Protective Order at 9, ECF No. 14; Def.'s Response to Pl.s Renewed Mot. for Protective Order at 9, ECF No. 20.  One of those filings, her response to Plaintiff's renewed protective order motion, was filed the same day as Defendant's opposition to Plaintiff's motion to compel, in which she made the contrary representation that "Ms. Manigault Newman is currently being sued for 'millions of dollars'" by the Trump Campaign.  *See* ECF No. 21 at 4.

### 1.      The Termination Date "Discrepancy" Is Irrelevant

Defendant's original proffered excuse for failing to file her report came in a March 2018 phone call with the White House Counsel's Office, in which she contended that she did not file her Termination Report because "there's an error on the report about my termination day." Mot. to Dismiss ¶ 14 & Ex. B.  Specifically, Defendant has claimed that her termination date was January 20, 2018, and not December 19, 2017, and that this disagreement prevented her from filing her report.  That claim is unfounded for the following reasons:

First, Defendant's precise Termination Date is irrelevant, because Defendant knowingly and willfully failed to timely file her Termination Report even using her preferred (erroneous) termination date of January 20, 2018.  As Defendant was repeatedly advised by White House personnel when she first raised the contention that she was prevented from submitting her report because of an "error" about her "termination day," her Termination Report was *already* late, regardless of whether her termination was effective December 19, 2017, or January 20, 2018.  *See, e.g.*, Passantino Decl. Ex. F ("Ms. Raviv then explained to Ms. Manigault that even using this later date, her report would still be late . . . ."); Mot. to Dismiss Ex. B. (Former Deputy White House Counsel Stefan Passantino explaining to Defendant in or about March 2018 that he wanted to make "super clear" the report must be filed "within 30 days of whatever that [termination] date was, which we're past.").  In other words, even if Defendant had been correct about her termination date, her report was still past due when she first raised this issue, and still remains overdue.

Second, the frequently repeated suggestion that her online Termination Report contained an incorrect termination date is false.  *See, e.g.*, Mot. to Dismiss Ex. B; Lynch Decl. Ex . C; Jones Decl. Ex. F at 2.  The online form established for Defendant in December 2017 by the White House Counsel's Office only contained one populated field—her name.  *See* Jones Decl. Ex. A at 1.  The Termination Date field is and always has been empty; that field like the others on the form needs

to be populated by the filer.  If Defendant had ever logged into Integrity.gov to begin completing her report, she would have realized that.  Thus her contention then and throughout this litigation that her Termination Report contained an "incorrect" date was baseless.

Third, Defendant's contentions that an incorrect termination date prevented her from submitting her Termination Report is belied by her own conduct.  In an effort to moot this action, Defendant submitted a hardcopy of Form OGE 278e to the White House Ethics Office on the day that she filed her motion to dismiss.  Defendant apparently printed the form, which is available online, and entered information in four of the eight requested sections.[13]  Inexplicably, she left the Termination Date field blank.  Jones Decl. Ex. C at 14.  Thus, even when she had the opportunity to "correct" her termination date, she failed to do so.  Any contention that an incorrect termination date prevented her from complying with EIGA accordingly is a pretext to cover her willful disregard of the statute and her indifference to its requirements.

Fourth, Defendant's preferred termination date of January 20, 2018 was not her correct termination date.  Instead, the December 19, 2017 termination date that she disputes *was* her correct termination date, as White House records demonstrate.  *See* Passantino Decl. ¶ 7 (noting General Kelly directed Defendant's termination to take effect immediately on December 19, 2017); *id.* Ex. F; *id.* ¶ 24 & Exs. G & H; *cf. id.* ¶ 5.  Although a January 20, 2018 date was discussed at her termination meeting, that date was subsequently changed to December 19, 2017.[14]  *See id.*

---

[13]  *See* OGE Form 278e, Office of Government Ethics, Public Financial Disclosure Guide (including link to site where OGE Form 278e can be "download[ed]" in either PDF or Microsoft Excel                                                    format), https://www.oge.gov/Web/278eGuide.nsf/Chapters/OGE%20Form%20278e?opendocument (last visited Dec. 6, 2020).

