# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

       Plaintiff,                            Case No.: 1:19-cv-1868 (RJL)

v.

OMAROSA MANIGAULT NEWMAN,

       Defendant,

_____/

## DEFENDANT OMAROSA MANIGAULT NEWMAN'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h)(1), the following is a statement of material facts as to which Defendant Omarosa Newman contends there is no genuine issue to be tried:

1. Defendant, Omarosa Manigault Newman, worked as the Director of Communications in the Office of Public Liaison in the White House from January 20, 2017 through January 20, 2018.

2. On or about December 13, 2017, a "post-government employment briefing" held in the Situation Room. See attached Declaration of Omarosa Manigault Newman (Manigault Newman Decl. ¶ 2.)

3. In attendance at this meeting was former White House Chief of Staff, Gen. John Kelly, White House ethics attorney Stefan Passantino, Esq., White House ethics

1

attorney Uttam Dhillon, Esq.,  and Human Resource Manager Irene Porada and Omarosa Manigault Newman. (Manigault Newman Decl. ¶ 3.)

4. During this "post-government employment briefing," General John Kelly discussed Mrs. Newman's termination.At that time, all parties agreed that January 20, 2018 would be her departure date. (Manigault Newman Decl. ¶¶ 7-8.)

5. December 13, 2017 was the last time Mrs. Newman was allowed on White House grounds; she was not permitted to obtain her personal effects from her office before leaving. (Manigault Newman Decl. ¶¶ 11-12.)

6. The requested financial disclosure report, and amendments thereto, have has since been filed. Specifically, the initial termination report was submitted on September 11, 2019. A Subsequent amended report was sent on December 21, 2020.

7. On March 26, 2018, A conversation was held with Mr. Passantino in which Defendant expressly informed him that she did "not feel comfortable completing a report with the wrong date on it." (Def. Mot. to Dismiss Plf.'s Corrected Complaint, Ex. B.)

8. In that same conversation, Mr. Passantino Mr. Passantino acknowledges possession of Defendant's property. Unambiguously, Mr. Passantino stated, "I've got two boxes of personal stuff and I've got your commission certificate."  Mr. Passantino goes further, "if we could just get this done then we can figure out a time to get to you or somebody your stuff and your certificate." (Def. Mot. to Dismiss Plf.'s Corrected Complaint, Ex. B.)

9.  Further, on May 6 2019, Defendant sent an email on informing Mr. Passantino that the White House was in possession of some of her items. Among those items were documents needed to complete the termination report. (See Exhibit A).

10. On or about July 12, 2019, Ms. Manigault Newman's belongings were returned to her. The boxes contained Ms. Manigault Newman's financial records, bank statements, travel documents, tax returns, W-2's, emails and other important data required to fill out the requisite financial disclosure form. (Manigault Newman Decl. ¶ 23.)

11. Ms. Manigault Newman has been attempting to submit her report since September 11, 2019. (See Ex. C.) Plaintiff's refused to certify that report and sent a list of modifications to be made. (See Ex.  D.)

12. Ms. Manigault Newman then filed a subsequent amended report on December 21, 2020. (See Ex. E)

13. Plaintiff again refuses to certify the report and send another tedious list of revisions. (See Ex. F)

Respectfully submitted,

**Law Office of John M. Phillips, LLC**

/s/ John M. Phillips
**JOHN M. PHILLIPS, ESQUIRE**
DC Bar Number:  1632674
212 North Laura Street
Jacksonville, Florida 32202
(904) 444-4444
(904) 508-0683 (facsimile)
Attorneys for Defendant
jphillips@floridajustice.com
erica@floridajustice.com

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

      Plaintiff,                         Case No.: 1:19-cv-1868 (RJL)

v.

OMAROSA MANIGAULT NEWMAN,

      Defendant,

_____/

## DEFENDANT OMAROSA MANIGAULT NEWMAN'S MOTION FOR SUMMARY JUDGMENT

      Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff hereby moves for summary judgment on the ground that there is no genuine issue of disputed material fact that Defendant Omarosa Manigault Newman did not knowingly and willfully fail to timely file her termination financial disclosure report required by the Ethics in Government Act, 5 U.S.C. app. 4 § 101 et seq.

      In support of this motion, Defendant submits the accompanying memorandum; statement of undisputed material facts; Declaration of Omarosa Manigault Newman and Defendant's proposed order.

                        Respectfully submitted,

                        **Law Office of John M. Phillips, LLC**

                        /s/ John M. Phillips
                        **JOHN M. PHILLIPS, ESQUIRE**
                        DC Bar Number: 1632674
                        212 North Laura Street
                        Jacksonville, Florida 32202
                        (904) 444-4444
                        (904) 508-0683 (facsimile)
                        Attorneys for Defendant
                        jphillips@floridajustice.com
                        erica@floridajustice.com

1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

       Plaintiff,                            Case No.: 1:19-cv-1868 (RJL)

v.

