## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

      Plaintiff,                        Case No.: 1:19-cv-1868 (RJL)

v.

OMAROSA MANIGAULT NEWMAN,

      Defendant,

_____/

### DECLARATION OF OMAROSA MANIGAULT NEWMAN IN OPPOSITION OF UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT

I, Omarosa Manigault Newman, make the following Declaration pursuant to 28 U.S.C. § 1746, and state that under penalty of perjury the following is true and correct to the best of my knowledge and belief:

1. At no point did I knowingly and willfully refuse to file any post-employment documents or reports.

2. On or about December 13, 2017, I was a party to a "post-government employment briefing" held in the Situation Room. I recorded this meeting to protect myself.

3. In attendance at this meeting were former White House Chief of Staff, Gen. John Kelly, White House ethics attorney Stefan Passantino, Esq., White House ethics attorney Uttam Dhillon, Esq., and Human Resource Manager Irene Porada.

4. During this "post-government employment briefing," General John Kelly terminated me.

5. During the termination, General Kelly threatened me by saying, "The issue that you may or may not have a full appreciation for, but I think you do, this would be a pretty high level of accountability, meaning a court martial. We're not suggesting any legal action here."

6. He continued, "I'd like to see this be a friendly departure, um, there are pretty significant, ahh, legal issues that we hope don't develop into something that would make it ugly for you, but I think it's important to understand that if we make this a friendly departure, um, we can all be, you know, you can look at your time here in the White House as a year of service to the nation and you can go on without any type of difficulty in the future relative to your reputation."

7. I discussed my date of departure with Mr. Passantino and Mr. Dhillon. I expressed it was important for me to stay until January 20, 2018 as that would have been a year of service. I asked, "How do I make it to the one-year mark? Which is 1/20...that's important to me...to make it to the one-year mark."

8. Mr. Dhillon then left the Situation Room to see if January 20, 2018 was a permissible date of departure. At that time, he also went to get Ms. Porada to complete the paperwork. Upon his return, he stated, "Yes, to the twentieth of January. We're taking you until the twentieth now."

9. Ms. Porada confirmed that the departure date would be January 20, 2018 by stating Irene Porada then stated, "O.K., so we'll take [her] through the twenty eth?" To wit, Mr. Dhillon responded, "Yes, Ma'am."

10. The EIGA and/or the need to file a financial disclosure form was not discussed with me during this Situation Room meeting.

11. The meeting in the Situation Room was the last time I was on the White House grounds.

12. I did not clean out my office, and several of my personal items were left in my office.

13. The following day, White House Press Secretary Sarah Huckabee Sanders released the following statement:

"Omarosa Manigault Newman resigned yesterday to pursue other opportunities. **Her departure will not be effective until <u>January 20, 2018</u>.** We wish her the best in future endeavors and are grateful for her service."

`

14. On **<u>December 19, 2017</u>**, I received a phone call from John Kelly. During this conversation,

    he informed me he had legal counsel present. When I requested to have my legal counsel

    present, the phone call was ended. The conversation is as follows:

    **Omarosa Manigault Newman (OMN):** Who's this?
    **John Kelly (JK):** This is, uh, John Kelly, the White House Chief of Staff.
    **OMN:** Hi, John Kelly. How are you?
    **JK:** Good. I hope you've got a few minutes. Listen, I have got you on speaker phone. I got the same lawyers with me that were with me in the Situation Room.
    **OMN:** Can I get my lawyer on the phone? Can I get my lawyer on the phone, please? If you have lawyers there…
    **JK:** Hello?
    **OMN:** If you have lawyers there, I'd like to get my lawyers on the phone as well. Can you just hold on one second?
    **JK:** Um…
    **OMN:** Let me just get my attorneys on.
    **JK:** Alight, I'll put you on… I'll put you on… I'll take you off speaker. That way, we can just talk for a second.
    **OMN:** No, no…
    **JK:** (interrupting): Ah, just… Ah, just…
    **OMN:** No. I don't want to have a conversation without my attorneys. Because last time I kind of got railroaded.
    **JK:** I'm just going to talk to you. You don't have to respond.
    (Call end).

