UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil Case No. 19-1868 (RJL) |
| ) | |
| OMAROSA MANIGAULT NEWMAN, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM OPINION**
March 15, 2022 [Dkt. ## 24, 32]

In this case, the United States of America ("the Government") seeks a civil penalty against defendant Omarosa Manigault Newman ("Manigault Newman") for violating the Ethics In Government Act. Both parties have moved for summary judgment, and briefing is now complete. For the following reasons, Manigault Newman's motion will be DENIED, and the Government's motion will be GRANTED.

## BACKGROUND

### A.  The Ethics In Government Act

The Ethics In Government Act ("EIGA"), 5 U.S.C. app. 4 § 101 *et seq.*, is a federal statute designed "to increase public confidence in the federal government, demonstrate the integrity of government officials, deter conflicts of interest, deter unscrupulous persons from entering public service, and enhance the ability of the citizenry to judge the performance of public officials." *Lovitky v. Trump*, 949 F.3d 753, 755 (D.C. Cir. 2020) (citation and quotation omitted). In pursuit of these aims, the EIGA "requires many . . .

government officials . . . to file financial disclosure reports[.]" *Trump v. Mazars USA, LLP*, 940 F.3d 710, 714–15 (D.C. Cir. 2019) (citing 5 U.S.C. app. 4 § 101(a), (c), (d), (f)).

The EIGA specifies both the officials covered by the statute and the scope of their obligations. Among others, "employee[s] in the executive branch" must file financial disclosure reports if their position is "not under the General Schedule" and their "rate of basic pay is equal to or greater than 120 percent of the minimum rate of basic pay payable for GS-15 of the General Schedule[.]" 5 U.S.C. app. 4 § 101(f)(3); *accord* 5 C.F.R. § 2634.202(c). And among other obligations, these officials must file a financial disclosure report "on or before the thirtieth day after termination of employment[.]" 5 U.S.C. app. 4 § 101(e); *accord* 5 C.F.R. § 2634.201(e)(1); *see also* 5 U.S.C. app. 4 § 102(a) (enumerating information required for the report).

Failure to comply with the EIGA carries consequences. In particular, "any individual . . . who knowingly and willfully fails to file or report any information that such individual is required to report" may be subjected to "a civil penalty in any amount, not to exceed $[66,190]." 5 U.S.C. app. 4 § 104(a)(1); 28 U.S.C. § 2461 note; *accord* 5 C.F.R. § 2634.701(b) (adjusting penalty amount for inflation).[1] The Attorney General is authorized to collect this penalty through "a civil action" brought "in any appropriate United States district court[.]" 5 U.S.C. app. 4 § 104(a)(1).

---

[1] The Federal Civil Penalties Inflation Adjustment Act, as amended, provides that federal agencies "shall . . . by regulation adjust each civil monetary penalty provided by law within the jurisdiction of the Federal agency . . . by the inflation adjustment" enumerated in the statute. *See* Pub. L. 101–410, § 4, 104 Stat. 890, 891 (1990); Pub. L. 104–134, tit. III, § 31001(s)(1), 110 Stat. 1321, 1321–373 (1996).

**B.     Factual Background**

Manigault Newman previously worked as the Director of Communications for the Office of Public Liaison in the White House. *See* Declaration of Christopher M. Lynch In Support of Plaintiff United States of America's Motion for Summary Judgment ("Lynch Decl.") [Dkt. # 24-7] Ex. A. In this role, Manigault Newman's salary was $179,700. *See* Declaration of Stefan Passantino In Support of United States of America's Motion for Summary Judgment ("Passantino Decl.") [Dkt. # 24-2], Ex. H. Because this amount exceeded 120% "of the minimum rate of basic pay payable for GS-15," 5 U.S.C. app. 4 § 101(f)(3),[2] Manigault Newman was required to submit a financial disclosure report 30 days after the termination of her employment ("Termination Report"), *id.* § 101(e).