[14]  To the extent Defendant claims that she was waiting after March 26, 2018 for a response from the White House about her termination date before filling out her Termination Report, that, too, is incorrect.  In her motion to dismiss, Defendant claimed that her March 2018 call with Mr. Passantino was her last communication with the White House Counsel's Office about her Termination Report prior to the filing of this action.  *See* Mot. to Dismiss ¶ 16.  Defendant

¶¶ 5, 7.  Defendant was undisputedly informed of this change repeatedly in March 2018.  *See, e.g.*, Passantino Decl. Exs. F-H; Mot to Dismiss Ex. B.  Thus, although the date discrepancy—the putative "only hold up" preventing her from "complet[ing] everything"—was resolved as of March 2018, Defendant's continued failure thereafter to submit her Termination Report evidences her "intentional[] disregard" of EIGA and "indifferen[ce] to its requirements."  *Gant*, 268 F. Supp. 2d at 33 (citation and internal quotation marks omitted).

### 2.  Defendant's Personal Effects That She Failed to Retrieve from the White House Until After this Action Was Filed Have No Bearing on Her Willfulness

When Defendant learned that this action had been authorized, Defendant for the first time asserted her second excuse for failing to file her Termination Report: She claimed that she was unable to complete her Termination Report without the personal effects she left in the White House when she was terminated in December 2017.  *See* Mot. to Dismiss ¶ 18 & Ex. D.  This argument, too, has no merit.  Indeed, Defendant's own admissions contradict it.  In a call with then-Deputy White House Counsel Stefan Passantino in March 2018, when her Termination Report was already past due, Defendant repeatedly stated that the *only* reason she had not completed her Termination Report at that time was her dispute regarding the termination date.  *See* Mot. to Dismiss ¶ 14 & Ex. B; *see supra* at 14 (setting forth Defendant's statements in the call).  At the time, as to her personal effects—which Mr. Passantino, not Defendant, raised, Defendant expressed concern only

---

subsequently asserted in her sworn interrogatory responses that this call took place on January 24, 2018.  Lynch Decl. Ex. B at 4.  While this latter date was also incorrect and the call actually occurred on March 5, 2018, *see* Passantino Dec. ¶ 20, there is no question that Defendant exchanged emails with Mr. Passantino after the call, informing her conclusively on the night of March 26 that her "employment with the government officially ended effective December 19, 2017" and her Termination Report was "now past due."  Passantino Decl. Ex. G.  When Defendant replied to the email later that night, she did not dispute the termination date or the due date of her report.  She simply requested information about where she could "file a complaint" about the issue.  Passantino Decl. Ex. I.

about "a little thumb drive with all of my wedding photos on it, as I have told everyone . . . to anybody that will listen, that I need that thumb drive back with my pictures on it."  Mot. to Dismiss Ex. B.  She did not connect her personal effects to the Termination Report, though the latter was clearly the primary subject of the call.

Yet in May 2019, for the first time, Defendant claimed that those personal effects were necessary to complete her Termination Report.  Mot to Dismiss Ex. D (letter from Defendant stating "[m]uch of the information that I need to complete this termination report . . . is contained in those boxes").  The record evidence again overwhelmingly demonstrates that this excuse is pretextual.  First, her New Entrant Report, initially filed on March 31, 2017, merely needed to be updated to  bring her information current through her termination date nine months later.  Her New Entrant Report is publicly available.  *See supra* at 11 n.5.  Moreover, had Defendant ever logged into Integrity.gov, the system would have populated her Termination Report with the corresponding data from the New Entrant Report.  *See, e.g.*, Passantino Decl. Ex. B at 4.  Thus, at a minimum, the majority of the financial information required for her report was available to Defendant regardless of whatever documentation remained in her office.