OMAROSA MANIGAULT NEWMAN,

       Defendant,

_____/

### DEFENDANT OMAROSA MANIGAULT NEWMAN'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The United States of America has sued Ms. Manigault Newman for allegedly violating the Ethics in Government Act (EIGA) by "knowingly and willfully failing to file her termination financial disclosure report within the time required by the EIGA." Complaint P. 6, ECF No. 2-1. The United States of America specifically sought a civil penalty "up to $50,000" in its corrected complaint. Subsequently, Plaintiffs could not come up with a number at the attorney conference or at any time prior hereto. Plaintiff now seeks $61,585 "as a matter of law." Mot. for Summary Judgment P. 43, ECF No. 24. The facts alleged within Plaintiff's Corrected Complaint fail to establish that Ms. Manigault Newman knowingly and willfully failed to file her financial report.

As discussed herein, Plaintiff has and still impedes the timely completion of her termination report. Additionally, former President Trump has used this suit as retaliation for defendant publishing her book. Defendant's inability to complete the termination report within 30-days cannot be deemed as a "willful" failure to act, given she actively sought assistance, information,

2

guidance, and the return of her own materials. This matter cannot meet the standard cited herein by Defendant and summary judgment is therefore proper.

## I.   Statutory Background
### a.   Summary Judgment

Entry of summary judgment is mandated, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish that existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

When a party has the burden of proof on an element essential to its case at trial and does not, after adequate time for discovery, there can be no genuine issue as to any material fact since a complete failure of proof concerning an essential element of the nonmovant's case necessarily renders all other facts immaterial. Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A. Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

Although Defendant has not been allowed any discovery herein and multiple request for depositions remain ignored, motion for summary judgment should be granted whenever the court concludes that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Jane W. v. President & Directors of Georgetown Coll., 863 A.2d 821 (D.C. 2004)

### b.   The Ethics in Government Act

The Ethics in Government Act (hereinafter "EIGA") establishes financial reporting requirements for key personnel in each of the three branches of the federal government. *United States v. Rose*, 28 F.3d 181, 183 (D.C.Cir.1994) (citing to the EIGA prior to its consolidation at 5 U.S.C. app. 4 § 101 et seq.).

3

Under section 101 of the EIGA, all executive-branch employees at pay grade GS 15 or above must file a highly detailed financial statement within 30 days of the termination of their federal employment. 5 U.S.C. app. 4 § 101(e), (f); see also *Washington Post Co. v. Dep't of Health & Human Servs.*, 690 F.2d 252, 265 (D.C.Cir.1982).

Section 104(a) of the EIGA authorizes the Attorney General to bring a civil action in federal district court against any individual "who knowingly and willfully fails to file or report any information that such individual is required to report" under the EIGA. [5 U.S.C. app. 4 § 104(a)] An individual knowingly and willfully fails to comply with the EIGA's filing requirements when that individual "intentionally disregards the statute or is indifferent to its requirements." *United States v. Tarver*, 642 F.Supp. 1109, 1111 (D.Wyo.1986); see also *United States v. Bank of New England, N.A.*, 821 F.2d 844, 856 (1st Cir.1987) (defining "willfulness" for purposes of federal regulatory statutes as a disregard for the governing statute and an indifference to its requirements).

## II.    Defendant Delayed Completion of the Termination Report was not "Willful"

The defendant has not intentionally disregarded the law, but instead she has been repeatedly impeded from successfully completing her termination report. Most notable of these impediments is the improper termination date listed on the electronic termination financial disclosure form. Ms. Manigault explicitly informed Plaintiff's agents that the termination date was incorrect and was in need of correcting. In a conversation held on March 26, 2018, Defendant unequivocally and explicitly informs Plaintiff that the termination report can not be completed as the date of termination was incorrect. The conversation is as follows:

> "**Stefan Passantino (SP):** I don't know if you've been getting the emails that we have been sending about this terminating report, this financial disclosure form?
> **Omarosa Manigault Newman (OMN):** Yeah, there's an error on the report about my termination day. So, my last day is the 20th and it's indicated the 13th … you were in the [situation] room when we all agreed to the 20th, so once

4

that's corrected, I can complete the report and everything will be done. But, with that discrepancy, I don't feel comfortable completing that report.

    **SP:** OK, well so, I will get with the Chief…

    **OMN:** I've never had a conversation with him about the, a change of a date or anything. So, I don't know where that would have happened. But that's the hold up. Without that change I can't complete [the financial disclosure form] … Let me be clear, as soon as that date is corrected then I can complete it. Without that, I don't feel comfortable completing a report with the wrong date on it.