15. After the call ended, I immediately attempted to call John Kelly back. I was unable to

    contact him. I left a voicemail returning his call. That conversation is as follows:

    **White House Recording:** For training purposes, this call may be monitored, but will not be recorded. Thank you for calling the White House. Press one for the comments line to leave…
    **White House Operator:** The White House?
    OMN: Hi, it's Omarosa Manigault. John Kelly just called me and I just want to return the call.
    **White House Operator:** I'm sorry; I can't hear you.
    **OMN:** Hi, it's Omarosa Manigault. General Kelly just called me and I want to return the call, please.
    **White House Operator:** Okay, one moment.
    **OMN:** Thank you.

**White House Operator:** You're welcome.
(Silent hold which lasted over 2 minutes long; from 0:33 to 3:07 of the recording.)
(Phone rings at 3:09)
**Voicemail Recording:** Sorry... Is not... Sorry... is not available. Record your message at the tone. When you are finished, hang up or press pound for more options.
**OMN:** Hey General Kelly, it's Omarosa. Just returning your call. Thank you. Bye, bye.

16. A link to an electronic financial disclosure form was sent to me.

17. The first page of the financial disclosure form incorrectly listed my termination date as December 13, 2017.

18. Due to the electronic nature of the financial disclosure form, I was unable to correct the termination date to January 20, 2018.

19. The inaccurate information contained on the first page of the electronic financial disclsoure form prohibited me from completing the form accurately.

20. I advised the White House ethics counsel of the termination date discrepency multiple times.

21. Specifically I had a conversation with Stefan Passantino in which I stated, "Yeah, there's an error on the report about my termination day. So, my last day is the 20th and it's indicated the 13th ... you were in the [situation] room when we all agreed to the 20th, so once that's corrected, I can complete the report and everything will be done. But, with that discrepancy, I don't feel comfortable completing that report." Passantino responded, "OK, well so, I will get with the Chief." Mr. Passantino then said, "OK. And so, when I talk to the Chief and the Chief is like No, we changed it from the 20th to the 13th, it is the 13th? If I hear that, I guess I'll just tell you. Things move from the 12th to the 13th. Why? When was sit room meeting?" The conversation ended with Mr. Passantino stating, "Let me find out about what is the story on the dates and like I said, I'm just going to convey what I hear." I recorded this conversation.

22. Additionally, I contacted the White House about my personal items. At that time, I informed them that pertinent information needed to complete the financial disclosure form were among my personal effects still in their possession.

23. The personal items included financial records, travel documents, emails and other important correspondence related to my employment on the Trump campaign, transition, inauguration and my tenure in the White House.

24. I requested that White House Counsel return my personal items on numerous occasions.

25. Specifically, Stefan Passantino attempted to trade my belongings for the termination report stating: "Okay. And so, also...we've got some personal stuff of yours... Okay. Well, I will, I will just let them know that. I will find out what, as far as the Chief was concerned, what the final date was, and let you know..."

26. I responded by asking, "So, are they holding up my items in exchange for that report? Is that what I'm hearing? Is that why my items..."

27. Mr. Passantino then replied, "No, well. No. It's not as nefarious as that. It's just process that we have to do... I mean, at the end of the day, I've got two boxes of personal stuff. And, I've got your commission certificate. And, I want to, I just want to get this all wrapped up, so we can just trade whatever you have. Sounds like you don't have anything else."

28. As previously mentioned, I recorded this conversation.

29. In January of 2018, Lara Trump, an executive at the campaign, Donald J. Trump for President, Inc., and daughter-in-law of the President called me, saying, "It sounds a little like, obviously, that there are some things you've got in the back pocket to pull out," She continued. "Clearly, if you come on board the campaign, like, we can't have, we got to... "

and encouraged me to discuss, "Everything, everybody, positive, right?" Lara Trump then offered me $15,000 per month with flexible location and work hours.