On December 12, 2017, White House officials informed Manigault Newman that her employment was being terminated. *See* Passantino Decl. Ex. A; *accord* Declaration of Manigault Newman In Opposition of United States of America's Motion for Summary Judgment [Dkt. # 30-1] ¶ 4. Manigault Newman's termination was effective on December 19, 2017, as reflected by records from the White House Human Resources Division.[3] *See*

---

[2] The basic pay for GS-15, step 1 in 2017 was $103,672. *See* 2017 Base GS Pay Scale, https://www.federalpay.org/resources/pdf/locality/gs-payscale-2017-base-table.pdf. 120% of that salary is $124,406.40.

[3] To be sure, Manigault Newman contends that her termination was effective on January 20, 2018. *See* Defendant Omarosa Manigault Newman's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ("Def. SOF") [Dkt. # 32] ¶ 4. However, this contention is based on an agreement reached with White House Chief of Staff, General John Kelly, on December 12, 2017. *Id.* ¶¶ 2–4. But a week *after* that agreement, General Kelly changed course and made Manigault Newman's termination effective immediately. *See* Passantino Decl. ¶¶ 4–7 & Ex. H. Manigault Newman does not offer any evidence contradicting this post-December 12 change to her termination date.

3

Passantino Decl. Ex. H (Notification of Personnel Action form listing "12-19-2017" as effective date of termination). As a result, Manigault Newman was obligated to file her Termination Report by January 18, 2018. *See* 5 U.S.C. app. 4 § 101(e).

In the run-up to the January 18, 2018 deadline, the Government repeatedly notified Manigault Newman of her EIGA obligations. On December 29, 2017, a White House ethics attorney—Alice Bartek-Santiago—instructed Manigault Newman to "submit [her] termination report by January 18, 2018" using the Government's Integrity.gov platform. Passantino Decl. Ex. B at 3–4. That same platform has since sent Manigault Newman automated emails on a weekly basis—totaling more than 100 notifications—reminding her of the January 18, 2018 deadline. *See* Declaration of David Jones In Support of United States of America's Motion for Summary Judgment ("Jones Decl.") [Dkt. # 24-3] ¶ 10 & Ex. B. On January 3, 2018, another ethics attorney from the White House Counsel's Office—Scott de la Vega—emailed Manigault Newman to remind her that the Termination Report was "due on January 18, 2018[.]" *See* Declaration of Scott de la Vega In Support of United States of America's Motion for Summary Judgment [Dkt. # 24-4] ¶ 21 & Ex. B at 1. The attorney notified her that she could request an extension "prior to January 18, 2018," and encouraged her to "let [White House staff] know if [they] c[ould] assist with [her] . . . Termination Report[.]" *Id.* Ex. B at 1. On January 12, 2018, Bartek-Santiago again emailed Manigault Newman, noting that she was "[t]here to help" if Manigault Newman "experience[d] any problems or ha[d] any questions regarding [the] termination report." Passantino Decl. Ex. B at 2. Despite these communications, Manigault Newman did not file the Termination Report by January 18, 2018.

After Manigault Newman missed her filing deadline, the Government continued to appraise Manigault Newman of her EIGA obligations. Bartek-Santiago emailed Manigault Newman on January 19, 2018, informing her that her "termination report was due on January 18, 2018" and that she had missed the deadline. *Id.* On January 24, 2018, Deputy White House Counsel Stefan Passantino likewise advised Manigault Newman that her "termination report was due January 18" and explained that the report would become "overdue"—*i.e.*, subject to a $200 late filing fee—on February 19. *Id.* Ex. C at 1. On January 26, 2018, the Director of White House Management and Administration—Marcia Kelly—emailed Manigault Newman and her husband, informing them that the "Termination report was due January 18," and encouraging Manigault Newman to "please get r done" to avoid a late fee. *Id.* Ex. D at 1. On February 6, 2018, Bartek-Santiago again emailed Manigault Newman, noting that she "ha[d] not yet logged into integrity.gov to complete [her] report," and offering to "chat over the phone if [she] need[ed] assistance filing [the] report." *Id.* Ex. E at 1. On February 22, 2018, Bartek-Santiago followed up on this email, reiterating that Manigault Newman needed to file the report and again offering assistance. *See id.*