Second, her explanation of why these personal effects had any bearing on her Termination Report has shifted over time, and none of the explanations is sufficient to excuse her failure to timely file her report.  Initially, Defendant claimed that the materials she left in her office contained various "financial records" that she needed, *see, e.g.*, Lynch Decl. Ex. B at 5, but she since has conceded that her boxes were not the only source of that information.  *See id.* Ex. E at 1-2 (listing the limited subset of information that Defendant contends (a) remained in her office, (b) was necessary to complete her report, and (c) cannot be obtained from another source).

Ultimately, Defendant revised this claim to state that the *only* materials that were not returned to her in July 2019 that she contends she needed to complete her Termination Report were

related to *official travel* during her time at the White House.[15]  *See* Lynch Decl. Ex. E at 1-2.  But official travel does not need to be reported on a Termination Report.  Part 9 of the Termination Report, the only part of the report that requires information about travel and travel-related expenses, requires the reporting of "[t]ravel reimbursements totaling more than $[390] that you, your spouse, and your dependent children received from any one source during the reporting period."  Jones Decl. Ex. C at 13; Jones Decl. ¶¶ 25-28.  But the same instructions make clear that filers should "not report . . . food, lodging, transportation, and entertainment or reimbursements provided by a foreign government within a foreign country or by the United States Government, the District of Columbia, or a State or local government."  Jones Decl. Ex. C at 13; Jones Decl. ¶ 27.[16]  Because her official travel for the Federal Government is not required to be reported and was *not* one of the deficiencies identified by the White House on the report submitted by Defendant in September 2019, any claimed inaccessibility of such documents does not excuse her failure to file a compliant Termination Report.

Third, Defendant's conduct *after* obtaining her personal items from the White House belies their bearing on her willfulness.  Defendant waited *more than 60 days* from the date that she

---

[15]  Indeed, despite being asked in discovery in multiple requests, Defendant initially failed to identify any specific item needed to complete any particular section of her Termination Report, and acknowledged that "the boxes did not contain all of the information I expected [or] needed" to complete the report.  Lynch Decl. Ex. B at 3, 18, 19, 20, 21, 22, 23.  Prior to revising her response to list only the official travel-related documents discussed in the main text above, Defendant listed only two items that "both (a) remained in [Defendant's office at the White House] after [Defendant] last w[as] in [that office]" AND "(b) were not contained in the [boxes of Defendant's personal effects that she received from the White House in July 2019]":  (1) "an accounting of Michael Clark Duncan's estate," and (2) "a copy of my Entrance Financial Disclosure Report [i.e. Defendant's New Entrant Report]."  Lynch Decl. Ex. D at 2.  This contention was not credible.  Defendant's New Entrant Report at all relevant times has been publicly available online, *see* Note 5, supra, and Defendant has provided no reason why an accounting of Mr. Duncan's estate could not be obtained from the estate's attorney.

[16]  Filers are also instructed not to report "any reimbursements [they] received for political trips that were required to be reported under section 304 of the Federal Election Campaign Act of 1971 (2 U.S.C. § 434)."  Jones Decl. ¶ 27.

received her boxes to submit what she purported to be her financial disclosure report to the White House.  Yet the statute merely affords filers thirty days from the date of termination to file a Termination Report.  5 U.S.C. app 4 § 101(e).  In other words, Defendant took twice as much time as permitted by statute after receiving the personal effects (that she claimed she needed) to submit even her incomplete report .  This lack of diligence provides further evidence of Defendant's contempt for EIGA and its requirements.  Moreover, although advised by the White House that the September 2019 report contained numerous deficiencies, Defendant still has not addressed those deficiencies in the 14 months since.  *See* Jones Decl. ¶¶ 12-24 & Exs. D-F.

In sum, Defendant belatedly and falsely claimed that she needed the materials in her office to prepare her Termination Report. Even so, Defendant's dilatory behavior continued after she received the materials.  On this undisputed record, Defendant's actions demonstrate Defendant's "indifference" to and "intentional disregard[]" of EIGA's requirements.  *Gant*, 268 F. Supp. 2d at 33.