    **SP:** OK. And so, when I talk to the Chief and the Chief is like "No, we changed it from the 20th to the 13th, it is the 13th." If I hear that, I guess I'll just tell you.

    **OMN:** I don't think you'll hear that because you were in the room when the 20th was decided. And two other attorneys were in the room when that date was decided. I don't know where the discrepancy would have come from…

    **SP:** Yeah. Right. No, no, no, no, no. I hear you and I was there for the conversation of the 20th. There would be only, if subsequently, subsequent to that conversation [the date] changed. But again, that's not my issue, I'm not going to get in the middle of that…

    **OMN:** I want to be crystal clear, that's the only hold up, is the discrepancy of the date. After that, I can complete everything." Def. Mot. to Dismiss Corrected Complaint, Ex. B [1]

Mr. Passantino never corrected or amended the electronic form to reflect the appropriate date. Further, Mr. Passantino never updated Defendant on what was determined by the "Chief" concerning the discrepancy in termination date. Making matters even worse, in Plaintiff's Motion for Summary Judgment, they create a fictional phone call and third separate date out of a hat. Based on this confusion and Defendant's repeated request for clarification, it defies logic and the facts herein to deem this a "willful" refusal.

Defendant was further obstructed from the successful completion of her termination report when Plaintiff decided not to return her personal belonging for a period of over 18 months. In the aforementioned March 26, 2018 conversation, Mr. Passantino confirms the White House is in

---

[1]Exhibit "B" is an electronically stored audio recording previously forwarded to this Honorable Court pursuant to Local Rule 5.4(e).

possession of Defendant's items. Among those items were documents essential to completing the

termination report. That portion of the conversation is transcribed below:

> **SP:** Okay. And so, also…we've got some personal stuff of yours… Okay.
> Well, I will, I will just let them know that. I will find out what, as far as the Chief
> was concerned, what the final date was, and let you know…
> **OMN:** So, are they holding up my items in exchange for that report? Is that
> what I'm hearing? Is that why my items…
> **SP:** No, well. No. It's not as nefarious as that. It's just process that we
> have to do… I mean, at the end of the day, I've got two boxes of personal stuff.
> And, I've got your commission certificate. And, I want to, I just want to get this
> all wrapped up, so we can just trade whatever you have. Sounds like you don't
> have anything else.
> **OMN:** I don't.
> **SP:** Okay, yeah so, if we could just get this all done then we can figure out
> a time to get to you or somebody your stuff and your certificate.
> **OMN:** Yeah, I would like to get my personal items back…
> **SP:** Yeah, no, I've got 2 boxes of personal stuff and your certificate. So,
> we're all aligned to try to get this done. Let me find out about what is the story on
> the dates and like I said, I'm just going to convey what I hear...
> **OMN:** So, as soon as that date is changed, I can complete the report and
> everything can kind of go from there.
> **SP:** Right. And like I said, all I can promise is, I was there when we set the
> 20th. The only thing I can't guarantee is that subsequent to that, when we were
> together in the Situation Room, is something changed. But, I will report back
> whatever I hear. So, we will go from there. I'm going to type up an email right
> now, based on this conversation." Id.

As noted above, Mr. Passantino clearly acknowledges possession of Defendant's items. He

even alludes to trading them in exchange for the completion of her report. Additionally, Plaintiff

also admitted in its Motion for Summary Judgment, that "It is correct that official travel documents

and other materials pertaining to her official work at the White House were not returned to her

because they are presidential records." See Declaration of David Jones (Decl. of David Jones ¶ 26-

27, ECF No. 24-3.)[2] Yet, suit was filed by Plaintiff while Defendant and her counsel begged for a

delay until she obtained the necessary boxes.

---

[2] Attachment in support of Plaintiff's previously submitted Motion for Summary Judgment

Additionally, on or about May 6, 2019, Defendant writes an email to Ashley Cheung informing her that she would like to complete the termination report, however, Plaintiff was in possession of key information needed to complete the report. That email is transcribed as follows:

> "Thank you for your letter about the referral from the executive office of President Donald Trump.
>
> I was always eager to get this termination report completed within the 30 days after my January 20th 2018 separation from the administration. However, as I had communicated with my ethics contact, Stefan Passantino, at the White House, I am still lacking some key information to complete the report.
>
> Specifically, in several calls and emails to Stefan, we discussed the need for the contents of seven boxes from my office that were seized by Uttam Dhillon, Irene H. Porada and Mr. Passantino, upon my departure.
>
> Much of the information that I need to complete this termination report- financial records, travel documents, emails and other important correspondence related to my employment on the Trump campaign, transition, inauguration and my tenure at the White House- is contained in those boxes. These boxes are still in the possession of the White House.
>
> I am still hopeful that the White House will return my boxes and give me access to the data necessary to complete the report. Please advise." See attached hereto Exhibit A.