30. It is my belief that this job offer was purely designed to have me agree to a different, legally binding, and more detailed non-disclosure agreement.

31. I promoted my book by appearing on several news shows on Sunday, August 12, 2018 and Monday, August 13, 2018.

32. Specifically, on August 13, 2018, on MNSBC's *Hardball*, I was asked by host Chris Matthews if I had tapes from my time working in the Trump administration. I replied, *"I have plenty."* I was then asked, *"Anything Mueller would like to see?"* I responded, *"If his office calls again ... anything they want I'll share."* I further responded. *"Anything that they want, I'll certainly cooperate."*

33. Additionally, on May 6, 2019, I emailed the Department of Justice informing them that my possessions contained vital information needed to complete the termination report. The email is as follows:

> *Thank you for your letter about the referral from the executive office of President Donald Trump. I was always eager to get this termination report completed within the 30 days after my January 20th, 2018 separation from the administration. However, as I had communicated with my ethics contact, Stefan Passantino, at the White House, **I am still lacking some key information to complete the report.** Specifically, in several calls and emails to Stefan, we discussed the need for the contents of seven boxes from my office that were seized by Uttam Dhillon, Irene H. Porada and Mr. Passantino, upon my departure. Much of the information that I need to complete this termination report – financial records, travel documents, emails and other important correspondence related to my employment on the Trump campaign, transition, inauguration and my tenure in the White House – is contained in those boxes. These boxes are still in the possession of the White House. I am still hopeful that the White House will return my boxes and give me access to the data necessary to complete the report."*

34. Nevertheless, White House counsel did not return my personal items. It took approximately a year-and-a-half for me to get them back. On July 12, 2019 my legal counsel personally retrieved my belongings from the White House gates.

35. On April 23, 2019 I received an email from the Department of Justice formally indicating there had been a referral from the White House.

36. The failure to confirm my date of departure and the withholding of my personal effects caused a delay in the completion of my final financial disclosure form.

37. I have consistently communicated my status in relation to the completion of the financial disclosure form with White House Counsel.

38. My financial disclosure was completed promptly after receipt of my personal belongings from the White House.

39. I have since updated and supplemented my financial disclosure report and received no further objections or requests for information from the White House Counsel's Office or Office of Government Ethics.

DATED this the _11_ of _JANUARY_, 20 _21_.

OMAROSA MANIGAULT NEWMAN

SWORN to and subscribe before me, this the _11_ day of _JANUARY_, 20 _21_

NOTARY PUBLIC



Notary Public State of Florida
Selecia E Young-Jones
My Commission GG 171185
Expires 12/27/2021



7

**FLORIDA JURAT**
FS 117.05(13)

State of Florida

County of _DUVAL_ }

Sworn to (or affirmed) and subscribed before me by means of

☒ Physical Presence,

— OR —

☐ Online Notarization,

this __11__ day of __JANUARY__, __2021__, by
   *Day*       *Month*     *Year*

_OMAROSA  MANIGAULT  NEWMAN_
*Name of Person Swearing or Affirming*

_Selecia E Young-Jones_
*Signature of Notary Public — State of Florida*

_SELECIA  E.  YOUNG-JONE_
*Name of Notary Typed, Printed or Stamped*

Notary Public State of Florida
Selecia E Young-Jones
My Commission GG 171185
Expires 12/27/2021

☐ Personally Known

☒ Produced Identification

Type of Identification Produced: _FL  DL_

*Place Notary Seal Stamp Above*

---

**OPTIONAL**

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _DECLARATION_

Document Date: _1. 11. 2020_     Number of Pages: _7_

Signer(s) Other Than Named Above: _N/A_

©2020 National Notary Association