Manigault Newman responded to this flurry of communications in early March 2018. *See* Passantino Decl. ¶ 20. In a call with Passantino on March 5, 2018, Manigault Newman confirmed that she had received the numerous emails about her EIGA compliance but would not complete the Termination Report because of her mistaken belief that the Report contained the wrong termination date. *See* Motion to Dismiss Plaintiff's Corrected Complaint For Failure to State a Cause of Action Upon Which Relief Can be Granted

("Mot. to Dismiss") [Dkt. # 5] ¶ 14 (quoting recording of telephone call captured by Manigault Newman). In particular, Manigault Newman stated that she "d[idn]'t feel comfortable completing that report" because her "last day [wa]s the 20th [of January] and [the report] indicated the 13th [of December]" was her termination date. *Id.* Passantino told Manigault Newman that he would "find out" her termination date and "let [her] know[.]" *Id.*

The termination date dispute was definitively resolved on March 26, 2018. That day, a White House ethics attorney—Deborah Raviv—emailed Manigault Newman to remind her that the Termination Report was "past due." Passantino Decl. Ex. B at 1. Manigault Newman called Raviv that morning to again protest the termination date on her form. *Id.* Ex. F (memorandum from Raviv memorializing the phone call). Raviv explained that she had confirmed with "White House Human Resources (HR) on March 23, 2018" that "Ms. Manigault's separation date was December 19, 2017." *Id.* At Manigault Newman's insistence, Raviv agreed to confer with Passantino again regarding her termination date. *Id.* That evening, Passantino emailed Manigault Newman and confirmed that her "employment with the government officially ended effective December 19, 2017." *Id.* Ex. G. He attached records from the White House Human Resources Division confirming Manigault Newman's termination date and reiterated that the EIGA mandated the filing of the Termination Report. *See id.*

Despite the repeated admonitions from the Government and a confirmation of her termination date, Manigault Newman did not file her Termination Report until September 11, 2019—well over a year after the report was due.[4] *See* Jones Decl. Ex. C.

### C.  Procedural History

The Government initiated this suit on June 25, 2019. It brought a single count alleging that Manigault Newman violated the EIGA because she refused to file her Termination Report with full knowledge of the requirement. *See* Complaint ("Compl.") [Dkt. # 2-1] ¶¶ 25–29. Manigault Newman filed a motion to dismiss, *see* Mot. to Dismiss, which I denied, *see* Minute Order, 05/21/2020. The parties subsequently cross-moved for summary judgment. *See* Plaintiff United States of America's Motion for Summary Judgment ("Gov. MSJ") [Dkt. # 24]; Defendant Omarosa Manigault Newman's Motion for Summary Judgment ("Def. MSJ") [Dkt. # 32]. Both motions are ripe for review.

## LEGAL STANDARD

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Id.*

---

[4] The Government contends—and Manigault Newman denies—that this report contained deficiencies. I do not find this dispute material to the outcome of this case.

## DISCUSSION

### A. Knowing and Willful Violation

The EIGA imposes civil liability on an individual only if three discrete requirements are satisfied. *First*, the individual must be "required to report" information under 5 U.S.C. app. 4 § 102. *See* 5 U.S.C. app. 4 § 104(a)(1). *Second*, the individual must "fail[] to file or report" that information. *Id. Third*, the failure must be "knowing[]" and "willful[.]" *Id.*

Here, there is no dispute as to the first two elements. Manigault Newman was required to file information enumerated in 5 U.S.C. app. 4 § 102 because she was an "employee in the executive branch," was "not under the General Schedule," and received a pay "greater than 120 percent of the minimum rate of basic pay payable for GS-15 of the General Schedule[.]" *See* 5 U.S.C. app. 4 §§ 101(e), (f); 102(a); *accord* Passantino Decl. Ex. H; 2017 Base GS Pay Scale, https://www.federalpay.org/resources/pdf/locality/gs-payscale-2017-base-table.pdf. Manigault Newman failed to file this information before the 30-day statutory deadline for filing Termination Reports. *See* 5 U.S.C. app. 4 § 101(e); *accord* Passantino Decl. Ex. H (December 19, 2017 termination date); Jones Decl. Ex. C at 1 (report filed September 11, 2019).