### 3. The "Unmonitored Email Address" Was Not in Fact Unmonitored

Defendant proffered yet another meritless excuse for her failure to comply with EIGA in her motion to dismiss this action.  There, she claimed that "all five (5) emails [referenced in the complaint reminding Defendant of her obligation to complete her Termination Report] were sent to the same unmonitored email address," and that it was only after "March 26, 2018, [when] Mr. Passantino emailed [Defendant] at an updated email address" that Defendant learned of her obligation to file her Termination Report.  Mot. to Dismiss ¶¶ 12-13.  As an initial matter, that claim is false because Defendant clearly *did* monitor that email address.  Indeed, the email submitted as Exhibit C to Defendant's Motion to Dismiss, the same filing in which Defendant first made the claim that her address ███████@gmail.com was "unmonitored," contradicts her claim.  That email, sent on March 26, 2018, to Stefan Passantino at the White House, was sent

*from* the supposedly "unmonitored" email address in response to one of the emails from the White House about her Termination Report.

Moreover, Defendant signed a separation form on December 12, 2017 listing the putative "unmonitored email address" as her appropriate email address for post-employment contact. Passantino Decl. Ex. A.  Defendant understood that she was expected to provide accurate contact information on that form so that the White House could reach her following her departure. Defendant accordingly crossed out the mailing address listed on the form and provided a corrected mailing address.  *Id.*  Thus, when she signed the form listing "███████@gmail.com" as her email address, Defendant authorized the White House to use that method of contact for her and assumed responsibility for monitoring that email address for communications from the White House.

Regardless, the "unmonitored" email address was not the only address that the White House used to contact Defendant about her obligation to file a Termination Report.  Starting on or about January 24, 2018, the White House consistently reached out to her at other email addresses, sending at least six emails to other addresses (usually, but not exclusively, in addition to the purportedly "unmonitored" address) between that date and March 26, 2018.   Defendant acknowledged these communications, both in writing and on a phone call that she recorded and submitted to this Court.  Passantino Decl. ¶¶ 16, 17, 22-25 & Exs. B, D, F-I; Mot. to Dismiss Ex. B.  And Defendant's husband also responded to an email addressing Defendant's failure to file her Termination Report.  Passantino Decl. Ex. D.  Put another way, Defendant knew that the White House was using that email address to reach her, again putting the responsibility on her to check the address (or advise the White House that she no longer was using it).

But as the above-described evidence demonstrated, it would be irrelevant even if Defendant had failed to monitor the email address, because Defendant unquestionably knew of her obligation

to file a Termination Report from other sources and yet failed to file it.  Any of these reasons independently demonstrates why Defendant's alleged failure to monitor ██████████@gmail.com does not create a genuine issue in dispute that her EIGA violation was willful.

## III.    The Court Should Award Plaintiff the Maximum Amount of Civil Penalties Permitted by Law

Because Defendant knowingly and willfully failed to file a Termination Report, she is liable for a civil penalty "in any amount, not to exceed $[61,585]."  5 U.S.C. app. 4 § 104(a)(1); *see* 5 C.F.R. § 2634.701(b).  The statutory language provides the Court broad discretion in determining the amount of the award.  And in similar circumstances, courts in this district have applied their broad discretion in issuing appropriate civil penalties.  *Cf. Fed. Election Comm'n v. Craig for U.S. Senate*, 70 F. Supp. 3d 82, 96 (D.D.C. 2014) (noting the court's "broad discretion [under FECA] to fashion a remedy that is appropriate to the particular circumstances of this case" and citing cases addressing civil penalty awards); *id.* (noting FECA permits award of "'a civil penalty which does not exceed the greater of [$7,500] or an amount equal to any contribution or expenditure involved in such violation'") (quoting 52 U.S.C. § 30109(a)(6)(B)) (alteration in original, footnote omitted).