It was not until July 12, 2019 when Ms. Manigault Newman's counsel personally went to the gates of the White House were some of her belongings returned. There, Defendant's counsel was presented with two boxes and one tube which were brought to the exterior gate of the White House. Attached here to as Exhibit B. The boxes retrieved from the White House contained Ms. Manigault Newman's financial records, bank statements, travel documents, tax returns, W-2's, emails and other important data required to fill out the requisite financial disclosure form. (Manigault Newman Decl. ¶ 23.) Ms. Manigault Newman has confirmed, under oath, items from these boxes were (1) perceived as necessary, (2) actually necessary, and (3) conveyed as necessary to Plaintiff. Id. This fact requires judgment be entered in favor of Defendant.

Facts show as early as March of 2018, Defendant has been requesting that termination date be corrected. To date, the electronic submission form has yet to be updated. As such, Defendant

has had to resort to manually filing her report, a process that is arduous and time-consuming. Defendant's failure to complete the report within 30-days cannot be seen as "willful" if the requesting agency was preventing the accurate completion of the financial disclosure form. Furthermore, by not returning Defendant's personal items, Plaintiff's withheld pertinent financial information necessary for the successful completion of the financial disclosure form required upon termination. The obstructive actions of Plaintiffs are prominent factors in Defendant returning a delayed report. Since Defendant's actions can in no way be interpreted as "willful", we ask this Honorable Court grant Summary Judgment against Plaintiff as Defendant's conduct does not meet the requirements of Section 104(a) of the EIGA.

### III.  Defendant has Submitted Two Termination Reports to Plaintiff

Plaintiff alleges that Defendant refuses to file her termination report. This is simply not true. Defendant has submitted two termination reports. The first being submitted on September 11, 2019. After this report was submitted, Plaintiff's refused to certify this report. Instead, David Jones sent an email on November 18, 2019 requesting several revisions. Revisions that had to be made manually on a PDF document that does not allow for edits to be saved when revising. See attached hereto Exhibit C. In that same message, Mr. Jones notes how ineffective the PDF form is. Id. Note, Defendant is forced to use the manual system as Plaintiff's refuse to correct the termination date on the electronic form. This undoubtedly inhibited Defendant from timely completing the form.

Nevertheless, Defendant revises the termination report again in effort to appease White House staff. The amended report was submitted on December 21, 2021. Again, on January 12, 2021, Mr. Jones refuses to certify the report and has sent another list of detailed and confusing revisions. See attached hereto Exhibit D.

8

It is worth noting, David Jones was at all times the "Senior Associate Counsel to the President" or "Special Assistant to the President". He was not with the Office of Government Ethics. Defendant repeatedly requested a contact with Office of Government Ethics and this was refused by Mr. Jones and record counsel in this case. Please see attached hereto Exhibit E. Meanwhile, some of record counsel implicated in various other Trump lawsuits and revenge tactics.

Again, Defendant has attempted to comply with the statute on numerous attempts but to no avail, her reports have been consistently denied. To suggest Defendant's inability to have her report certified would be a mischaracterization of the facts. Instead, Defendant is being continuously impeded from the successful resolution of her report as Plaintiffs refuse to certify her report. Now, we cannot even get a suitable person's contact information to assist in the completion of the report. See attached Exhibit F.

## IV.   Whistle Blower Protection Act (WPA) and Whistleblower Protection Enhancement Act (WPEA) Violations

The United States Congress, dating back to 1978, through the enactment of various whistleblower protection laws, has repeatedly strengthened the statutory protections afforded to federal employees. Ms. Manigault Newman would fall in this protected class of federal employees. Federal employees are entitled and encouraged to make disclosures of governmental wrongdoing, without fear of retaliation or harassment from their superiors. As stated in United States Senate Report 112-155:

> In the vast federal bureaucracy, it is not difficult to conceal wrongdoing provided that no one summons the courage to disclose the truth. Whenever misdeeds take place in the federal agency, ther are employees who know that it has occurred, and who are outraged by it. What is needed is a means to assure them that they will not suffer if they help uncover and correct administrative abuses…These conscientious civil servants deserve statutory protection rather than bureaucratic harassment and intimidation.

"Congress in 1989 unanimously passed the WPA which forbids retaliation against a federal employee who discloses what the employee reasonably believes evidences a violation of law, rule or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health and safety." (Senate Report, P.3 ¶ 2.) "The stated congressional intent of the WPA was to strengthen and improve protections for the rights of federal employees, prevent reprisals, and to help eliminate wrongdoing within the government. (Senate Report, P.3 ¶ 3.)