There is also no question that Manigault Newman knowingly failed to report. As explained above, the Government provided Manigault Newman with notice of her EIGA obligations repeatedly by email, phone, and automated notifications from integrity.gov. To be sure, Manigault Newman contends that the Government sent some of these notices to an "unmonitored" email address. Defendant Omarosa Manigault Newman's Response to Plaintiff's Motion for Summary Judgment ("Def. Resp.") [Dkt. # 30] at 16. However, even

8

assuming that this email address was unmonitored, *but see* Passantino Decl. Ex. A (listing the email address in her Separation Action Form), Manigault Newman expressly admitted that she had received these emails and was aware of her obligation to the file the report in March 2018 on a phone call with Passantino, *see* Passantino Decl. ¶ 20; *accord* Mot. to Dismiss ¶ 14. Thus, Manigault Newman indisputably knew about her ongoing failure to file the Termination Report for at least a year and a half before eventually filing it in September 2019. Accordingly, the only question before me is whether Manigault Newman's failure to file her Termination Report was "willful."

Generally, "in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" *Bryan v. United States*, 524 U.S. 184, 191–92 (1998) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)); *accord United States v. Burden*, 934 F.3d 675, 156–59 (D.C. Cir. 2019). Courts have interpreted the EIGA's willfulness requirement in accordance with this general rule, concluding that "[a]n individual knowingly and willfully fails to comply with the EIGA requirements when that individual intentionally disregards the statute or is indifferent to its requirements." *United States v. Lairy*, No. CV 19-2488, 2020 WL 4039176, at *2 (D.D.C. July 17, 2020) (Contreras, J.) (citations and quotations omitted); *accord United States v. Gant*, 268 F. Supp. 2d 29, 33 (D.D.C. 2003) (Urbina, J.) (same).

Manigault Newman willfully violated the EIGA. As described above, Manigault Newman was well aware of her obligation to file her Termination Report under 5 U.S.C. app. 4 § 101(e)—having received countless reminders—but nevertheless failed to file her report for more than a year after the statutory deadline. This conduct establishes a willful

violation. *See, e.g., Lairy*, No. CV 19-2488, 2020 WL 4039176, at *3 (RC) (finding EIGA violation where defendant was informed by email of "time-sensitive deadline to submit the report" and failed to file the report for over six months); *Gant*, 268 F. Supp. at 33–34 (RMU) (finding EIGA violation where defendant received numerous reminders of his filing obligation but failed to comply); *United States v. Tarver*, 642 F. Supp. 1109, 1111 (D. Wyo. 1986) (finding EIGA violation where defendant "was twice informed of the requirements of the Act" but "refused to comply"); *United States of America v. Hunter*, 1:14-cv-442 (D.D.C. Aug. 27, 2014), ECF No. 8, at 3 (Boasberg, J.) (finding EIGA violation where defendant refused to file after "repeated letters . . . to remind him of his obligations").

### B. Defenses To Liability

Manigault Newman offers three objections to the Government's motion for summary judgment, but none are convincing. I'll address each in turn.