Here, Defendant should be assessed the maximum penalty, both because of the egregiousness of her conduct and her significant financial resources.  In *Gant*, the defendant, received numerous notices about his obligation to file a Termination Report and acknowledged his receipt of the complaint, but nonetheless failed to file a compliant report.  *See Gant*, 268 F. Supp. 2d at 33.  The court awarded the Government the maximum penalty because "notwithstanding the many written and verbal reminders that both the [agency that formerly employed the defendant] and the plaintiff gave the defendant, the defendant failed to comply with his EIGA obligations,"

rendering the violation "flagrant and ongoing[.]"  *Id.* at 34.   In this case, Defendant's conduct is even more egregious than the defendant in *Grant*.

Defendant has admitted that she has known for almost three years about her obligation to file a Termination Report, but waited more than a year and a half to submit *any* report, and—although advised that her tardy submission was woefully deficient—to date, still has failed to correct the report.  In other words, as of this filing—nearly three years after her Termination Report was due—Defendant still has not complied with EIGA.  *See, e.g.,* Passantino Decl. ¶¶ 10-25 & Exs. B-I; Jones Decl. ¶ 10 & Ex. B.  Instead, over the past three years, Defendant has either ignored the communications reminding her of her obligations and offering her assistance in complying with them or provided a series of shifting and pretextual excuses that wholly fail to justify her failure to comply with EIGA.

Defendant has even continued her evasive conduct during this litigation by asserting false and unsubstantiated excuses to this Court and seeking broad and irrelevant discovery to harass Plaintiff, including attempting to seek the depositions of the President and Plaintiff's former trial counsel.  *See, e.g.*, *supra* at 26-34; *id.* at 26 n.12; Plaintiffs' Renewed Motion for Protective Order, ECF No. 17.   This conduct warrants the maximum penalty permitted by law.  *See* 153 Cong. Rec. S324 (daily ed. Jan. 10, 2007) (statement by Sen. Vitter) (describing the prior $10,000 maximum penalty as "unacceptable" because, "this can literally be a slap on the wrist in certain situations").

Defendant also has substantial financial resources, and her salary while employed by the White House was generous by federal standards.   *See* de la Vega Decl. Ex. A (reflecting Defendant's numerous sources of assets and income); Passantino Decl. Ex H at 1 (Defendant's government salary was $179,700).[17]   Given these significant financial resources, a lesser fine

---

[17] Although Defendant's own failure to file a compliant Termination Report has prevented a full accounting of her assets and sources of income since leaving the White House, Defendant has,

would be inadequate to penalize the seriousness of Defendant's misconduct here and would undermine the deterrent effect of EIGA's enforcement scheme.  *Cf. Hunter* Op. at 3; *Lairy* Op. at 7.

## CONCLUSION

For the reasons set forth above, the Court should grant this motion and enter judgment for Plaintiff awarding Plaintiff a civil penalty of $61,585.

Dated: December 7, 2020

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

ALEXANDER K. HAAS
Branch Director

JACQUELINE COLEMAN SNEAD
Assistant Branch Director

*/s/ Christopher M. Lynch*
Christopher M. Lynch
D.C. Bar # 1049152
Trial Attorney
United States Department of Justice
Civil Division,
Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 353-4537
Fax: (202) 616-8470
Email: christopher.m.lynch@usdoj.gov

---

among other assets, $1,000,001-$5,000,000 in assets as the 1/3 beneficiary of a trust.  *Id.*  She receives royalty income from a variety television shows, *see id.*, and she has written a "best-selling" memoir about her time at the White House.  *See, e.g.*, Brian Stetler, Omarosa's Trump tell-all 'Unhinged' tops NYT best seller list, CNN Business (Aug. 23, 2018), https://money.cnn.com/2018/08/22/media/omarosa-unhinged-best-selling-book/index.html  (last visited Dec. 6, 2020).  Defendant's celebrity also enables her to receive valuable in-kind compensation, such as the "wedding package which included a wedding dress, custom veil, and accessories with an estimated value of $25,000 " that she received from Kleinfeld Bridal Corp in connection with her appearance on *Say Yes to the Dress*.  De la Vega Decl. Ex. A at 5.  In addition, her husband has a salary of between $102,000 and $200,000 per year. Jones Decl. Ex. C.  These significant resources are more than sufficient to pay the maximum fine.

*Attorneys for Plaintiff*