Prior to the enactment of the WPEA, the United States Senate Committee on Homeland Security and Governmental affairs submitted a detailed legislative report of the Whistleblower Protection Enhancement Act of 2012. The eighty plus page report explains the legislative intent, public policy, and democratic principles sought to be protected by the WPEA. A copy of the report is attached hereto as Exhibit G.

The Senate report declare that Congress enacted the Whistleblower Protection Enhancement Act of 2012 to "Strength the rights of and protections for federal whistleblowers so that they can more effectively help root out waste, fraud, and abuse in the federal government. (Senate Report, P.1 ¶ 2.) Congress' desire to strengthen the rights and protections for federal whistleblowers was in response to a series of narrow judicial interpretations of the original Whistleblower Protection Act which, according to Congress, "violated the purpose and intent of the original act. The Senate Report states:

> Unfortunately, federal whistleblowers have seen their protections diminish in recent years, largely as a result of a series of decisions by the United States Court of Appeals for the Federal Circuit…Specifically, the Federal Circuit has wrongfully accorded a narrow definition to the type of disclosure that qualifies for whistleblower protection… [The WPEA] would address these problems by restoring the original congressional intent of the WPA to adequately protect whistleblowers, by strengthening the WPA.

10

The Report continues, "More specifically, [the WPEA] would, among other things clarify the broad meaning of "any" disclosure of wrongdoing that, under the WPA, a covered employee may make with legal protection. (Senate Report, P.2 ¶ 2.) The [WPEA] makes clear that "any disclosure" means "any disclosure". (Senate Report, P.41 ¶ 4). "It is critical that employees know that the protection for disclosing wrongdoing is extremely broad and will not be narrowed retroactively by future…court opinions. Without this assurance whistleblowers will hesitate to come forward. (Senate Report, P.5 ¶ 1).

The Committee on Homeland Security and Governmental Affairs further concluded that: "The stated congressional intent of the [original] WPA was to strengthen and improve protections for the rights of federal employees, to prevent reprisals, and to help eliminate wrongdoing within the government…Now, seventeen years after the last major revision to the WPA, it is again necessary for Congress to reform and strengthen several aspects of the whistleblower protection statutes in order to achieve the original intent and purpose of the laws." (Senate Report, P.3 ¶ 2.)

To achieve the original legislative intent of the WPA, the Enhanced Act codifies a series of express prohibited personnel practices that federal employees, like Former President Trup, are enjoined from engaging in against former federal employees such as Ms. Manigault Newman. Additionally, the WPEA codifies a series of protections for former federal employees, like Ms. Manigault Newman, to speak openly and freely about the mismanagement and abuses occurring within the federal government, without fear of reprisal.

Shortly after the Submission of this Senate Report, the WPEA was taken to the floors of both the Senate and the House and was passed with unanimous bi-partisan support without

objection. On November 27, 2012, the WPEA was signed into law continues to remain if full

force and effect.

Specifically, 5 U.S.C.A. § 2302 (b)(8) states

"Any employee who has authority to take, direct others to take, recommend, or
approve any personnel action, shall not, with respect to such authority...take or fail
to take, or threaten to take or fail to take, a personnel action with respect to any
employee or applicant for employment because of--
**(A)** any disclosure of information by an employee or applicant which the
employee or applicant reasonably believes evidences--
**(i)** any violation of any law, rule, or regulation, or
**(ii)** gross mismanagement, a gross waste of funds, an abuse of authority,
or a substantial and specific danger to public health or safety,

if such disclosure is not specifically prohibited by law and if such information is
not specifically required by Executive order to be kept secret in the interest of
national defense or the conduct of foreign affairs." 5 U.S.C.A. § 2302 (b)(8).


In the present case, Ms. Manigault Newman worked as the Director of Communications in

the Office of Public Liaison in the White House from January 20, 2017 through January 20, 2018.

On December 13, 2017, while at work in the West Wing of the White House, Ms. Manigault

Newman was escorted into the Situation Room to discuss human resource issues related to her

employment with the Trump Administration.[3] Former White House Chief of Staff, Gen. John

Kelly, White House ethics attorney Stefan Passantino, Esq., White House ethics attorney Uttam

Dhillon, Esq.,  Human Resource Manager Irene Porada and Ms. Manigault Newman were present.

General John Kelly terminated Ms. Manigault Newman while in the Situation Room.  During the

termination, General Kelly threatened, **"I'd like to see this be a friendly departure...and you**

---

[3]Historically, The Situation Room at the White House is utilized during times of American crisis.  For example, the
Situation Room was utilized during operation Neptune Spear, a mission against Osama Bin Laden.

**can go on without any type of difficulty in the future relative to your reputation.**" (Motion

to Dismiss, Ex. "A"[4]) Shortly thereafter, General Kelly exited the Situation Room.