#### 1. Termination Date

Manigault Newman first contends that she could not file the Termination Report because it contained the wrong termination date. *See* Def. Resp. at 9–15; Def. MSJ at 4–5, 7–8. Not so. While Manigault Newman disagreed with White House officials as to her termination date, any disagreement was conclusively resolved on March 26, 2018 when Deputy White House Counsel Stefan Passantino confirmed her termination date after consulting with the White House Human Resources Division. *See* Passantino Decl. Ex. G. He likewise attached records from the Human Resources Division showing that Manigault Newman's "employment with the government officially ended effective December 19,

2017." *See id.*; *accord id.* Ex. H. At this point, any ambiguity over Manigault Newman's termination date was resolved.[5] Her continued dissatisfaction with that date was not a basis for withholding the Termination Report.

### 2. Missing Documents

Manigault Newman next claims that she could not complete the Termination Report because the Government refused to return documents integral to the Report's completion. *See* Def. Resp. at 6–9; Def. MSJ at 5–8. However, this factual dispute is immaterial because Manigault Newman made no effort to retrieve these documents until May 2019—more than a *year* after her Termination Report was due.[6] *See* Defendant Omarosa Manigault Newman's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment [Dkt. # 32] ("Def. SOF") ¶ 9; *accord* Mot. to Dismiss ¶ 14 (attesting in March 2018 that "the *only* hold up" was the "discrepancy of the [termination] date" and making no mention of documents needed to complete the report (emphasis added)). Accordingly, even if the documents were necessary to complete her report—though they

---

[5] For this reason, Manigault Newman no longer had any genuine basis to believe that filing the Termination Report with this termination date would have subjected her to liability for filing false information. *Contra* Def. Resp. at 10–11. In addition, she could have avoided such fears by filing the Termination Report without including the December 19 termination date, precisely as she did after the initiation of this suit. *See* Jones Decl. Ex. C.

[6] To be sure, Manigault Newman mentioned in March 2018 that she wanted her "personal items," such as "a little thumb drive with all of [her] wedding photos on it[.]" Mot. to Dismiss ¶ 14; Gov. MSJ at 14 (both quoting call transcript). However, she did not ask for any documents related to the completion of her Termination Report—or claim that any documents in the White House's possession were necessary to complete her Termination Report—prior to May 2019.

11

were not[7]—that fact would not refute that Manigault Newman willfully disregarded the EIGA's requirements for more than a year.[8]

This dispute is also not genuine because Manigault Newman failed to file her Termination Report within the statutory 30-day timeline *after* being afforded the opportunity to retrieve the documents. Indeed, Manigault Newman failed for months to coordinate a time and place to retrieve the documents despite numerous messages from White House officials trying to accommodate their return. *See* Plaintiff's Supplemental Brief in Support of Motion for Summary Judgment [Dkt. # 43] at 6–9 (summarizing correspondence). Then, after she received her effects from the White House, she still did not file her report within 30 days. *See* Def. SOF ¶¶ 10–11 (receipt of belongings from White House on July 12, 2019; Termination Report submitted 61 days later on September 11, 2019); *accord* Jones Decl. Ex. C. There is thus no genuine dispute that Manigault Newman would have filed a timely Termination Report if the White House facilitated the return of her effects—because it did, and she did not. Thus, this argument is insufficient to defeat the Government's summary judgment motion.

---

[7] Manigault Newman has conceded that the only documents in the Government's possession that she could not obtain from other sources were official travel records, *see* Lynch Decl. Ex. E, and these records were not necessary to complete the Termination Report, *see* Jones Decl. ¶ 27, Ex. C at 13.

[8] The same logic refutes Manigault Newman's more limited claim that her "subjective[]" belief that the documents were necessary creates a material dispute as to her *mens rea*. *See* Def. Resp. at 7. Any subjective belief that the documents were necessary to complete the report is immaterial because Manigault Newman made no attempt to procure those documents for more than year.

### 3. Whistleblower Protection

Lastly, Manigault Newman contends that "[t]his litigation was clearly enacted as retaliation because [she] decided to disclose information concerning the gross mismanagement of the White House." Def. MSJ at 14; Def. Resp. at 6, 16–21. As a result, she contends that she is protected by the Whistleblower Protection Act ("WPA"), as amended by the Whistleblower Protection Enhancement Act. *See* Def. MSJ at 9–18; Def. Resp. at 6. Manigault Newman's argument suffers at least two fatal defects.