On March 26, 2018, Ms. Manigault Newman as recorded a conversation with Stephan

Passantino, White House Ethics Attorney. The substance of that conversation is detailed below:

> **Stefan Passantino (SP):** I don't know if you've been getting the emails that we have been sending about this terminating report, this financial disclosure form?
>
> **Omarosa Manigault Newman (OMN):** Yeah, there's an error on the report about my termination day.  So, my last day is the 20th and it's indicated the 13th ... you were in the [situation] room when we all agreed to the 20th, so once that's corrected, I can complete the report and everything will be done.  But, with that discrepancy, I don't feel comfortable completing that report.
>
> **SP:** OK, well so, I will get with the Chief...
>
> **OMN:** I've never had a conversation with him about the, a change of a date or anything.  So, I don't know where that would have happened.  But that's the hold up.  Without that change I can't complete [the financial disclosure form]... Let me be clear, as soon as that date is corrected then I can complete it.  Without that, I don't feel comfortable completing a report with the wrong date on it.
>
> **SP:** OK.  And so, when I talk to the Chief and the Chief is like "No, we changed it from the 20th to the 13th, it is the 13th."  If I hear that, I guess I'll just tell you.
>
> **OMN:** I don't think you'll hear that because you were in the room when the 20th was decided.  And two other attorneys were in the room when that date was decided.  I don't know where the discrepancy would have come from...
>
> **SP:** Yeah.  Right.  No, no, no, no, no.  I hear you and I was there for the conversation of the 20th.  There would be only, if subsequently, subsequent to that conversation [the date] changed.  But again, that's not my issue, I'm not going to get in the middle of that...
>
> **OMN:** I want to be crystal clear, that's the only hold up, is the discrepancy of the date.  After that, I can complete everything.
>
> **SP:** Okay.  And so, also...we've got some personal stuff of yours... Okay.  Well, I will, I will just let them know that.  I will find out what, as far as the Chief was concerned, what the final date was, and let you know...
>
> **OMN:** So, are they holding up my items in exchange for that report? Is that what I'm hearing? Is that why my items...
>
> **SP:** No, well.  No.  It's not as nefarious as that.  It's just process that we have to do... I mean, at the end of the day, I've got two boxes of personal stuff.  And, I've got your commission certificate.  And, I want to, I just want to get this all wrapped up, so we can just trade whatever you have.  Sounds like you don't have anything else.
>
> **OMN:** I don't.
>
> **SP:** Okay, yeah so, if we could just get this all done then we can figure out a time to get to you or somebody your stuff and your certificate.
>
> **OMN:** Yeah, I would like to get my personal items back...

---

[4] Exhibit "A" is an electronically stored audio recording that has been previously forwarded to this court under separate cover pursuant to Local Rule 5.4(e).

**SP:** Yeah, no, I've got 2 boxes of personal stuff and your certificate.  So, we're all aligned to try to get this done.  Let me find out about what is the story on the dates and like I said, I'm just going to convey what I hear...

**OMN:** So, as soon as that date is changed I can complete the report and everything can kind of go from there.

**SP:** Right.  And like I said, all I can promise is, I was there when we set the 20th.  The only thing I can't guarantee is that subsequent to that, when we were together in the Sit[uation] Room, is something changed.  But, I will report back whatever I hear.  So, we will go from there.  I'm going to type up an email right now, based on this conversation. (Motion to Dismiss, Ex. "B"[5])

The threats made by General Kelly and the institution of this litigation on the the day Ms. Manigault Newman's book highly suggest a violation of Whistleblower statutes through retaliation. The White House then acted on these threats when they withheld Defendant's personal belongings.  This litigation was clearly enacted as retaliation because Ms. Manigault Newman decided to disclose information concerning the gross mismanagement of the White House.

Ms. Manigault Newman was not swayed by General Kelly's threat. She then proceeded to exercise her First Amendment right. Each time she spoke out, she received the increased fury of the White House.

Shortly thereafter, Ms. Manigault Newman emailed Mr. Passantino requesting information on where to "file a formal complaint about the fees and discrepancy in the report..." Ms. Manigault Newman further asked Mr. Passantino whether to direct her inquiry to the Ethics Office or the Department of Justice.  A copy of said email is attached hereto as Exhibit "H".

Stefan Passantino did not respond to Ms. Manigault Newman's email and he never "reported back" to Omarosa regarding the discrepency with the date on the financial disclosure form.  When Defendant sought to speak to someone other than Mr. Passantino, Stefan Passantino admits he, "did not respond to her", and "heard no further from Ms. Manigault Newman." (Decl.