*First*, Manigault Newman has not identified any provision of the WPA that creates an affirmative defense to civil litigation. To the contrary, the WPA's remedial scheme requires aggrieved former employees to "seek corrective action from the Merit Systems Protection Board." 5 U.S.C. § 1221(a); *accord Manigault-Speaks v. United States Dep't of Health & Hum. Servs.*, No. CV 19-2529, 2020 WL 5632413, at *5 (D.D.C. Sept. 21, 2020) (Berman Jackson, J.) (no jurisdiction where plaintiff did not "assert that she pursued her administrative remedies"). After the Board issues a decision, the complainant may "obtain judicial review of the order or decision," in "the United States Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction." 5 U.S.C. § 7703(a)(1), (b)(1)(B); *accord Stella v. Mineta*, 284 F.3d 135, 142 (D.C. Cir. 2002) ("Under no circumstances does the WPA grant the District Court jurisdiction to entertain a whistleblower cause of action brought directly before it in the first instance."). Thus, Manigault Newman has not offered a cognizable WPA defense to liability.

*Second*, even if the WPA created a defense to civil litigation, it would not cover the conduct at issue here. Manigault Newman specifically cites a provision which prohibits

13

officials from "tak[ing] or fail[ing] to take, or threaten[ing] to take or fail to take, a personnel action *with respect to any employee or applicant for employment*[.]" 5 U.S.C. § 2302(b)(8) (emphasis added); *accord* Def. MSJ at 12. However, Manigault Newman was not an "employee or applicant for employment" when she made the alleged disclosure or when the Government initiated this lawsuit. Accordingly, the Government did not violate the only substantive provision cited by Manigault Newman. *See Guzman v. Off. of Pers. Mgmt.*, 53 F. App'x 927, 929 (Fed. Cir. 2002) (per curiam) ("no cause of action under the Whistleblower Protection Act" where plaintiff "was not an employee or applicant for employment when she made her alleged disclosure or when [the agency] allegedly took, or failed to take, a personnel action with respect to her").

### C.   Penalty

Because I find that Manigault Newman violated the EIGA, all that remains is the question of the appropriate penalty. The Government argues that Manigault Newman should be held liable for $61,585—the inflation-adjusted statutory maximum at the time of the Government's motion—"because of the egregiousness of her conduct and her significant financial resources."[9] *See* Gov. MSJ at 34–36. I agree. Manigault Newman's years-long failure to comply with the EIGA after "many written and verbal reminders" is

---

[9] While Manigault Newman correctly notes that this amount differs from the $50,000 the Government requested in its complaint, *see* Compl. at Prayer for Relief, she does not dispute that it is within "the discretion of this Court" to impose an appropriate monetary penalty. Def. Resp. at 4; *accord* Fed. R. Civ. P. 54(c) ("Every [non-default] final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."); Wright & Miller, Federal Practice and Procedure § 2664 (4th ed. April 2021 update) ("The courts may award damages in excess of those the claimant asked for in the pleadings[.]").

a "flagrant" violation warranting imposition of "the full civil penalty[.]" *Gant*, 268 F. Supp. at 33–34 (RMU). Moreover, Manigault Newman earned a substantial salary—$179,700—in her former White House role, and her late-filed EIGA report shows that she is a "1/3 beneficiary" of a trust worth more than $1 million. *See* Jones Decl. Ex. C at 16. Given these significant financial resources, I find that imposition of the maximum penalty is necessary to effectuate the deterrent aims of the EIGA.

## CONCLUSION

For all of the foregoing reasons, Manigault Newman's Motion for Summary Judgment is **DENIED**, and the Government's Motion for Summary Judgment is **GRANTED**. A separate Order consistent with this decision accompanies this Memorandum Opinion.

RICHARD J. LEON
United States District Judge