---

[5] Exhibit "B" is an electronically stored audio recording that has been previously forwarded to this court under separate cover pursuant to Local Rule 5.4(e).

of Stefan Passantino ¶ 25, ECF No. 24-2). As previously mentioned, the termination date discrepency still had not been corrected on the electronic financial disclosure form. Notably, the attorney who was most responsible for obtaining and repeatedly demanded her report admitted, under oath, he refused to provide Defendant assistance about who she could discuss issuses pertaining to it. Once again, this refusal and admitted ignoring of the issue shows contempt by the government. Defendant was actively seeking help as she was concerned with how the matter was being handled. Those concerns were expressly and admittedly ignored.

In January of 2018, Ms. Manigault Newman was then contacted by Lara Trump, an executive at the campaign, Donald J. Trump for President, Inc., and daughter-in-law of President Trump called Defendant, saying, "It sounds a little like, obviously, that there are some things you've got in the back pocket to pull out," Lara Trump said. "Clearly, if you come on board the campaign, like, we can't have, we got to... " and encouraged me to discuss, "Everything, everybody, positive, right?" Lara Trump then offered her $15,000 per month with flexible location and work hours. ("Manigault Newman Decl. ¶ 29.) It is my belief that this job offer was purely designed to have her agree to a different, legally binding and more detailed non-disclosure agreement. ("Manigault Newman Decl. ¶ 30.)

Ms. Manigault Newman then received an email from the Department of Justice dated April 23, 2019 stating this matter was being escalated to litigation. On May 6, 2019 Ms. Manigault Newman responded to the Department of Justice, again reminding them that they were withholding her personal items and that she could not complete the report without her personal items. At that time, the White House appears to still be leveraging Ms. Manigault Newman's belongings in exchange for her report. That email is transcribed below:

> Thank you for your letter about the referral from the executive office of President
> Donald Trump.  I was always eager to get this termination report completed within

the 30 days after my January 20th, 2018 seperation from the administration. However, as I had communicated with my ethics contact, Stefan Passantino, at the White House, **I am still lacking some key information to complete the report**. Specifically, in several calls and emails to Stefan, we discussed the need for the contents of seven boxes from my office that were seized by Uttam Dhillon, Irene H. Porada and Mr. Passantino, upon my departure. **Much of the information that I need to complete this termination report – financial records, travel documents, emails and other important correspondence related to my employment on the Trump campaign, transition, inauguration and my tenure in the White House – is contained in those boxes. These boxes are still in the possession of the White House. I am still hopeful that the White House will return my boxes and give me access to the data necessary to complete the report.** Please advise. (*See* attached Exhibit "I")

On May 9, 2019, Ashley Cheung, Esq., with the United States Department of Justice, emailed Ms. Manigault Newman and informed her that the DOJ would "look into the situation and get back with you." A copy of said email is attached hereto as Exhibit "J".

The following day, Ms. Cheung informed Ms. Manigault Newman that "The White House Counsel's Office has located documents that it intends to return to you. **Please let us know whether you would like to pick up the documents in person or have them mailed to you**…" A copy of said email is attached hereto as Exhibit "K".

On May 15, 2019, the undersigned counsel for Ms. Manigault Newman requested that Ms. Cheung, "Please provide some description of the quantity of materials and proximate availability." Counsel also inquired why the Department of Justice and the White House Counsel's Office were jointly using the word "us" and who actually possessed the boxes at all material times. A copy of said email is attached hereto as Exhibit "L".

Ms. Cheung never provides directly address the substance of Mr. Phillips email. She instead declares, "We regard the return of your client's personal effects as unrelated to our claim under the Ethics in Government Act." A copy of said email has been attached hereto as Exhibit "M". Ms. Manigault Newman has never been informed of a physical inspection of her items. Ms.

Cheung fails to elaborate as to why Ms. Manigault Newman's personal effects as unrelated to the EIGA claim. As such, it appears the White House was further acting on its threat by not returning her personal effects in an effort to hinder the completion of her termination report

On July 12, 2019 Ms. Manigault Newman and her counsel, retrieved two boxes and one commission certificate which were brought to the exterior gate of the White House. *See* attached Exhibit "N". The boxes retrieved from the White House contained Ms. Manigault Newman's financial records, bank statements, travel documents, tax returns, W-2's, emails and other important data required to fill out the requisite financial disclosure form.

It is imperative to note Plaintiff's Corrected Complaint indicates, "the Executive Office of the President referred this matter to the Department of Justice." (Complaint, P. 5, ¶ 24, ECF No. 2-1). This suggest that the President wanted Ms. Manigault punished for speaking on the mismanagement that was occurring during her tenure at the White House. The President's own words further suggest he had a personal vendetta against Ms. Manigault Newman.

Former President Trump then makes his personal grudge against Defendant known through a string of malicious tweets. Those statements include calling Ms. Manigault Newman "wacky", said she "had zero credibility with the media,", calling her a "lowlife", insinuated she was illegitimate, said "people in the White House hated her, said she was "vicious, but not smart," indicated he'd "rarely see her,", that she "begged me for a job, tears in her eyes, called her "wacky and deranged," called her a liar for saying there was a tape of him saying the "N-word," as he has never had that word in his vocabulary," and made other false statements about Ms. Manigault Newman. (Tucker Higgins, Trump launches Twitter attack on Omarosa: 'She was vicious, but not smart', August 13, 2018, https://www.cnbc.com/2018/08/13/trump-launches-twitter-attack-on-omarosa-she-was-vicious-but-not-smart.html.)

Specifically, the President appeared to be most upset about her book, stating, "While I know it's "not presidential" to take on a lowlife like Omarosa, and while I would rather not be doing so, this is a modern-day form of communication and I know the Fake News Media will be working overtime to make even Wacky Omarosa look legitimate as possible. Sorry!" — Donald J. Trump (@realDonaldTrump) August 13, 2018. Id.

Former President Trump goes further by publicly admitting to suing Ms. Manigault Newman. President Trump tweeted:

> "Yes, I am currently suing various people for violating their confidentiality agreements," Trump tweeted. "Disgusting and foul mouthed Omarosa is one. I gave her every break, despite the fact that she was despised by everyone, and she went for some cheap money from a book. Numerous others also!" (Bruce Haring, August 31, 2019, President Donald Trump Is Suing Omarosa And Others For Confidentiality Breaches, https://deadline.com/2019/08/president-donald-trump-is-suing-omarosa-and-others-for-confidentiality-breaches-1202708722/).

To date, the only matter in litigation against Ms. Manigault Newman is the instant matter. This suggest President Trump is utilizing the federal court system to resolve a federal dispute. Employer/employee revenge is a gross mismanagement of taxpayer money and court resources.

On July 25, 2019, the Department of Justice, upon referral from the Executive Office of the President, filed the instant lawsuit seeking $50,000.00 in damages against Ms. Manigault Newman for allegedly violating a provision within the Ethics in Government Act.

## CONCLUSION

The core of section 101 of the EIGA is meant to penalize those who "knowingly" and "willfully" disregard the 30-day completion requirement. In the present cause, we see that Defendant has attempted to constantly communicate with Plaintiff in order to obtain the information needed to resolve the report. Defendant was confronted with two serious impediments:

18

(1 The electronic financial disclosure report sent to Defendant did not display the appropriate termination date and (2 The White House staff refused to relinquish possession of Defendant's personal belongings so that the report could be completed in a timely manner.

Additionally, Defendant has attempted to submit a completed report twice. Plaintiffs in this matter refuse to certify the termination report despite Defendant's good faith efforts to complete the report on two separate occasions. As such, Defendant's actions were not "willful" and cannot be seen as a violation of section 101 of the EIGA.

Lastly, Ms. Manigault Newman is being retaliated against for utilizing her First Amendment Right to free speech. Ms. Manigault Newman is simply shedding light on the mismanagement that was occurring in the White House during her tenure. As such, Ms. Manigault Newman should be afforded the protection of the Whistleblower Protection Enhancement Act. As such, summary judgment should be granted in favor of Defendant.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of Court using the CM/ECF which will furnish a copy to Christopher M. Lynch, Esq., Joseph H. Hunt, Esq., James J. Gilligan, Esq., Jacqueline Coleman Snead, Esq., United States Department of Justice Civil Division, Federal Programs Branch, 1100 L. Street, N.W., Washington, D.C. 20005, at Christopher.m.lynch@usdoj.gov ; Jacqueline.Snead@usdoj.gov ;this _2nd_ day of _Feb_ , 2021.

Respectfully submitted,

**Law Office of John M. Phillips, LLC**

/s/ John M. Phillips
**JOHN M. PHILLIPS, ESQUIRE**
DC Bar Number: 1632674
212 North Laura Street
Jacksonville, Florida 32202
(904) 444-4444
(904) 508-0683 (facsimile)
Attorneys for Defendant
jphillips@floridajustice.com
erica@floridajustice.com

20

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

      Plaintiff,                          Case No.: 1:19-cv-1868 (RJL)

v.

OMAROSA MANIGAULT NEWMAN,

      Defendant,

_____/

### [PROPOSED] ORDER GRANTING DEFENDANT OMAROSA MANIGAULT NEWMAN'S MOTION FOR SUMMARY JUDGMENT

Upon consideration of Defendant's Motion for Summary Judgment and accompanying materials, any opposition and reply, and the entire record in this case, it is hereby ordered that: Defendant's Motion for Summary Judgment (ECF No. __) is hereby GRANTED, dismissing all claims concerning liability and damages.

It is so ORDERED, this day, _____, 2020.

_____
The Hon. Richard J. Leon United States District Judge